G75MNAJ1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

PRISCO NAJERA, et al.,

                    Plaintiffs,

            v.                        12 CV 3133 (DLC)

1443 GOTHAM PIZZA INC.,
et al.,

                    Defendants.

------------------------------x
                                      New York, N.Y.
                                      July 5, 2016
                                      9:30 a.m.

Before:

                        HON. DENISE COTE,

                                      District Judge

                            APPEARANCES

MICHAEL FAILLACE & ASSOCIATES PC
      Attorneys for Plaintiffs
BY:   JOSHUA S. ANDROPHY
      SHAWN RAYMOND CLARK

MILMAN LABUDA LAW GROUP PLLC
      Attorneys for Defendants
BY:   JOSEPH MARTIN LABUDA
      -and-
XUE & ASSOCIATES PC
BY:   BENJAMIN B. XUE


ALSO PRESENT:   CARMEN BARROS, Interpreter (Spanish)
                MARCIA GOTLER, Interpreter (Spanish)

G75MNAJ1

```
 1            (Case called)
 2            MR. ANDROPHY:  Good morning, your Honor, Joshua
 3   Androphy of Michael Faillace & Associates P.C. for the
 4   plaintiffs.  And my colleague, Mr. Clark, is just walking in.
 5   He was waiting for some of our clients downstairs.
 6            MR. CLARK:  I apologize for my tardiness, your Honor.
 7   Shawn Clark also for the plaintiffs.
 8            THE COURT:  Thank you very much.
 9            Your Honor, Benjamin Xue from Xue & Associates on
10   behalf of defendants.
11            Excuse me one second.
12            Mr. Donald, can I be of assistance to you?
13            THE DEPUTY CLERK:  I'm just checking with the other
14   plaintiffs.  I told them when all the jurors come in, can they
15   move over there so we can keep all the jurors?
16            THE COURT:  Thank you very much, Mr. Donald.
17            MR. LABUDA:  Good morning, your Honor, Joseph Labuda,
18   Milman Labuda Law Group for the defendants.
19            THE COURT:  We are going to give you two documents,
20   counsel.  One is the civil voir dire and the other one is a
21   preliminary jury instruction.  And I'll take your comments on
22   those in just a moment, so two separate documents.  And we will
23   mark a copy of each of these as a court exhibit.  The civil
24   voir dire form will be marked as Court Exhibit 1 and the
25   preliminary jury instruction will be marked as Court Exhibit 2.
```

1          There are a number of issues that we have to discuss

2     and I expect to get a venire around 10:15 or shortly

3     thereafter.  That gives us about 45 minutes to work together.

4     I expect you will want a break before the venire comes up.  As

5     you know, I issued an order on Friday, July 1, reiterating that

6     this would be a jury trial with five plaintiffs' cases called,

7     and I saw that in one of the submissions from defense counsel

8     that I received on Friday, I think it was, there was a request

9     that the jury calculate monetary and liquidated damages despite

10    the parties' agreement months ago that that would not be

11    happening and despite the presentation to me of requests to

12    charge and jury verdict form which doesn't have the jury

13    calculating any damages.  Of course, under the law there is no

14    right for a jury to calculate liquidated damages.  I'm unaware

15    of any authority that would permit that to happen.

16         Let's just talk a little bit about the rules of the

17    road before me because I know this is a transferred case.  I

18    have not had the pleasure of supervising it from its inception.

19    And I think it would just be helpful if everyone understood,

20    particularly because we also have some new counsel in the case,

21    everyone understood what I expect of you.  I expect if you make

22    a factual representation to me that you have a good-faith basis

23    for making it.  I expect if you are arguing a legal position

24    for me you believe it is legally supported and are able to cite

25    legal authorities to support your position.  On the other hand,

G75MNAJ1

1    if you are arguing a legal position that would make new law or

2    extend the law beyond where it is today, based on your

3    understanding, that's just fine, too.  You have a duty to

4    zealously represent your clients and I don't want to restrict

5    that duty in any way whatsoever.  Be forthright about it being

6    an extension of the law and argue then why you think that

7    extension is appropriate in this case.  That's just fine with

8    me, too.  And hopefully no one has any objection to that ground

9    rule, and I think it's what most judges in this district expect

10   and want from counsel.

11          We are not going to have the jury calculating monetary

12   and liquidated damages.  I don't understand there is any basis

13   in the law in any case for them to be calculating liquidated

14   damages.  This case has been prepared for trial with the

15   understanding that counsel would be calculating damages based

16   on the fact finding done by the jury and presenting those

17   calculations to me after the trial.  Hopefully there will be

18   agreement.  If there isn't agreement, as I understand it, the

19   parties have agreed that I will use the record created at trial

20   to resolve any disagreement.  We wouldn't be retrying the case.

21   And I'll do the calculation in the event there is a

22   disagreement.

23          So the number of jurors.  We are going to have eight

24   jurors.  As you know, in the federal court there is no

25   alternative juror system any longer.  And the peremptories, we

G75MNAJ1

will have three peremptories a side and therefore there be 14

seated in the box.  And you'll together simultaneously exercise

your peremptory challenges, three a side, three for the

plaintiffs and three for the defendants.  Unless you tell me

otherwise, I'm assuming you want a verdict from a unanimous

jury.  But obviously you can agree to take a verdict from a

less than unanimous jury, for instance, seven out of eight,

whatever you want to do, six out of eight.  Up to you, but I am

just going to assume, unless I hear from you, that you want a

unanimous verdict to each of the questions.

    The plaintiffs have asked for a bar on

cross-examination regarding tax returns and I think I mentioned

that last week in a conference call, there will be no

cross-examination about illegal status or citizenship or green

cards or anything that would imply to the jury that everyone

working in this country is not protected by federal and state

labor laws.  That would be highly prejudicial and really

offensive to the principles in which this country was founded,

and the 403 prejudice could be severe.

    Based on that, I don't have any suggestion that it is

relevant at all.  Any probative value would be so limited and

so far outweighed by the substantial prejudice and unfairness

it would insert into these proceedings, there would be no

cross-examination about whether any plaintiff filed tax

returns.  I think you have the drift of my meaning here.  I

G75MNAJ1

1    think it's an important principle.  The circuit has written

2    repeatedly on how all workers in the workplace are entitled to

3    the protection of our law, our labor laws, whether they are

4    legal or illegal in their status in this country.

5           Let me see if I can find, and I have found it, read to

6    you the oral description of the case that I plan to give the

7    venire when they arrive, and please listen carefully.  I'm

8    happy to read it again if you'd like me to.  I'd like any of

9    your suggestions for edits or additions or deletions.  This is,

10   again, what I would say to the venire as they are seated and

11   about to be part of the voir dire process.

12          This case is brought by five individuals who contend

13   that they worked delivering pizzas and performing other tasks

14   at one or more of the following pizza parlors in Manhattan:

15   144 Ninth Gotham Pizza, 852 Eighth Gotham Pizza, 1443 York

16   Gotham Pizza, and 1667 First Gotham Pizza.

17          Each of the plaintiffs contends that he was not paid

18   properly, as required by law.  For example, some of the

19   plaintiffs contend that they are owed money for overtime work

20   for which they were not properly paid.  Others claim that they

21   were not paid the minimum wage, that their tips were taken by

22   their employers, that they are entitled to extra pay when their

23   workday ended more than 10 days after it began, and each of the

24   plaintiffs have sued, as their employer, Gotham Pizza, as well

25   as Michael and Lana Shamailov, who are alleged to own and/or

G75MNAJ1

1    operate the four Gotham Pizza locations.  You won't be required

2    to make a separate determination of the merits of each

3    plaintiff's claims against each of the defendants.

4           The defendants each contend that the plaintiffs were

5    paid the amount of money that the law required them to be paid.

6    In addition, Lana Shamailov disputes that she owned or operated

7    any of the four Gotham Pizza locations.  Plaintiff's counsel,

8    any requests or objections?

9           MR. ANDROPHY:  Just one item, that last sentence that

10   says:  Lana Shamailov disputes that she owns or operated any of

11   the Gotham Pizza locations.  I believe that the defendants

12   acknowledge that she owned, but they contend that she did not

13   operate the locations.  If they confirm that that's correct,

14   then perhaps owned should be deleted from that last sentence.

15          THE COURT:  Thank you.  And that's Mr. Androphy who is

16   speaking.

17          MR. ANDROPHY:  Yes, your Honor.

18          THE COURT:  Thank you very much.  Mr. Xue.

19          MR. XUE:  Your Honor, we do not contest Lana and

20   Gotham Pizza under Lana's name, under Lana Shamailov's name,

21   but we do contest Lana Shamailov ever controlled or operate the

22   business, any of those four locations.

23          THE COURT:  I'll strike the words owned or.  So the

24   last sentence that I would read would read as follows:  In

25   addition, Lana Shamailov disputes that she operates any of the

G75MNAJ1

1     four Gotham Pizza locations.

2              Any other requests, Mr. Xue, for changes to this just

3     introduction to the case?

4              MR. XUE:  No, your Honor.

5              THE COURT:  Thank you so much.  That's helpful.

6              I have a question about the jury charge, and it has to

7     do with the tools of the trade issue.  And the parties have

8     cited to me an FLSA provision and a New York Labor Law

9     provision.  They seem to be attacking this issue from two

10    different directions.  And my understanding of the case is that

11    it's the FLSA issue that's at stake here.  My understanding is

12    the plaintiffs are contending that they were required to reach

13    into their own pockets and pay personally for tools of the

14    trade:  Bicycle repairs, perhaps bicycles, helmets, whatever,

15    along that line.  It seems that the New York Labor Law

16    provision is addressing a different issue and that is the

17    extent to which an employer may lawfully take a deduction from

18    an individual week's paycheck to pay for repairs.  If I have

19    that right, I'm going to rely on the charge and am preparing a

20    charge that has to do with what the plaintiffs contend, which

21    is that the plaintiffs were unlawfully required to pay for

22    repairs and maintenance and perhaps purchasing of their own

23    tools of the trade.  Do I have the theory right, Mr. Androphy?

24              MR. ANDROPHY:  Yes, your Honor.  The theory is that

25    the plaintiffs were required to spend their own money on items

G75MNAJ1

1   such as bicycles and related equipment or repairs to perform

2   their jobs as delivery workers.

3           I'll note that under the New York State regulation,

4   Section 146-2.7, subsection C says:  If an employee must spend

5   money to carry out duties assigned by his or her employer,

6   those expenses must not bring the employee's wage below the

7   required minimum wage.

8           We contend that that is a basis, as well as the FLSA

9   provisions for recovery of those funds, that the expenditures

10  that plaintiffs had to make on bicycles and related equipment

11  were required by their employer to carry out their duties and

12  brought their wages further below the minimum wage than we

13  contend they were paid to begin with and, therefore, they can

14  recover those amounts.

15          THE COURT:  And that section, I expect that's cited in

16  your request to charge.  You don't need to repeat it.

17          MR. ANDROPHY:  Sure.

18          THE COURT:  I'll check on that and maybe it's one of

19  those legal issues that has the identical effect under both

20  federal and state law, and I'll look at that with care.

21          MR. ANDROPHY:  I'm not certain if I cited the

22  subsection in the requests to charge.  It's subsection C of the

23  provision that's cited in the requests to charge.

24          THE COURT:  Further -- and, counsel, you may want to

25  think about this and talk to me at the end of the day -- but at

G75MNAJ1

page 34 of your request to charge -- and I want to thank you

for making joint requests.  It was very helpful.  What happened

in this case is you provided joint requests and had isolated

instances in which you disagreed with respect to the substance

of a request and flagged those for me, and I found that very

helpful and I want to thank you.

It has an issue about whether the burden is on the

defendant to prove that it provided notice to employees.  Why

don't we circle back to that, if we have time, but I know our

time is limited this morning, and so I want to move right

along.  That's another issue I want to raise with you.

As you know, and I want to repeat some of this because

I think Mr. Labuda was not in the case at the beginning of my

supervision of it, so he may not have heard anything about how

I conduct trials, and I want to make sure everyone is on the

same page.  I don't want legal issues or evidentiary issues

raised with me for the first time unless there is an emergency,

unless you've had an opportunity to discuss it with counsel and

perhaps reach agreement.  Many times those discussions

eliminate the need to raise the legal issue all together.  I

don't want you blindsiding each other as a result.

Secondly, I expect you to work cooperatively to

isolate those legal issues in a timely fashion so we can deal

with them before the jury day or after the jury day or, if

necessary, at lunch.  I rarely allow side bars.  I don't want

G75MNAJ1

1    to interrupt the jury's time.  If there is something you

2    anticipate will be important for a court ruling, then raise it

3    with your adversary, see if you can resolve it; and if not,

4    raise it with me outside the jury's presence.

5           That means that tomorrow we will be meeting at 9:00,

6    so we will have 9 to 9:30 to discuss any legal issues with each

7    other, any legal or evidentiary issues, and then the jury will

8    expect to be hearing evidence starting at 9:30 and we will go

9    to 5 along the schedule we have previously discussed.

10          Let's move to the voir dire form, which each of you

11   have been given today.  Any objections, requests, on that form?

12          MR. LABUDA:  If we can have a minute, your Honor.

13          THE COURT:  Why don't I put that aside for a minute.

14   We will give you a minute, also, on the preliminary and jury

15   instruction.

16          Mr. Androphy, did you bring 10 binders?

17          MR. ANDROPHY:  I did, your Honor.

18          THE COURT:  Have defense counsel had a chance to look

19   at them to make sure that they contain only blank pages with

20   just an individual plaintiff's name on the top of a page?  I

21   want everyone to feel comfortable that what we are providing to

22   the jury is what we agreed could be provided to the jury.  When

23   I take a break, defense counsel should feel free to inspect the

24   binders so they are comfortable as well.  Each binder should

25   have a different number on its cover, 1 through 8.  Do they,

1    Mr. Androphy?

2              MR. ANDROPHY:  Yes, they do, your Honor.

3              THE COURT:  So each juror will have an individual

4    binder should they ask to have one.

5              Another issue that was raised was the meal break

6    credit and the meal cost credit.  Defense counsel raised these

7    issues and presented some authority to me and plaintiff's

8    counsel also presented some recent material addressed to these

9    issues.  Let me give you what I understand the law to be here.

10             One of the things that the jury is going to be

11   required to do is to calculate the regular rate of pay.  If the

12   plaintiff succeeds in establishing a number of hours the

13   plaintiff worked and the amount of money the plaintiff was paid

14   in the course of a week, the defendants are not going to be

15   able to argue to the jury, and I will not charge them, that in

16   performing that regular rate of pay calculation, they should

17   deduct from the hours worked meal break time or from the amount

18   of earnings during the course of a week the cost of meals.

19             If the defendants can represent to me that weekly pay

20   stubs were provided to the five plaintiffs that reflected a

21   meal cost credit and a deduction from hours worked based on

22   break time, please feel free to raise this to me again.  And if

23   you think my ruling with respect to the impact on the

24   calculation of the regular rate of pay is incorrect, please

25   feel free to cite to me any case or regulation or statute that

G75MNAJ1

1    you think supports your claim.  I did not see such authority in

2    what the parties provided to me, but I'm happy to look again

3    with more care if you think you have such authority.

4           This is not a situation, as I understand it, where

5    plaintiffs were given notice that their meals would be provided

6    and a credit would be taken from their weekly pay, deducted

7    from their weekly pay to cover that meal cost.  Of course,

8    there are regulations about notice and the maximum amount of

9    money that can be taken as a meal cost credit.  Nor is this a

10   case, as I understand it, in which the plaintiffs were notified

11   contemporaneously by the defendant of the amount of time they

12   would be allowed for a break and that that would be deducted

13   from the calculation of the number of hours they had worked

14   that week and would be reflected on their pay stub so that if

15   someone looked at their pay stub at the end of the week, they

16   would understand that it was, let's say, two and a half hours

17   less than they were on the premises because two and a half

18   hours have been given to them as a meal credit, meal break

19   credit, and they had not been required to perform any work or

20   do any tasks for their employer during that time.  If you think

21   my ruling is based on a misunderstanding of the facts or the

22   law, please raise this to me again, but I wanted to give you a

23   ruling sooner rather than later on these issues.

24          Mr. Xue, did you want to be heard now on that issue or

25   did you want to just reflect on it and perhaps be heard later?

G75MNAJ1

1          MR. XUE:  Your Honor, as to the meal credit, I agree

2     with your Honor's ruling that indeed the record does not show

3     that on -- the payroll record does not show a credit for meal

4     provided when prior notice was not given in term of deducting

5     the meal costs from the pay.  As to the meal break time, your

6     Honor, it does not affect pay rate, but it does affect total

7     hour of work each employee performed because in testimony there

8     was -- by defendants at deposition that the meal time, meal

9     break was given to employee and was uninterrupted break, which

10    basically means that defense would be entitled to not really

11    credit.  Basically it be entitled to a defense that the break

12    time is not compensatable under the law.

13         THE COURT:  There will be a factual dispute which you

14    can argue to the jury about credit time, of course, and how

15    that time was spent.  But in terms of the calculation of

16    regular rate of pay?

17         MR. XUE:  It does not impact regular rate of pay.  I

18    agree with you, your Honor.

19         THE COURT:  That's I think the only time this comes up

20    for the jury's calculation, when they have to calculate the

21    number of hours worked during a week and the amount of money

22    paid during the week and determine whether the regular rate of

23    pay meant that there was a violation of -- for instance, the

24    minimum wage loss, they will be making their determinations

25    based on the factual record presented to them.

G75MNAJ1

```
 1            By the way, were there pay stubs provided to each of
 2   these five plaintiffs each week?
 3            MR. XUE:  Not all five, your Honor.  I believe four
 4   plaintiff got pay records.
 5            THE COURT:  No, not pay records.  The kind of pay stub
 6   required by law that has the detailed information as to how
 7   their wage was calculated, was that provided to the four
 8   plaintiffs each week?
 9            MR. XUE:  Yes.
10            THE COURT:  And I would love to see one.  I'm sure
11   I'll see one during the trial.
12            Have you provided me with a copy of the exhibits you
13   plan to use during the trial?
14            MR. XUE:  Yes, your Honor.
15            THE COURT:  I'll just look at one of those and see.
16   I'll look at this meal break credit issue with more care and I
17   think the meal cost credit issue is behind us.
18            MR. LABUDA:  Your Honor, if I may, for one moment,
19   just to add, there may be an issue just with respect to how the
20   jury does calculate the regular rate because I see two possible
21   scenarios where the jury decides to divide the number of hours
22   that were paid as per the pay stubs, divide that by the hours
23   and the pay and reach a calculus that way.
24            Another way that I think they could foreseeably
25   calculate is to deduct the hours if they were on break and
```

G75MNAJ1

 1  doing noncompensable time or on noncompensable time,

 2  subtracting from that the total hours and then dividing that by

 3  the pay, which may affect the regular rate.  I just throw it

 4  out there.  We may want to talk about it at some point, at

 5  length a bit more, but it may affect it.

 6          THE COURT:  Mr. Labuda, if you have a proposed request

 7  to charge on these issues, feel free to give me one by

 8  tomorrow.

 9          MR. LABUDA:  Thank you, your Honor.

10          THE COURT:  You're welcome.

11          Let me ask counsel, other than giving you a moment to

12  look at the voir dire form and the preliminary jury

13  instruction, is there any issue you would like to raise with me

14  before the jury arrives?  Mr. Androphy.

15          MR. ANDROPHY:  Your Honor, just one housekeeping

16  matter.  We provided to the Court a set of exhibits.  I wrote

17  to the Court last week that there was a change with one of the

18  exhibits where part of -- I believe Exhibit 11 has become a new

19  exhibit, Exhibit 24.  I have additional tabs and exhibit

20  stickers.  If there is an opportunity, I can make the

21  appropriate changes to the Court's set of exhibits so that your

22  Honor has the same set of exhibits that we will be giving to

23  the witnesses and that we are using.

24          THE COURT:  Thank you, Mr. Androphy.  I'll let you

25  work with my staff on that.  I appreciate that very much.

G75MNAJ1

1           Mr. Xue, is there anything that you would like to

2    raise with me before we take this short break?

3           MR. XUE:  Nothing from defense, your Honor.

4           THE COURT:  Thank you so much.  We will take a break

5    for about three minutes so that you can look at these

6    documents.  We will resume so you can give me any requests with

7    respect to these documents, and then we are going to hopefully

8    give you a break for about five minutes before the venire

9    arrives.

10          Mr. Labuda.

11          MR. LABUDA:  Yes, your Honor.  One issue before I

12   forget.  I know this week there are other obligations that I

13   have.  I will not be here every day.  I just wanted to set the

14   rules for the road in terms of me leaving because I have to

15   leave midday tomorrow.  Would the Court prefer me to notify the

16   Court when I need to leave, have the jury be excused, or should

17   I just leave on my own accord?

18          THE COURT:  You should leave at a break.  If you need

19   to be gone Tuesday afternoon, you should leave at lunchtime or

20   after our midafternoon break, whatever your schedule requires.

21   I'll try to remember when I'm introducing you to advise the

22   jury that you will be coming and going because you have

23   multiple obligations to various clients.

24          MR. LABUDA:  Thank you, your Honor.

25          THE COURT:  Thank you.  But it's not uncommon, you

G75MNAJ1

1    know, in cases where there are multiple counsel sitting at a

2    table for some to be gone for part of the trial as they are

3    preparing witnesses.  It's really not unusual and it is just

4    fine with me.

5            And I thank you, Mr. Labuda, for all the time you will

6    be with us.  Thank you.

7            We will take a very brief recess so you can read these

8    documents.

9            (Recess)

10           THE COURT:  With respect to the voir dire, any

11   requests?  It's the form marked civil voir dire.  Mr. Androphy.

12           MR. ANDROPHY:  Yes, your Honor.  One item is No. 19 on

13   page 4 where it asks the jury if they have heard of any of the

14   people who may testify or whose names may be mentioned.  There

15   may be some additional witnesses.

16           THE COURT:  I think you were supposed to provide those

17   names to Ms. Rojas, but why don't you give them to me now.

18           MR. ANDROPHY:  Your Honor, the plaintiffs may call

19   some of the plaintiffs from the cases --

20           THE COURT:  Give me the names.

21           MR. ANDROPHY:  Sure.  Fernando Rodriguez, Manuel

22   Montiel Lopez, Rodolfo Ruiz Briones.  Israel Juarez Luna,

23   Cristobal Bravo, Levi Gallardo, Anastacio Antolin?

24           THE COURT:  We have a six-hour time limit here.  You

25   understand that.

G75MNAJ1

1        MR. ANDROPHY:  Yes, your Honor.

2        THE COURT:  And no one who is going to be a fact

3    witness other than a party in this trial, which would be the

4    five named plaintiffs, may be present in the courtroom unless

5    counsel agree they may, defense counsel and plaintiff's

6    counsel.  You understand that?

7        MR. ANDROPHY:  Understood, your Honor.

8        THE COURT:  They can obviously be present in the

9    courtroom after their testimony is completed.

10       MR. ANDROPHY:  Some of them are present now, I

11   assumed, for the preliminary matters, that their presence was

12   not a problem before the trial actually begins taking place.

13       THE COURT:  I think they should be excused.  They

14   certainly shouldn't be here during jury selection or opening

15   statements.

16       MR. ANDROPHY:  Ok.  Understood.

17       THE COURT:  You'll make those arrangements during our

18   next break.

19       MR. ANDROPHY:  Yes.

20       THE COURT:  Any other requests.

21       MR. ANDROPHY:  As far as the time constraints, I don't

22   expect we will be calling all of these individuals, but

23   depending on how the testimony goes as far as number and which

24   individuals, we intend to potentially call some.

25       THE COURT:  Thank you for that notice, Mr. Androphy.

G75MNAJ1

1          MR. ANDROPHY:  Further, on that item 19, the

2     defendants have also issued subpoenas to three additional

3     individuals, one who was a former plaintiff, two who actually

4     are current plaintiffs whose cases are not being tried today.

5     There are some issues I do want to raise concerning that and

6     potentially opposing that.  I am not sure if your Honor would

7     like me to address that now or at another --

8          THE COURT:  Let's add their names quickly because we

9     are running out of time.  We are going to have a jury here

10    momentarily and I want to give you a break.  At lunchtime we

11    will raise any issues.  I'll give you time to raise any legal

12    issues.  You had told me there were none.  Anyway, that's fine.

13    The names.

14         MR. ANDROPHY:  Carlos Altamirano, Fausto Ramales, and

15    Luis Najera.

16         THE COURT:  Any other requests or objections?

17         MR. ANDROPHY:  Just for No. 27, just noticed a typo.

18    The first sentence says do you understand of.

19         THE COURT:  Thank you.  Understand or speak Spanish or

20    Russian.  Thank you very much for catching that.

21         MR. ANDROPHY:  That's all for plaintiffs.

22         THE COURT:  Much appreciated.

23         Mr. Xue, any requests or objections?

24         MR. XUE:  No, your Honor.

25         THE COURT:  Thank you.  With respect to the

G75MNAJ1

1    preliminary jury instruction, Mr. Androphy, any requests or

2    objections?

3            MR. ANDROPHY:  No, your Honor.

4            THE COURT:  Mr. Xue.

5            MR. LABUDA:  Your Honor, we would just like to add a

6    sentence to the second paragraph about the defendants, just

7    with respect to the defendant Lana Shamailov, asserting that

8    she is not an employer or did not employ the plaintiffs.

9            THE COURT:  Great.  I'll make an addition along those

10   lines.

11           MR. LABUDA:  Thank you.

12           THE COURT:  Take a very quick break.  Be back here in

13   five minutes.  We expect to have a venire at that time.  Thank

14   you very much.

15           (Recess)

16

17

18

19

20

21

22

23

24

25

G75KNAJ2

1          THE COURT:  We're going to mark as a court exhibit the

2     revised preliminary jury instruction.  It will be marked as

3     Court Exhibit 3.

4          Did someone have an issue as we're waiting for the

5     jury to arrive?

6          MR. ANDROPHY:  Yes, your Honor.  Based on your Honor's

7     instructions, we have told all of the plaintiffs whose case are

8     not being tried and who I mentioned would potentially be

9     witnesses, to leave the courtroom.  My understanding of your

10    Honor's direction is that plaintiffs who have other cases, who

11    are not going to be witnesses at this trial, are welcome to

12    observe the trial and remain in the courtroom.  The defendants,

13    I believe, were under the impression that they were excluded

14    from the courtroom as well.

15         THE COURT:  I'll hear from Mr. Xue.

16         MR. XUE:  Your Honor, it's my understanding that your

17    Honor has instructed parties who is going to testify or who is

18    not part of this trial to be excluded in the courtroom.  It is

19    also very prejudicial to have present who is not testifying --

20    is going to testify in August or September or November trial to

21    be present for the entire trial because the purpose of breaking

22    up this trial is to try to be fair to both parties, to get a

23    just verdict.  If the plaintiff who is not testifying but is

24    going to testify soon in their own cases allowed to be present

25    in this trial and they will hear all the cross-examinations,

G75KNAJ2

all the trial strategy the defense has, it's going to be

extremely prejudicial to the defense, and especially a defense

is going to testify to exact the same thing over and over again

in this case.

THE COURT:  Okay.  Well, I'm going to deny your

application, Mr. Xue.  I appreciate that, but your clients, of

course, are entitled to, and appropriately are, present

throughout this trial; and even though they plan to be at the

next three jury trials as well, I don't think there's any rule

with respect to these issues.  It's a little hard for all of us

to look in this crystal ball and know precisely what's going to

happen after this trial but I have no objection to plaintiffs

who will not be -- plaintiffs in the overarching case -- who

will not be testifying at this trial in July being present in

the courtroom.

Anything else we need to address?

MR. ANDROPHY:  Nothing else from plaintiffs.

THE COURT:  Okay.  Good.

I don't know what's taking so long but we were told

we'd get a venire veneer about ten minutes ago and maybe

someone has arrived.  I'll ask my law clerk to go to the back

of the courtroom.

No, I'm sorry, it was Mr. Donald.  Good, he's waiting

there.

So why don't we use these moments then, Mr. Androphy,

G75KNAJ2

1   for you to raise preliminarily with me something that you're

2   concerned about in terms of witnesses the defendants may call.

3         MR. ANDROPHY:  Yes, your Honor.  I received a notice

4   Friday that the defendants were going to subpoena three

5   individuals -- Carlos Altamirano, Luis Najera and Fausto

6   Ramales.  Carlos Altamirano was originally a plaintiff in this

7   case pretty early on -- I forget exactly when -- but he gave

8   our office notice that he no longer wanted to be part of the

9   case and we stipulated to dismiss him.

10        The other two individuals are currently plaintiffs in

11   this case.  We currently represent them.  Defendants have

12   subpoenaed them for trial testimony, which I have to assume

13   that that's because the defendants expect that these

14   individuals will give testimony that's actually favorable for

15   the defendants.  These two individuals, Luis Najera and Fausto

16   Ramales, as I understand it, are currently work at Gotham

17   Pizza.  They returned there to work there, I believe,

18   approximately a year ago, and they also have, I guess, in

19   recent months have had minimal contact with our office.  They

20   certainly have not given us instructions that they do not want

21   to be part of the case, do not want us to represent them, but,

22   on the other hand, they have not been very communicative with

23   us.  So there are issues relating to this.

24        THE COURT:  Okay.  I think we have a venire.  Thank

25   you.  I think we have the jurors, so --

G75KNAJ2

1            THE DEPUTY CLERK:  Madam Interpreters, would you come

2     set up the headsets for the plaintiffs.

3            THE COURT:  Okay.  We'll bring in the venire, please,

4     Mr. Donald now.

5            You may all be seated.

6            (Jury selection ensued)

7            (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

G75KNAJ2

1          (At the sidebar)

2          THE COURT:  So, defense counsel have exercised their

3    peremptory challenges to challenge three Hispanic members of

4    the venire.  They are Ms. Serrano, Mr. Gutierrez, and

5    Ms. Rivera.  They are our only, I believe, Hispanic members of

6    the venire.

7          MR. XUE:  Number 4 is also Hispanic, right?  Benito.

8          THE COURT:  Anastasia Venetos-Wahl is Juror No. 4.

9    She may or may not be Hispanic, I'm not sure.

10         Maybe I should put some background on this:  There are

11   14 members of the venire sitting in the jury box.  We are

12   selecting a jury of eight jurors in this FLSA case.  Each side

13   was given the chance to exercise three peremptory challenges,

14   three for the plaintiffs and three for the defendants.

15         I have no objection to the exercise of the peremptory

16   challenges by the defendants in this case, by plaintiffs'

17   counsel.

18         Okay, we'll seat our jury.  Thank you.

19         MR. LABUDA:  Can we take a two-minute restroom break,

20   your Honor?

21         THE COURT:  In a moment.

22         (Continued on next page)

23

24

25

G75KNAJ2

```
1          (In open court)

2          THE COURT:  So we have our jury.

3          All of those, whether your names were called or not,

4    who were willing to serve as jurors, I want to thank you.

5    Ms. Rojas will give you instructions now.  You are excused.

6          Ladies and gentlemen, Ms. Rojas is going to take you

7    back to the jury room and give you an opportunity to use the

8    restroom there and then you will come back out and I will give

9    you some further instructions.  Again, don't discuss the case

10   at all with each other, at all.  I'll give you instructions in

11   a moment.

12         You can go back to the jury room.  My law clerk will

13   hold the door for you and show you where it is.

14         (Jury not present)

15         THE COURT:  Counsel, we'll take a recess for five

16   minutes here and then resume.  So, take a short break and then

17   come on back.  Thank you.

18         COUNSEL:  Thank you, your Honor.

19         (Recess)

20         (Jury present)

21         THE COURT:  So, jurors, starting with Jurors No. 5 and

22   6, we're going to have four in the first row and four in the

23   second row.  Just slowly, just slowly.

24         That's perfect.

25         I'm going to ask Ms. Rojas, please, to administer the
```

G75KNAJ2

1     oath.

2                (A jury of eight was impanelled and sworn)

3                THE COURT:  We're going to break for lunch at a

4     quarter to 1:00.  I want to assure you, you will all get to eat

5     lunch today.  I have some preliminary instructions and let me

6     give those to you now.

7                You'll remember that earlier this morning I told you

8     that in our American system of justice, the judge and the jury

9     have separate roles.  My role is to instruct you as to the law

10    that governs and controls this case, and I will largely give

11    you those instructions at the end of the trial.

12               Your job, as jurors, is to decide the fact issues,

13    based on the evidence that will be presented at this trial.

14    You're the only triers of the fact issues, and your decisions

15    on those factual issues will determine the outcome of this

16    lawsuit.

17               Please do not take anything that I say or do during

18    this trial as indicating that I have a view as to what your

19    verdict should be; I do not.  I'll be taking notes for my own

20    purposes to rule on legal and evidentiary issues.

21               Now, I know you will pay close attention to the

22    evidence because that is going to be the basis of your verdict.

23    So what does the evidence consist of?  The evidence consists

24    of:  The testimony given from witnesses who will testify from

25    this witness stand under oath; it will consist of documents or

G75KNAJ2

exhibits that will be received into evidence; it will consist

potentially of agreements, or stipulations, reached by the

parties as to certain facts.  That's it, only those things are

the evidence in this case, and you must your verdict only on

that evidence.

Let me list some things that are not evidence.

Anything the lawyers say is not evidence.  They're going to

make opening statements to you, they're going to make closing

statements to you, they're going to ask questions of witnesses.

None of that is evidence.

I know, however, that you will listen carefully to

them because it helps give you some information that can be

useful to you.  For instance, let me give you an example with

respect to a question:  Often, you cannot understand a witness'

answer unless you've listened carefully to the question.  So

you need to listen to the question to understand the context in

which the witness is giving their answer.  So just because the

question is not evidence doesn't mean you shouldn't listen to

it.

Lawyers have an obligation and an opportunity to

object to questions put by the other lawyers.  If they do and I

sustain the objection, that means the witness cannot answer the

question; and if the witness has answered the question, the

answer is stricken and not part of the record.  If I overrule

an objection, the witness may answer and you may consider that

G75KNAJ2

testimony.

Of course, at any time during the trial, if I strike evidence or tell you you should disregard something, that's not part of the record evidence.  And, obviously, anything you hear or learn outside this courtroom is not evidence; only what comes in in this courtroom, during this trial, is evidence for you.

One of the important issues you will be deciding here is the credibility, or the believability, of the witnesses. I'm going to give you more instructions about that at the end of the trial, but let me say something very briefly about that right now.

In essence, you can use the same tests in your everyday life at this trial.  How do you decide for yourself, in your ordinary life, whether to believe someone or not, whether they seem to be a reliable describer of past events or not?  You can use those same tests here.  Did they have a motive to say something falsely?  Did they seem to be somebody with a good recollection?  Have they said something that's clearly wrong?  And should that influence your view as to the reliability to other things they speak about?  All the tests you apply in your normal life you may apply here in judging the credibility of witnesses.

Of course, sometimes it's not precisely what a witness says but how the witness says it that can influence your

G75KNAJ2

judgment as to whether or not they are a reliable person and a

truth-teller when they're speaking to you.

          Now, as the trial proceeds, you may begin to get some

impression of the facts but I want to caution you to keep an

open mind until all the evidence is in.  After all, we can only

take testimony one witness at a time, one document at a time.

And we know that sometimes you have an impression that

something happened a certain way because of testimony given by

a witness on direct examination and then there's

cross-examination and you say, oh, my Lord, it's completely

different, my impression was wrong, I think it's more like this

as opposed to like that.  And the same thing can happen when

you compare one witness' testimony with another witness'

testimony.  So, as a result, we ask you to keep an open mind

and not make a final judgment about what the evidence shows

until all the evidence is before you.

          So we follow some rules to help ensure that you are

focusing only on the evidence received at this trial and not

else.  Here are some of those rules:

          First -- and this is a hard one -- we don't want you

to discuss the case with each other at all until the time for

your deliberations.  All of you will be deliberating together,

all eight of you, at the end of this trial.  That's the time to

discuss the case with each other.  Before then, human

experience tells us if you start to discuss the case with each

G75KNAJ2

other, your preliminary views, you're probably tempted to put

forth what you believe, what the evidence shows and then defend

that if somebody disagrees with you.  And that whole process is

unfair because you haven't heard all the evidence.  So it's a

hard rule to follow but I trust that you will follow it.  So

there are many things to discuss -- the Olympics in Brazil, the

hot and humid whether we're going to have this week, whether

you had a good vantage point to see fireworks last night.

Whatever it is, feel free to talk about topics with each other

as long as it's not about this trial, until your deliberations

happen.

          Obviously, you're not to do any research about this

case -- about the lawyers, about me, about the fact issues,

about anybody -- you're not to go on the Internet and do a

Google search.  Does anyone have an encyclopedia anymore?

You're not to open up an encyclopedia.  We have to rely on the

lawyers to present the evidence that they think is important

and relevant, so all of you are looking at the same evidence

together to discuss when you deliberate.

          And, of course, you can't discuss the case with anyone

outside, anyone at all.  And if someone comes up to talk to you

about the case, just politely tell them that you have been

instructed by Judge Cote not to discuss the case, and then just

report that to Ms. Rojas because I may have a further

instruction for you.

G75KNAJ2

1          This is an open courtroom -- anyone can come and watch

2     what we're doing, it's a public courtroom -- and so if you

3     happen to know anyone who enters this courtroom, again, just

4     let Ms. Rojas know because I may have a further instruction for

5     you.

6          And following up on that, the parties, the lawyers, no

7     one is going to speak to you outside this courtroom, no one is

8     going to wish you a good day or a safe journey home or anything

9     else.  They're under my instructions to have no contact with

10    you whatsoever, so don't be think they're being rude; they're

11    just following my instructions.

12         In the age of the Internet:  Let me give you a

13    specific instruction about the Internet as it applies to jury

14    service.  I've already told you you can't do any independent

15    research about any of the participants or issues in this case,

16    and that means you can't search the Internet, websites, blogs

17    or use any electronic tools or reference materials to obtain

18    information about this case or to help you decide this case.

19    You may not search for or look at profiles of any of the people

20    in this case, including the lawyers, on any social media

21    website.  You basically can't try to find out any information

22    from any source outside this courtroom.  And, as I've already

23    told you, you can't discuss this case with anyone, including

24    your fellow jurors, during the trial.  Only when it comes time

25    to discuss this case can you discuss it with your fellow

G75KNAJ2

1    jurors.

2          So, this means when you go home tonight, you can't

3    discuss this case with family members or friends or anyone.

4    Just tell those you live with that you've been selected as a

5    juror in a civil trial, we expect it to end sometime next week,

6    and the judge has instructed you that you can't discuss the

7    case but you'll tell them all about it when it's over.

8          So, that means, in the age of the Internet, you can't

9    communicate with each other by telephone during this trial or

10   email or text messages, you can't talk about this trial at all,

11   on email or text messages or Twitter or Facebook or other

12   media.  Don't update your status on a website to tell anyone

13   that you're a juror on this trial during the trial or give any

14   information at all about the trial while the trial is ongoing.

15         The bottom line is -- and I think you get my point --

16   the parties, the plaintiffs and the defendants, are entitled to

17   have you render a verdict based solely on the evidence that

18   comes in during this trial and nothing else, and exposing

19   yourself to information outside this courtroom would compromise

20   your ability to serve with fairness as a juror for all the

21   parties.

22         Let me just end by saying a few words about trial

23   procedure.

24         After you come back from lunch, the lawyers are going

25   to have an opportunity to make opening statements to you.  This

is an opportunity to give you a description of what they expect

the evidence will show.  It's not evidence but it's very

helpful to understand what they expect you'll hear as witnesses

testify and documents come into evidence.

          After the opening statements, the plaintiffs will have

an opportunity to call witnesses.  Their first witness will be

questioned -- that's called direct testimony -- and then

tendered for defense counsel to ask questions -- that's

cross-examination -- and we complete it for a witness,

redirect, recross, until every witness is done, and we repeat

that for every witness.  When the plaintiffs rest, the

defendants will have an opportunity to call witnesses and we'll

follow the same procedure of direct and cross-examination.  At

some point, they will rest.  Then the lawyers will sum up to

you and give you statements about what they believe the

evidence you've heard has shown, and then I will give you my

charge as to the law, and that's what you use in rendering your

verdict.

          What's our schedule going to be each day during the

trial?  I meet with the lawyers at 9:00 o'clock in the morning

so that we have about a half an hour to resolve legal and

evidentiary issues together.  We start hearing testimony

promptly at 9:30, so you should make sure that you're in the

jury room before 9:30 so we don't have to wait for you.  We

need all of you present to start on time at 9:30.  And we sit

1   until 5:00 o'clock each day -- so you'll be here from 9:30 to

2   5:00 -- but I'll stop promptly at 5:00 so you can make your

3   travel arrangements relying on that.  We take a lunch break

4   12:45 to 2:00 each day and we take a mid-morning and a

5   mid-afternoon recess in a way that hopefully won't interfere

6   with you hearing evidence.  But if you need more breaks at any

7   time, just raise your hand and, of course, we'll accommodate

8   you.

9           Ms. Rojas has shown you the jury room and given you

10  our contact information and taken contact information from you.

11          I'm now going to give you a very preliminary

12  instruction about the issues in this case.  When you come back

13  at 2:00 o'clock, you're going to hear the opening statements

14  from the lawyers.  As you will hear, the five plaintiffs in

15  this case worked at one or more Gotham Pizza locations in

16  Manhattan.  They have each brought claims under federal and New

17  York State labor laws, asserting that the defendants did not

18  pay them the amount required by those laws.  For example, they

19  argue that they were not paid the minimum wage, that they were

20  not paid at the correct rate for the hours they worked

21  overtime, and that their pay did not take into account whether

22  they ended their employment each day more than ten hours after

23  they began work that day.  We call that "spread of hours," when

24  you begin and end employment more than ten hours apart on an

25  individual day.

G75KNAJ2

1          Now, the defendants deny that they violated the law in

2    these ways.  They argue that they paid the plaintiffs the wages

3    the law required.  One of the defendants, Lana Shamailov, also

4    contends that she did not employ any of the plaintiffs under

5    the standards of law that I'm going to give you at the end of

6    the trial.

7          The burden is going to be on the plaintiffs to prove

8    their claims.  Among other things, the plaintiffs are going to

9    be required to prove -- and you're going to be required to

10   decide -- separately for each plaintiff the dates they began

11   and ended employment with any particular Gotham Pizza

12   restaurant, the number of hours each plaintiff worked each

13   week, the amount of wages each plaintiff received each week or

14   per hour that they worked, the number of days in which each

15   plaintiff worked for a spread of hours, that is, more than ten,

16   that was greater than ten.  As I just mentioned, again, the

17   spread of hours is the length of interval between the beginning

18   and end of an employee's workday, even if the actual working

19   time was interrupted by time off for meals or other breaks.

20         Now, you may take notes during the course of the

21   trial, although you are not required to do so.  In the event

22   you decide to take notes, we have binders prepared for that

23   purpose and each binder contains a separate page for each of

24   the five plaintiffs.  You'll also be provided with a pen.

25         If you decide to take notes, however, you have to make

G75KNAJ2

1   sure that your note-taking does not interfere with your

2   listening to or considering all of the evidence.  Also, if you

3   take notes, you are not to discuss them with anyone before or

4   during the trial.  That includes your fellow jurors.  Notes are

5   to be used solely to refresh your own recollection of the

6   evidence in the case; and the fact that a particular juror has

7   taken notes will entitle that juror's view to no greater weight

8   during deliberations than those of any other juror, and you may

9   not show your notes to other jurors during your deliberations.

10          Of course, if during your deliberations you have any

11   doubt as to what the testimony given during the trial was,

12   you'll be permitted to request that the official transcript

13   being prepared by our court reporters be read to you and that

14   the relevant portion of the transcript be provided to you.  So,

15   when you come back from lunch, at 2:00 o'clock, I'm going to

16   ask you to raise your hand if you'd like us to give you a

17   binder.

18          And with that, do not discuss the case during lunch.

19   Have a nice lunch.  We'll see you at 2:00.

20          (Continued on next page)

21

22

23

24

25

G75KNAJ2

1            (Jury not present)

2            THE COURT:  Mr. Androphy, if you could provide my law

3     clerk with the first eight binders, we'll lay them out here on

4     this ledge in front of Ms. Rojas' desk so that if anyone wants

5     one of the binders, my staff will give them to them right after

6     lunch.

7            Good.  Thank you so much.

8            Now, Mr. Androphy, you were beginning an argument

9     about three witnesses that you believe that defendants had

10    subpoenaed who had been or are currently plaintiffs and you

11    gave us their names.  I think you were at the point, after that

12    background information, to begin your argument or make an

13    application, and I'm happy to hear you now.

14            MR. ANDROPHY:  Yes, your Honor.

15            For one of those individuals, Mr. Altamirano, he is no

16    longer a plaintiff.  We object to his testimony being admitted,

17    on the basis that he was not included in the defendants'

18    witness list at the time of the filing of the joint pretrial

19    order or really at any time until I received a copy of his

20    subpoena Friday.

21            THE COURT:  Okay.

22            MR. ANDROPHY:  Regarding the other two plaintiffs, as

23    I believe I started mentioning, they are current plaintiffs,

24    though I understand that they are both currently working at

25    Gotham Pizza, that they returned to work there approximately

G75KNAJ2

1    within the last year, so during the time frame that they were

2    plaintiffs in this lawsuit.  I can only presume that defendants

3    intend to call them as witnesses because they think those

4    plaintiffs' testimony will be helpful to the defendants.  Those

5    individuals, we still currently represent them and I would be

6    faced with a significant conflict if they're called by

7    defendants to give testimony and they do give testimony

8    favorable to the defendants and I would be faced with having to

9    impeach individuals who are currently clients of me and the

10   firm.

11            So I would request that their testimony also be

12   excluded.

13            THE COURT:  So, with respect to the first person, it's

14   a lack-of-notice issue, and with respect to the last two, it's

15   the conflict from having to impeach current clients?

16            MR. ANDROPHY:  Yes, your Honor.

17            THE COURT:  I'll hear from defense counsel.

18            MR. XUE:  Your Honor, with regard to the first

19   witness, Carlos Altamirano, he was not dismissed from the case

20   until year 2014 for failure to show up at deposition, and the

21   case was dismissed based on stipulation but he was never

22   stricken from the case caption, he was part of the plaintiffs.

23            And the other two are the current plaintiff in the

24   case.  We give notice to plaintiff at the beginning of this

25   case that we intend to call every plaintiff as our -- as

G75KNAJ2

defense witness and we also again made the same statement in

the joint proposed pretrial order.  So I think it's

disingenuous for plaintiffs to argue that they are not on

notice that we intend to call all the plaintiff on the case to

testify.

THE COURT:  I'm looking at page 12 of the pretrial

order.  The defendants list five witnesses and then add:

"Defendants reserve the right to call each of the plaintiffs as

his own witness.  The parties stipulate that they may examine

the adverse party witness at cross-examination and the

examination can exceed the scope of the direct examination."

So I'm going to grant the application with respect to

Mr. Altamirano.  He was dismissed, as I understand it, in 2014.

He should have been listed separately as a witness.  He was no

longer a plaintiff in this case.  The fact that the caption

wasn't reformed does not affect that notice issue.  And, of

course, as I've done previously, if the plaintiffs had been

given sufficient notice and there was a motion to preclude, I

handled that earlier in this case by allowing the plaintiffs to

take a deposition in the interim, and so that ability to cure

the prejudice of lack of notice doesn't exist here.  We're

starting the trial and it's too late, with Friday notice before

the 4th of July weekend, to expect the plaintiffs to be able to

take the deposition if they could locate the person.

So that leaves us with two potential defense

1    witnesses, Najera and Ramales.  I'm going to think about this

2    over lunch but, obviously, the pretrial order was prepared at

3    the time when there were going to be 22 plaintiffs in a single

4    trial, which is absolutely, in my view, unworkable.  I know of

5    no precedent for it.  The detailed kind of fact-finding that

6    the jurors must do -- particularly because they have to keep

7    each plaintiff's case sufficiently separate with respect to

8    each defendant, that they have to be making scores upon scores

9    of individual determinations here -- it would be an

10   extraordinary, extraordinary challenge for any jury.  In

11   criminal cases, there's a rule of thumb that you are not going

12   to have more than ten, at the outside, defendants presumptively

13   in a single trial.  We don't have a case, obviously, in which

14   there are a lot of common issues and there is going to be, I

15   expect, some pattern-and-practice evidence that will be helpful

16   to the jury, but the determinations about dates and amounts are

17   all individual.

18            So I'm going to reflect about the application with

19   respect to Najera and Ramales --

20            MR. XUE:  Your Honor, I would like to just add a

21   couple of point on the Fausto Ramales and Luis Najera's

22   testimony.

23            THE COURT:  Okay.  I will let you, but in the future,

24   all counsel should understand, I give you an opportunity to be

25   heard and then I rule --

G75KNAJ2

1          MR. XUE:  Understood.

2          THE COURT:  -- and we don't reargue.

3          MR. XUE:  Understood, your Honor.

4          THE COURT:  So this is the one exception, okay?

5          MR. XUE:  Thank you, your Honor, thank you, your

6    Honor.

7          THE COURT:  Mr. Xue?

8          MR. XUE:  Yes.  Your Honor, none of defense counsel

9    ever talked to Mr. Ramales and Mr. Najera but we have reason to

10   believe that they have no interest in being part of this

11   case --

12         THE COURT:  I'm sorry, you're talking about Ramales

13   now and Najera?

14         MR. XUE:  Yes, both.  They're party plaintiffs.

15         THE COURT:  They work for your clients currently?

16         MR. XUE:  They do work for my clients currently.

17         THE COURT:  Okay.  Let's just be frank about this:

18   The potential for influence here, which I'm sure would be a

19   subject for cross if they take the stand, is significant.

20         MR. XUE:  That's understood, your Honor, but the

21   defense is entitled to present a case and witness we believe

22   that it may speak on defense favor.

23         THE COURT:  Absolutely.

24         MR. XUE:  So if we are precluded from calling a party

25   witness we duly give notice to, I think is prejudicial to the

G75KNAJ2

1    defense.

2             THE COURT:  But the notice you gave with respect to

3    these two was on Friday.  Am I right?

4             MR. XUE:  No, no.  This two was -- we said we would

5    call every plaintiff as our witness.  And I actually --

6             THE COURT:  I'm sorry.  Obviously, I read in the

7    pretrial order that general statement, but when did you first

8    notify plaintiffs' counsel that you were calling Najera and

9    Ramales individually?

10            MR. XUE:  Yes, back in, I believe, March or April,

11   when its joint pretrial order was drafted, I named them

12   separately, but we had agreement later on, instead of naming

13   everyone separately, we just say we would call each party.

14            THE COURT:  Okay.  Now wait one minute.  I'm looking

15   at the pretrial order.  There's a Rodrigo Ramales.  Is that a

16   different Ramales than the Ramales that's at issue right now?

17            MR. XUE:  Yes.  It's Fausto Ramales.

18            THE COURT:  F-a-u-s-t-o?

19            MR. XUE:  Yes.

20            THE COURT:  Fausto?

21            MR. XUE:  Yes, Fausto Ramales.

22            THE COURT:  Okay.

23            MR. XUE:  Luis Najera.

24            THE COURT:  No, no, no.  I'm sorry, I want to know the

25   first date on which you specified to plaintiffs' counsel that

G75KNAJ2

 1   you intended to subpoena Najera or Fausto Ramales.

 2              MR. XUE:  Your Honor, first, in an initial disclosure,

 3   we said we intend to call every plaintiff.  And also --

 4              THE COURT:  I think you're not hearing me, Mr. Xue,

 5   okay?  By name, these individuals, when did you first give

 6   notice?

 7              MR. XUE:  I believe in March, your Honor, when this

 8   joint pretrial order was prepared, the first draft from my

 9   office naming them separately.  And then they also want to name

10   my clients separately as their witness.  So basically we name

11   Fausto Ramales and we also named Luis Najera as my own witness

12   but then we --

13              THE COURT:  And that was along with every other

14   plaintiff in the case?

15              MR. XUE:  No, not along with.  We put their name

16   separately as defense witness.

17              THE COURT:  Okay.  So you had seven names?

18              MR. XUE:  Yes.

19              THE COURT:  And the seven names included Najera and

20   Fausto Ramales?

21              MR. XUE:  Yes.  And then we talk, we reach agreement,

22   instead they name our client in their list as plaintiff

23   witness, I name their client in defense witness.  We just say

24   we reserve the right to call each other's client to testify at

25   trial.

1          THE COURT:  Okay.  I want to make sure I understand

2     factually, Mr. Xue, and I'm not misled here.  So, in the draft

3     pretrial order, you had seven and only seven names listed?

4          MR. XUE:  Yes.

5          THE COURT:  You had the five that you've listed here

6     as well as Najera and Ramales?

7          MR. XUE:  Yes.

8          THE COURT:  And no other names listed?

9          MR. XUE:  Yes.

10          THE COURT:  Well, that's certainly sufficient notice.

11          MR. XUE:  We had a discussion with plaintiff counsel,

12     instead of naming each other's party separately as our own

13     witness, we just reserve the right to call each other witness.

14          THE COURT:  Okay, good.  I'll reflect on this over

15     lunch.  I'm going to look at the law on conflict, but let me

16     give you a preliminary view here:  You're always allowed to

17     call each other's -- an adverse party to testify.  That's a

18     potential in every case.  And it's not unusual in a civil case

19     for the plaintiff to call the individual defendants on the

20     plaintiffs' own case.  And when they've listed the defendant,

21     parties, as plaintiff witnesses, I talk with counsel at the

22     final pretrial conference about the impact of that on the rule

23     that normally a cross is limited to the scope of direct

24     examination.  And in such circumstances, we normally agree that

25     the person will be on the stand once and cross may also serve

G75KNAJ2

1    as the direct testimony, so it can be broader than the scope of

2    direct.

3              So you will or won't impeach your clients -- that's

4    your view -- but I'm going to look at this further.  As long as

5    there's been no breach of the attorney-client relationship and

6    that's not argued to me, that's not an issue.  So,

7    preliminarily -- and I'll give you a final ruling at 2:00 --

8    Najera and Fausto Ramales, may be called as defense witnesses.

9              Thank you, all.

10             (Luncheon recess)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

G75MNAJ3

1                            AFTERNOON SESSION

2                                2:00 p.m.

3           THE COURT:  Counsel, I have thought about these issues

4    over lunch and I will let the defendants call two of the

5    plaintiffs, Najera and Fausto Ramales.

6           Ms. Rojas is checking on the jury.

7           MR. LABUDA:  Your Honor, we just wanted to have the

8    Court voir dire the interpreter.  We just wanted to make sure

9    the interpreter had sufficient credentials to interpret.  We

10   don't know who it is.  We just wanted to make sure that this is

11   a court federally certified translator.

12          THE COURT:  This is a certified interpreter.

13          MR. LABUDA:  That's sufficient.  Thank you, your

14   Honor.

15          THE COURT:  Please bring in the jury.

16          (Jury present)

17          THE COURT:  Welcome back from lunch, ladies and

18   gentlemen of the jury.  As I mentioned to you before lunchtime,

19   we have binders prepared for any of you who would like to take

20   notes during this trial.  If you wish to have a binder

21   delivered to you, would you please raise your hand.

22          Jurors 1, 3, and 4, 6, 7, and 8, we will provide those

23   to you now.  You'll see on the front of the binder is a number

24   that reflects your juror number, so you will know which binder

25   is yours.  Ms. Rojas has pens for you.  Anyone who needs a pen.

G75MNAJ3                        Opening – Mr. Androphy

1    If you need a pen, just raise your hand.  Thank you so much.

2              We are going to have the first opening statement.

3    It's from plaintiff's counsel.  I remind you nothing the

4    lawyers say is evidence, but I know you will give the lawyers

5    your full attention because it provides you with an

6    understanding often of the shape of the testimony to come.

7    It's their opportunity to give you a preview of what they

8    expect the evidence will show.

9              We will start with plaintiff's counsel.  Mr. Androphy.

10             MR. ANDROPHY:  Thank you.  May it please the Court.

11   First I want to thank you, ladies and gentlemen of the jury,

12   for serving as jurors.  I'm sure you probably all have things

13   you would rather be doing, but it's a great service that you

14   are giving us your time and attention.

15             Ever since it was first passed in 1938, the Fair Labor

16   Standards Act has stood for this country's commitment to pay

17   workers a minimum wage, to provide for overtime in return for

18   long work hours, and protect workers against employers who

19   otherwise might exploit them.

20             As you will hear over the course of the trial, the

21   defendants violated these laws at their four pizzerias.  As you

22   have already heard, Gotham Pizza is a chain of pizzerias with

23   four locations in Manhattan.  One is on First Avenue and 87th

24   Street, one is on York Avenue and 77th Street, the third is on

25   Ninth Avenue and 19th Street, and the fourth at Eighth Avenue

G75MNAJ3                    Opening - Mr. Androphy

1    and 51st Street.

2            The plaintiffs worked for each of these locations.

3    You will hear the particulars of each plaintiff's work

4    experiences shortly when they testify.

5            As Judge Cote will instruct you at the end of

6    testimony, the law requires that workers be paid minimum wage.

7            THE COURT:  I'll instruct as to the law, counsel.

8    What do you expect the evidence to show?

9            MR. ANDROPHY:  Sure.  Let me summarize the violations

10   of the minimum wage and overtime laws for each of the five

11   plaintiffs.

12           Prisco Najera worked for Gotham Pizza for over 60

13   hours per week.  He was first paid $250 per week, and then at a

14   later point he was paid $4.65 per hour for the first 40 hours

15   he worked and $7.25 per hour for the hours above 40 each week.

16           Plaintiff Wilfredo Ramirez usually worked about 68

17   hours per week.  He was paid a fixed weekly rate that started

18   at $325.  Later on in his employment it went up to $350.

19           Plaintiff Eleuterio Alonzo worked at least 56 hours

20   per week and was paid $250 per week.

21           Aureliano Tapia worked over 60 hours per week.  You

22   will hear he was paid $4.65 per hour.  Then later on he was

23   paid $8 per hour for all hours worked.  That's no additional

24   pay at any of those times for overtime, for hours above 40.

25           Israel Fuentes worked for the defendants or over 60

1   hours per week.  He was first paid $250 per week.  Later he was

2   paid $4.65 per hour and $7.25 per hour for the hours above 40

3   in a week.

4           You'll also hear from the plaintiffs that the

5   defendants illegally withheld parts of their tips.  They would

6   keep a percentage of tips specifically when deliveries were

7   made through orders that were placed through the Internet or

8   paid for with credit cards.

9           The law requires that employers keep records of the

10  hours that employees worked and the pay that employees

11  received.  You will see at trial the defendants have records of

12  the hours for all of the plaintiffs except for Wilfredo

13  Ramirez.  But you will also see that they did not keep records

14  of the amounts they paid the plaintiffs.

15          You will see in the records for two plaintiffs, Prisco

16  Najera and some of the records for Israel Fuentes, that on

17  these sheets of papers which contained the hours that they

18  worked, there are also notations purporting to record the pay

19  that these two individuals received.  You will hear from the

20  plaintiffs that that information was only added to the

21  documents long after the documents were created and well after

22  the plaintiffs were paid and also that that information is

23  completely false.

24          Defendants' time records for Aureliano Tapia and

25  Eleuterio Alonzo and for part of Israel Fuentes' employment do

G75MNAJ3                    Opening - Mr. Androphy

1     not contain any indication of the pay that they received and,

2     as I already mentioned, they don't have any records for

3     Wilfredo Ramirez.

4           The defendants will not be able to provide any

5     convincing explanation for why some individuals have this pay

6     information and others do not.  In fact, the only common thread

7     that there appears to be among those that have the pay

8     information and those that do not is when the defendants

9     provided these records to my firm's office.  On certain dates

10    they provided documents that happened to have pay information

11    and others that do not.

12          Ladies and gentlemen, I submit to you that you will be

13    able to conclude from the testimony here at trial that those

14    records with pay information, that pay information was added

15    long after the records had been signed by the plaintiffs Prisco

16    Najera and Israel Fuentes and even after this action was filed.

17          In addition to hearing from the plaintiffs, you will

18    also hear from the defendants and their witnesses.  I fully

19    expect that you'll find the defendants' testimony entirely

20    incredible.

21          You will hear from Lana Shamailov.  You will hear that

22    she is the sole shareholder of all Gotham Pizza locations.  You

23    will see that she is the CEO of Gotham Pizza and yet she may

24    claim that she has never even heard of Gotham Pizza.

25          Her husband, Michael Shamailov, at least acknowledges

1    he knows what Gotham Pizza is.  He admits to managing the

2    pizzerias.  That's about as far his credible testimony will go.

3    He's currently being sued by a number of employees in addition

4    to the plaintiffs here for failing to pay proper wages.

5           As you will learn at trial, even though he had been

6    sued in 2010 by other employees for similar violations, and was

7    sued in 2012 by some of the employees you will hear from this

8    week, Gotham Pizza continued to engage in blatant wage

9    violations through at least the end of 2013.

10          Defendants have shown a complete and utter disregard

11   for the law, both by underpaying employees continuously and in

12   attempting to conceal violations by doctoring evidence.  These

13   people have not hesitated to violate the law that serves their

14   purpose in continuing to exploit workers for their personal

15   gain and profit.  I am confident you will conclude, based on

16   the testimony you hear at trial, that the defendants are

17   continuing to perpetrate these falsehoods.

18          I expect that you'll find that the defendants denied

19   the plaintiffs the basic protections of federal and state

20   employment law and that they are liable accordingly, and also

21   that the defendants did so intentionally and willfully as they

22   have continued to violate the wage laws, even after being sued

23   multiple times, and they have done so intentionally.

24          Thank you again for your time and attention.  I hope

25   that you will listen carefully, and I trust that you will

1    listen carefully to all of the testimony and evidence in this

2    case.  Thank you.

3              THE COURT:  Mr. Xue.

4              MR. XUE:  Thank you, your Honor.

5              Good afternoon, may it please the Court.  First I

6    would like to thank all the member of the jury for your

7    sacrifice and your time committed for this trial.  We value

8    your judgment, we value your time.  Why do we need?  Because

9    you are the people who has common sense.

10             When an employee worked for employer and does not get

11   paid, they will either complain or quit.  It did not happen in

12   this case.

13             What happened in this case is one or two employee, who

14   failed that perform their job duties, got drunk at work, were

15   fired by their employer, were angry at their employer and take

16   revenge.  Ask his friends to join the action to sue this

17   honest, hard-working small business owner, Michael Shamailov.

18             This guy has been working in his four pizza shop over

19   four years.  Did not get open at the same time.  One, two,

20   three, four, gradually.  He worked there seven days a week, 12

21   hour a day.  He is a hard-working businessman who create job

22   opportunities for all his employees.  Small business.  Very

23   small.  Each pizza shop have five, six or sometimes seven

24   employees, very small operation.  He has to pay the skyrocket

25   Manhattan rent, pay the expenses supplies, pay the utilities.

He pay his workers honestly.  He himself worked very hard.  But

now he is fighting for survival of his business.

THE COURT:  Ladies and gentlemen, you must ignore that

last comment.  Of course every employer is required to obey the

law and that includes the labor laws that govern rates of pay

and employment.  Thank you.

MR. XUE:  As the Court informed you and instruct you

as the law, that FLSA and New York Labor Law, it's written to

protect employee, honest, hard-working employee for wage they

are duly entitled to.  But the laws have not been used by

someone to take advantage of the law, try to gain something

they are not entitled to.

The evidence in this case, the testimony from Michael

Shamailov, lana Shamailov, and his current employees and even

some plaintiffs will give you the full picture, what's exactly

the true pay practice in this Gotham Pizza shops.  Every

employee was paid for that minimum wage and some employees paid

way above minimum wage, and every employee were allowed to keep

the tip they received for the delivery employees.  The law

actually allowed employer to pay less than minimum wage, but

this is an employer who paid above minimum wage, at or above

minimum wage, even for delivery employee, and still allowed the

delivery employee to keep all the tip they received, cash tip,

credit card tip.

You see tip records.  Eight employees, each of these

1    employee's own handwriting.  You see records of the hours

2    written down by each of the employees themself.  You see every

3    week, before this employee were paid, employee were asked to

4    sign the pay record, the hourly records, which was presented to

5    them before they received a pay.  And the record, some of this

6    record for delivery employee even contained all the tip

7    informations.

8         But now they come back.  They want you to give them

9    something they already received, the tip they already received,

10   the wage they already received.  They are going to try to make

11   you believe that all these documents are fraudulent, even

12   though they signed it themself weekly.

13        We will also present witness showing it's not just the

14   pay is correctly.  The employer actually gives the employee

15   break times, three break times every day to consume three meals

16   at a restaurant:  Breakfast, lunch, and dinner break.  Each

17   break lasts for 30 minutes and employer still pay them.  Now

18   they are seeking for you to give them the double pay because

19   they want overtime for their break time, and I would submit to

20   you they are not entitled to it.

21        I will also submit to you that many of this employees,

22   they have prior, especially delivery employees, they have prior

23   employment.  They already have a bicycle.  They have bicycles

24   they brought to this job even though they use it at former

25   jobs.  And now they claim that even though the Gotham Pizza did

1    not require them to have bicycle, but now they claim that you

2    have to order Gotham Pizza to give them money to purchase the

3    bicycle which they used.  We all commute to work.  We drive our

4    own cars.  We don't ask our employer to pay our car.  We don't

5    ask our employer to pay our subway ride.

6         THE COURT:  Ladies and gentlemen, you'll get my

7    instructions as to the law, as I told you, towards the end of

8    the case.  There is something called tools of the trade which

9    the law imposes certain duties on employers regarding.  And if

10   you find, for instance, that a bike was a tool for the trade,

11   then there are certain obligations that accrue.  So the

12   reference to commuting by subway may not be entirely relevant

13   here.

14        MR. XUE:  You also heard testimony from both side,

15   plaintiff and the defendant, that no one ever raised an issue

16   of pay with the employer, never.  No written complaint, not

17   even oral communication to the employer, same day or nothing,

18   paid properly.  You should take that into consideration.

19        I'll also ask you to take into consideration, they not

20   only sued Michael Shamailov, they also sued a devoted mom and

21   house mom, Lana Shamailov, who has no operation or control

22   whatsoever of any of Gotham Pizza's restaurants.  The judge is

23   going to instruct you about a law, what constitute an improper

24   in the Fair Labor Standards Act and New York Labor Law setting.

25        I will also submit to you that Michael Shamailov is

 1    not a perfect record keeper.  If he's perfect record keeper, we

 2    would not be here today.  He has business to run.  He has a

 3    family he has to make sure taken care of.  Sometime paperwork

 4    fall through the crack.  He did not keep perfect record.  He is

 5    not a perfect man.  But he did his best.  He tried his best.

 6    He did everything in good faith and it's nowhere in any of the

 7    record a violation in this case.

 8              I will ask you to please search your heart, listen

 9    carefully to the testimony that's going to be presented in this

10    case and also read carefully the exhibits that's going to be

11    presented to you for your review.  I will ask you in the end, I

12    hope you draw the same conclusion I draw.

13              THE COURT:  I'm sorry, counsel.

14              MR. XUE:  Thank you, your Honor.  Thank you, everyone.

15              THE COURT:  Ladies and gentlemen, we will have the

16    plaintiff's first witness.

17              Mr. Androphy.

18              MR. ANDROPHY:  Plaintiffs call Prisco Najera.

19              THE DEPUTY CLERK:  Mr. Najera, if you would please

20    come forward and take the witness stand.

21     PRISCO NAJERA,

22         a Plaintiff, called as a witness on his own behalf,

23         having been duly sworn, testified as follows:

24              MR. ANDROPHY:  Your Honor, I have a binder with

25    exhibits.  Can I provide that to the witness.

 1  DIRECT EXAMINATION

 2  BY MR. ANDROPHY:

 3  Q.  Mr. Najera, did you ever work for Gotham Pizza?

 4  A.  That's right.

 5  Q.  What is Gotham Pizza?

 6  A.  It's a pizza place.

 7  Q.  Did you work at one location or more than one location?

 8  A.  In two of them.

 9  Q.  Which two locations did you work at?

10  A.  77th and York or 86th and First Avenue.

11  Q.  When did you begin working at Gotham Pizza?

12  A.  Well, approximately June of 2009.

13  Q.  Which location did you start at?

14  A.  77th and York.

15  Q.  When did you stop working at Gotham Pizza?

16  A.  March 2012.

17  Q.  Does Gotham Pizza sell anything other than pizza?

18  A.  Salads.

19  Q.  Is everything in Gotham Pizza prepared on site at the

20  location of the pizzeria?

21  A.  Yes.  We prepared everything over there.

22  Q.  How did you come to find your job, to get a job at Gotham

23  Pizza?

24  A.  Friends Luis and then later on with Rodrigo.  They are the

25  ones.

G75MNAJ3                     P. Najera - direct

1   Q.  Can you explain, how did Luis and Rodrigo help you find the

2   job at Gotham Pizza?

3   A.  It was Luis who told me they needed somebody to work over

4   there, and I went looking for a job over there.

5   Q.  Was Luis employed by Gotham Pizza at that time?

6   A.  Yes.  It seems he was working on 19th.

7   Q.  Who did you meet with when you first went to Gotham Pizza

8   to seek a job?

9   A.  Rodrigo.

10  Q.  And what did he tell you?

11          MR. XUE:  Objection.

12          THE COURT:  Overruled.  You may answer.

13  A.  Well, I went there asking for a job and he said yes, they

14  needed somebody, and I could start working.

15  Q.  Did Rodrigo discuss at that time your schedule or your pay?

16  A.  No.  He has told me to start working, that he would later

17  on talk to the owners.

18  Q.  Did you speak with the owners about your pay at some time

19  after you started?

20  A.  No.  I was told, good luck, that I had a job.

21  Q.  Did you speak with Michael Shamailov around the time that

22  you started working?

23  A.  Yes.  With Michael and Ken.

24  Q.  When you say Michael, are you referring to Michael

25  Shamailov?

1   A.  Yes, that's right.

2   Q.  And can you tell us who Kenny is?

3   A.  He is the one that worked for him.  He was like the

4   manager, the one who was always going around him.

5   Q.  When you spoke with Michael and Kenny, did they tell you

6   how much you would be paid?

7   A.  No.

8   Q.  Who paid you each week?

9   A.  Michael and sometimes Kenny.

10  Q.  Did you ever find out how much you were going to be paid?

11  A.  Not until the first week when I received my pay.

12  Q.  How much pay did you receive that first week?

13  A.  250.

14  Q.  At that time did you have a conversation with anyone about

15  what your pay would be going forward from that date?

16  A.  No.  They were the ones who told me that would be my pay

17  per week.

18  Q.  Do you know who decided how much you would be paid?

19  A.  Michael or Kenny, because they were in charge of the

20  pizzeria.

21  Q.  Did you ever see Michael's wife, Lana, at the pizzeria,

22  Gotham Pizza?

23  A.  Yes.  Sometimes she ate over there and sometimes she

24  brought food.

25           THE INTERPRETER:  The interpreter will have to request

1   a clarification.

2          Correction.

3   A.  Sometimes she came and ate over there and sometimes she

4   took food with her away from the pizzeria.

5   Q.  What did you do as your job at Gotham Pizza?

6   A.  Deliveries.  I used to chop peppers, I would prepare

7   salads, and then they had a person who prepared, so we helped

8   him prepare the dough.  And I used to make the sauce.  And I

9   cleaned the floor.  I cleaned the windows and the fans on top

10  and sometimes he sent us to clean the pizza oven.  Sometimes

11  the grinder or actually the grater for the cheese.  Because

12  sometimes they used to go to 77th to get the dough and the

13  cheese from there.  Because the machine on 77th broke down and

14  we were sent to do that.

15  Q.  When you say that you went to the location at 77th Street

16  to get cheese and dough, where were you going to bring it after

17  you got it from 77th Street?

18  A.  No.  That's not right.  We would pick it up on 86th and go

19  to 77th.

20  Q.  Thank you for that clarification.

21         When you say 86th and 77th, are you referring to the

22  Gotham Pizzerias at those locations?

23  A.  Yes.  The food would move from the business on 86th to

24  77th.

25  Q.  Overall, would you typically spend more of your day doing

G75MNAJ3                    P. Najera - direct

1   deliveries or doing these other jobs that you have described at

2   Gotham Pizza?

3   A.  Other jobs mostly because when I would come in the morning

4   I would have to get the boxes of salad ready, and I would end

5   up doing four to five deliveries from the morning until I left

6   at 5 p.m.

7   Q.  Now, other than delivery workers like yourself, what other

8   jobs were there that people had at Gotham Pizza?

9   A.  Could you please repeat that question for me.

10  Q.  Other than delivery work that you did, what other jobs were

11  there that other people at Gotham Pizza had?

12  A.  Well, other people.  There was a pizza maker who made pizza

13  and there was someone at the counter, but just in the morning.

14  Q.  On the typical day at Gotham Pizza, how many delivery

15  workers would work at a Gotham Pizza location?

16  A.  Four to five.

17  Q.  Would they all have the same shift or were there different

18  shifts?

19  A.  Yes.  Sometimes in the morning there were two of us and

20  then around 5 or 6 p.m., two or three more would come.  There

21  were always at least two there.

22  Q.  Approximately what time would the delivery workers who

23  started in the morning usually work until?

24  A.  In my case I would finish up between 9:30 and 10 p.m.

25  Q.  Do you know what time the delivery workers who came later

1   in the day would typically work until?

2   A.  Yes.  Sometimes I would work late and I would get off at 12

3   or 11:30.

4   Q.  You've told us already that you started working at the York

5   Avenue location.  At some point did you go to work at the First

6   Avenue location?

7   A.  Yes.

8   Q.  And when was that, that you moved to the First Avenue

9   location?

10  A.  Michael moved me there when the business was open.  Michael

11  moved me there when it opened up.

12  Q.  When the First Avenue location opened?

13  A.  Yes.  When we opened up on First Avenue.

14  Q.  Do you recall approximately how long after you had started

15  working at Gotham Pizza you moved to the First Avenue location?

16  A.  Six to seven months or so.

17  Q.  How long did you work at the First Avenue location?

18  A.  Just a month and a half, two months.  I was not there long.

19  Q.  At that point did you stop working for Gotham Pizza

20  completely or did you move back to another location?

21  A.  I was off work for about two weeks, a few weeks, and then I

22  went back to 87th, and I had an interview with Michael and he

23  told me again, well, you are in luck again.

24  Q.  To be clear, after you worked at the First Avenue location,

25  did you then go back and work at the York Avenue location?

G75MNAJ3                    P. Najera - direct

 1   A.  Yes.  After about a week or two after I had left 86th.

 2   Q.  Were the same people in charge of Gotham Pizza at First

 3   Avenue and Gotham Pizza at York Avenue?

 4   A.  Yes, the same ones, Michael and Kenny.

 5   Q.  What was your schedule when you first started working at

 6   Gotham Pizza?

 7   A.  10:30 until 9:30 or 10, and sometimes until 11.

 8   Q.  How many days a week did you have that schedule?

 9   A.  Six days.

10   Q.  At some point did your schedule change?

11   A.  Yes.

12   Q.  What was your usual schedule after it changed?

13   A.  Yes.  He switched me -- he switched my schedule

14   approximately in 2010, more or less then, yes, or 2011.  Yes.

15   I think it was 2011.

16   Q.  You think your schedule changed around 2011?

17   A.  Yes.  It was switched in 2011.

18   Q.  Do you recall what that schedule was after it changed?

19   A.  Yes.  He put me on in the morning on some days and in the

20   afternoon or evening on other days.

21   Q.  How many days per week were you working after your schedule

22   changed?

23   A.  I kept on working six days.

24   Q.  And how many of those days did you start in the morning

25   initially?

 1    A.  Well, in the morning I worked like, I am not sure, but like

 2    two or three days.  And then, yes, three days.  And then I

 3    worked in the afternoon or evening like two days or three.

 4    Yeah.  Like three and three, three in the morning, three in the

 5    afternoon.

 6    Q.  On days when you started in the morning, what time would

 7    you usually start working?

 8    A.  10:30, and then I would leave, let's say, at 9.  Yeah, 9.

 9    Sometimes we would stay later.

10    Q.  On days when you started in the afternoon, what times would

11    you usually start and end?

12    A.  From 5 until 12.

13    Q.  And is that the basic schedule that you had the rest of the

14    time you worked at Gotham Pizza?

15    A.  Yes.  After I switched, he kept me like that.  My wages

16    changed.

17    Q.  Did you work the exact same schedule every week or were

18    there changes from week to week?

19    A.  The same schedule every week.

20    Q.  When you first started working at Gotham Pizza, did you

21    write down the hours that you worked anywhere?

22    A.  No.

23    Q.  Do you know of anyone writing down the hours that you

24    worked when you first started working at Gotham Pizza?

25    A.  No.

1   Q.  At some point did you start writing down the hours that you

2   worked?

3   A.  Yes.  In 2011, when my schedule was changed.

4   Q.  Mr. Najera, if you can turn in the binder I put in front of

5   you at the start of your examination to tab 3.

6   A.  Is this it?

7        MR. ANDROPHY:  Your Honor, may I approach to verify.

8   Q.  If you could take a moment to turn through the pages there

9   attached as 3.  You don't need to read all of them right now,

10  but just enough that you are familiar with them.

11  A.  Ok.

12  Q.  Do you recognize those documents?

13  A.  Yes, I do.

14  Q.  What are they?

15  A.  We would do this, this part up here.  We would put this and

16  this up here.

17  Q.  Can you just describe what these documents are.

18  A.  These documents are the hours that we worked and the tips

19  that we made are also there.  And we would sign these papers

20  just like that.  But this wasn't also filled out.  This part

21  that said we were paying them overtime, that part wasn't there.

22  And you can see here that the total number of hours wasn't

23  there either.  They would put that down later.  And this number

24  was on here because he didn't write -- interpreter's

25  correction -- he didn't pay us that amount either.  When we

1    would sign these, the only thing that was on here would be the

2    hours up here and the tips, and down here our signature, but

3    the rest of it was completely blank and still had not been

4    filled out.  This would go to Rodrigo and then we would never

5    see this paper again.  And the next day he would bring us the

6    money, but without the paper.

7           MR. ANDROPHY:  I ask that Plaintiff's Exhibit 3 be

8    admitted.

9           THE COURT:  P3 is received.

10          (Plaintiff's Exhibit 3 received in evidence)

11          MR. ANDROPHY:  May I publish it to the jury.

12          THE COURT:  Yes.

13   Q.  Mr. Najera, looking at the first page in front of you, can

14   you identify what parts of the document were filled in when you

15   signed the document?

16   A.  Yes.  The hours and the part about the tips.

17   Q.  Do you see where there are dates at the top where it says

18   pay period, work week 3/8/11 to 3/14/11?

19   A.  Yes, I do.

20   Q.  Was that written in when you signed it?

21   A.  No.

22   Q.  How about where it says the total amount received?

23   A.  Not that either.  There was nothing there.

24   Q.  How about where it says, pay rate $7.25 and overtime rate,

25   $10.87?

1    A.  Not that either.  That was all clean.

2    Q.  And the lines below that where it says spread of hours and

3    tips paid and overtime rate, were those written there when it

4    signed?

5    A.  That was all blank.

6    Q.  Did you ever see this document with all that additional

7    information on it?

8    A.  No.  Only at my attorney's office.

9    Q.  Never while you worked at Gotham Pizza?

10   A.  Never.

11   Q.  Now, where it has the information for the hours, did you

12   write in those times yourself?

13   A.  Yes.  Sometimes I would write them down and sometimes

14   Rodrigo would write them down.

15          THE COURT:  Mr. Androphy, I think the jurors are just

16   seeing the document for the first time on the screens in their

17   individual boxes.

18          MR. ANDROPHY:  Thank you.  We had some technical

19   difficulties.  If your Honor will allow me, I may want to go

20   through some of those questions now that they can see it.

21          THE COURT:  Yes.

22   Q.  Mr. Najera, on this first sheet where it says total amount

23   received, was that written in when you signed the document?

24   A.  No.

25   Q.  And where it says pay rate, 7.25, and overtime rate, 10.87,

G75MNAJ3                    P. Najera - direct

1   and beneath that where it says spread of hours and tip paid,

2   overtime paid, was that written in when you signed the

3   document?

4   A.   No.  All of that was left blank.

5            THE COURT:  Mr. Androphy, to save time, because we

6   have had this technical difficulty, if you wish, you may have

7   your client circle the information that was or was not,

8   whatever you would like, on the document and we will mark that

9   Exhibit 3A.

10  Q.   Mr. Najera, if you understood the Court's instruction, if

11  you can now circle the information that was not on the document

12  when you signed it and then we will display that to the jury.

13           THE INTERPRETER:  Counsel, the information that was

14  not on the document?

15           MR. ANDROPHY:  Yes.

16  A.   None of this was here.  This wasn't here, this wasn't here,

17  and this wasn't here.

18           MR. ANDROPHY:  May I publish that to the jury.

19           THE COURT:  Yes.  Mark this 3A.

20           Keep going, counsel.

21           MR. ANDROPHY:  Thank you.

22  Q.   On that first page that you just circled, do you see that

23  it says first day at the top on the left?

24  A.   That's right.

25  Q.   Was your first day of work at Gotham Pizza in March 2011?

1  A.  No.

2  Q.  Did Gotham Pizza ever give you a copy of this document and

3  the similar documents for other weeks for you to keep?

4  A.  No, never.

5  Q.  When you first started working at Gotham Pizza, how much

6  were you paid, not including tips?

7  A.  250.

8  Q.  Over what period were you paid $250?

9  A.  I began working in 2009 and up until that date they were

10  paying me 250.

11  Q.  Are you referring to the day in that first sheet that we

12  just looked at?

13  A.  Yes.  I started working like in June of 2009, and I was

14  paid the 250 until that date.

15  Q.  When you say you were paid 250,000, do you mean $250 per

16  week, per month, per day?

17  A.  Weekly.

18  Q.  How were you paid, by cash or by check?

19  A.  Cash.

20  Q.  Did you receive any written statement of your pay when you

21  were paid?

22  A.  Never.

23  Q.  If you worked more hours than your usual schedule, would

24  you receive any more pay or would you only receive $250?

25  A.  Well, no, never.  You know, I would work four, five days

G75MNAJ3                          P. Najera - direct

1   and then I would have a rest day, but I was never paid over

2   that.

3   Q.  At some point did your pay change?

4   A.  To the extent it did not.

5   Q.  On that date in that document that's displayed in front of

6   you, did your pay change then?

7   A.  Well, it was changed and we were paid per hour.

8   Q.  And what was your rate of pay per hour at that time?

9   A.  4.65 per hour, 40 hours, and any overtime over 40 hours we

10  would be paid $7.25.

11  Q.  Would you be paid any extra amount on days when you were at

12  work for more than 10 hours?

13  A.  No, never.

14  Q.  When they were paying you at an hourly rate, did you ever

15  receive a pay stub or a wage statement?

16  A.  No.  We would do all this here, but, as I was saying

17  before, all of this other stuff was not there.  You would have

18  just have a signature and everything else was clean.

19  Q.  At the time you got paid, would you see the time sheet?

20  A.  We would just get this paper with just the signature, and

21  Rodrigo would give it to Michael or Kenny in the evening.  And

22  the following day he would be coming with the money, but not

23  with any other paper.

24  Q.  Were you ever paid $7.25 per hour, as is written on this

25  Exhibit 3?

1    A.  No.  We were paid $4.65.

2    Q.  Were you ever paid overtime at the rate of $10.87 per hour,

3    as is written on this paper?

4    A.  No.  I was paid 7.25.

5    Q.  Did you ever receive what's called spread of hours pay,

6    additional pay when you worked more than 10 hours in a day?

7    A.  No.  We were never paid anything extra.

8    Q.  When you made deliveries, did you sometimes receive tips

9    from customers?

10   A.  Yes, that's right.

11   Q.  Were you able to keep for yourself the full amount of all

12   the tips that customers left for you?

13           MR. LABUDA:  Objection, your Honor.

14           THE COURT:  Overruled.

15   A.  No.  He would take 15 percent from Seamless and the credit

16   card payments.  Sometimes he would take more:  Even up to 30,

17   $40 were missing.  But I never complained or said anything.

18   But one time there were about $100 missing, so I complained,

19   and then he gave me the $100 back.

20   Q.  When you say he, who gave you the $100 back?

21   A.  Michael did.

22   Q.  How do you know that you were not receiving the full amount

23   of your tips?

24   A.  Because we would realize more or less how much we were

25   making and how much he was paying us.

G75MNAJ3                         P. Najera - direct

 1   Q.  Would you write down the amount of tips that customers had
 2   left you?
 3   A.  Well, they were here.
 4   Q.  Referring to Plaintiff's Exhibit 3, correct?
 5   A.  Yes.
 6   Q.  And you would write those in yourself?
 7   A.  Sometimes I used to note them down.  Sometimes it would be
 8   Rodrigo.
 9   Q.  Do you know what SW tips means or indicates?
10   A.  No.
11   Q.  What tips did you write in on that column where it says SW
12   tips?
13   A.  I believe those are the Seamless ones.
14   Q.  Can you just explain what Seamless means?
15   A.  Those are the Internet orders.
16   Q.  On average how much was missing from your tips each week?
17   A.  15 to $20.
18   Q.  How did you make your deliveries at Gotham Pizza?
19   A.  By bicycle.
20   Q.  Did the restaurant provide you with the bicycle or did you
21   have to purchase one yourself?
22   A.  We had to buy bicycles.
23   Q.  Did the restaurant pay you back for the money you spent on
24   those bicycles?
25   A.  No, never.

1   Q.   While you worked at Gotham Pizza, did you have to buy one

2   bicycle or more than one bicycle?

3   A.   I had to buy three bicycles during the three years that I

4   worked for them.

5   Q.   Why did you have to buy three bicycles?

6   A.   Because sometimes the bicycles we had were stolen.

7   Q.   Do you recall how much you spent on the bicycles?

8   A.   Well, I would buy a bicycle for about 450; another one was

9   300; and another one, 250.

10  Q.   Did you purchase anything, any other related equipment,

11  bicycle-related equipment?

12  A.   Yes.  A chain and a padlock.

13  Q.   Do you recall how much you spent on those?

14  A.   Well, it was 65 because the padlock was about 35 and the

15  chain, 30, so it was 65 for both things.

16  Q.   Did you work at Gotham Pizza with any of the other

17  plaintiffs who are here today?

18  A.   Yes.

19  Q.   Which ones?

20  A.   With Israel, Aureliano, the other gentleman also,

21  Eleuterio.

22  Q.   Do you recall what jobs they had at Gotham Pizza.

23  A.   They also had to deal with boxes and to prepare the dough

24  and to clean the containers for the dough.  And they also

25  prepare salads and also dice the peppers and sausages and

G75MNAJ3                              P. Najera - direct

1   chicken, everything that we had to do over there.

2   Q.  Did they basically have the same job as you?

3   A.  Because sometimes we were two in the morning and between

4   the two of us we had to do the same job.

5           MR. ANDROPHY:  I have no further questions at this

6   time.

7           (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

G75KNAJ4                    P. Najera – cross

 1  BY MR. XUE:

 2          THE COURT:  Do you wish to cross-examine this witness

 3  or not?

 4          MR. XUE:  Yes, your Honor.

 5          THE COURT:  Okay.

 6          MR. XUE:  Thank you, your Honor.

 7  CROSS-EXAMINATION

 8  BY MR. XUE:

 9  Q.  Mr. Najera, you claim you started working with Gotham Pizza

10  in June 2009; is that correct?

11  A.  That's correct.

12  Q.  And did you work continuously for Gotham Pizza until

13  March 2012?

14  A.  Yes; that's when I stopped working.

15  Q.  But you also testified in the middle of this duration that

16  at some point you stopped working for Gotham Pizza; is that

17  correct?

18  A.  Yes, a couple of weeks.

19  Q.  Okay.  When was that?

20  A.  That's when it was moved to 87 or I was moved to 87.

21  Q.  Why did you quit your job from 87?

22  A.  Well, Michael himself fired me.

23  Q.  Why were you fired?

24  A.  Well, because when I went to work at 87, he just had a

25  pizza man whose name was Fausto Ramales and he didn't have a

G75KNAJ4                       P. Najera - cross

1    counter guy.  So I was a counter person.  But he didn't pay me

2    anything for that.

3    Q.  What do you mean, he didn't pay you anything for that?

4    A.  Because he paid me as a delivery man, not as a counter man.

5    Q.  So is it correct that you had drinking issue?

6             MR. ANDROPHY:  Objection.

7             THE COURT:  Overruled.

8    A.  Well, they could have made -- performed a test.  I didn't

9    drink.  I used to drink when I was young, when I was 20 years

10   old.

11   Q.  Isn't it correct you were fired from this job from Gotham

12   Pizza in March 2012 for drinking at work?

13   A.  No.

14   Q.  Isn't it correct that you solicit the other plaintiffs to

15   join the case --

16             THE COURT:  Excuse me.  I'm sorry, Counsel.  Can you

17   lower the mic.  It's coming out --

18             MR. XUE:  I'm sorry.

19             THE COURT:  Thank you so much.

20   Q.  Isn't it correct that you solicit other plaintiffs to join

21   the case in suing Gotham Pizza because you were angry that you

22   were fired from Gotham Pizza?

23   A.  No.  Well, he even when looking for me at the restaurant

24   where I was working, asking me to go back and work for him.

25   Q.  And when was that?

G75KNAJ4                    P. Najera - cross

1    A.   More or less, three weeks after he fired me.

2    Q.   Three week after March 2012?

3    A.   That's right.

4    Q.   Isn't it correct that indeed, actually, it was Kenny, the

5    manager, who fired you, instead of Michael Shamailov who fire

6    you?

7    A.   It was Michael.

8    Q.   In this conversation, you testified to three week after

9    March 2012, did you tell Michael that you have no issue with

10   him but you have a lot of issue with Kenny?

11   A.   I told him.

12   Q.   You told him that, right?  And isn't that correct --

13   A.   Well, yes, because -- because, actually, you know, Kenny

14   and he were the ones who interacted a lot but Kenny is the

15   actually was the one who complained to us.  But, you know, both

16   of them, but Kenny was the one who complained mostly.  Well,

17   they stop me one time around Metropolitan Hospital, they stop

18   me, both of them, one time because I had already started the

19   lawsuit --

20   Q.   Okay.

21   A.   -- and they threatened me --

22            MR. XUE:  I move to strike, your Honor.  I ask the

23   witness to be instructed to just respond to my questions.

24            THE COURT:  We're going to stop the answer at this

25   point.

1           You may place your next question.

2           MR. XUE:  Thank you, your Honor.

3           THE COURT:  Your motion to strike is denied.

4    BY MR. XUE:

5    Q.  Isn't it correct Kenny is the one who actually complain

6    about your work performance?

7    A.  I always worked well for them.  Well, you know, like I said

8    before, even the day I was supposed to take a day of rest, you

9    know, they came and asked me to go back to work, and I went

10   back to work and they never paid me for that.

11   Q.  But --

12          THE COURT:  Excuse me one second.

13          Mr. Najera, very important:  You listen carefully to

14   the question that is asked and answer only that question.

15          THE WITNESS:  Okay.

16          THE COURT:  Your attorney is going to have an

17   opportunity to ask you more questions if he thinks that's going

18   to be important for the jury.

19          THE WITNESS:  Okay.

20          THE COURT:  But this is the chance for the defendants'

21   attorney to ask you questions.

22          THE WITNESS:  Okay.

23          THE COURT:  And you must answer those questions.

24          THE WITNESS:  Okay.

25          THE COURT:  Now I'm going to read to you the last

1    question that was asked and I want you to answer that question,

2    please.

3            Isn't it correct that Kenny is the one that actually

4    complained to you about your work performance?

5            THE WITNESS:  No.

6    Q.  Isn't it correct that in an encounter a few week after

7    March 2012, you asked Michael to fire Kenny?

8            THE INTERPRETER:  Could you please repeat the end of

9    the question?

10   Q.  Isn't it correct that in an encounter you had with Michael

11   a few week after March 2012, you requested Michael to fire

12   Kenny?

13   A.  Well, he asked me to go back to work for him, and I told

14   him that if he wanted me to go back would work for him, he had

15   to fire Kenny.

16   Q.  So, at no time during that encounter you said to Michael

17   saying, you owe me money, I'm not going back?  Is that correct?

18   A.  No, I never said that.

19   Q.  And, in fact, during that entire course of your employment,

20   you never tell Michael that he owe you any unpaid wage?  Is

21   that correct?

22   A.  Well, yes, when I claim about the hundred dollars.

23   Q.  Even on that only occasion, you said that was hundred

24   dollar missing, he give it right away to you; is that correct?

25   A.  Well, yes, four days later, after he looked at his papers.

1  Q.  You also testified that you were involved in preparing some

2  food besides doing deliveries; is that correct?

3  A.  That's right.

4  Q.  Do you know a gentleman with the nickname Nino, who is

5  working for Gotham Pizza?  N-i-n-o.

6  A.  That's right, I know him.

7  Q.  He is the gentleman who prepared foods to be used at those

8  restaurants; is that correct?

9  A.  Well, he came and handed the condiments to the dough, he

10  cut it up, and we were the ones that had to roll it and make

11  little balls.

12  Q.  So he do all the cutting, he do all the preparation; is

13  that correct?

14  A.  No, because I prepared the sauce.  I prepared the salads.

15  If he was the preparer, he had to do all that.  I used to cut

16  the cheese.  And he was the one to prepare it, he had to cut

17  the cheese, true.

18  Q.  So you think, as an employee, you should not be preparing

19  the sauce, you should not be cutting the cheese, you should do

20  whatever you like to do; is that correct?

21          MR. ANDROPHY:  Objection.

22          THE COURT:  Overruled.

23  A.  Well, you know, like you were saying, you know, we prepare

24  the food because the person who was supposed to prepare

25  everything, he came to the restaurant and he was there one or

1   two hours at the restaurant, because I mean he had the

2   responsibility for the pizza places, he had to be in three

3   places at the same time.  So how could he be done?

4   Q.  So if Michael is treating you so badly, why did you go back

5   to work for him after you were fired from 87 Street restaurant?

6   A.  I have three children and I have to work all the time so

7   that my children can eat, and to pay the rent.

8   Q.  But there are a lot of pizza restaurants in New York City;

9   you could go to another one, right?

10  A.  But he offer me the job when I needed it, and I accepted.

11  Q.  In fact, you went there because he pay you more than anyone

12  else; is that correct?

13  A.  He used to pay me 250 a week.

14  Q.  He never paid you 250 a week; is that correct?

15  A.  He always paid me 250 per week.

16  Q.  You were always being paid 7.25, remember?  Do you remember

17  that?

18  A.  Did you -- Counsel --

19  Q.  Isn't it correct you were always paid about 7.25 per hour?

20  A.  He never paid me 7.25 per hour.

21  Q.  Did you testify today that sometime he pay you 7.25 per

22  hour?

23  A.  For any hour we worked over 40, he paid 7.25.

24  Q.  So he did pay you 7.25, right?

25  A.  He paid 4.65 up to 40 hours.  Above 40 hours, he paid us

G75KNAJ4                          P. Najera - cross

1   7.25.

2   Q.  When did he start paying you 7.25 per hour after first 40

3   hours?

4            THE INTERPRETER:  When did he start?

5            MR. XUE:  Yes.

6   A.  Well, what it says here, 3/8, but this says it's my first

7   day.  That was not my first day.

8            MR. XUE:  Your Honor, I would like to show the witness

9   Defense Exhibit H.  I have a binder.

10            THE COURT:  Do you have a question, Counsel?

11            MR. XUE:  Yes.

12   Q.  Please look at the first page of Defense Exhibit H.

13            Did you see your signature on this document,

14   Mr. Najera?

15   A.  That's right.

16   Q.  Yes.  And right beneath your signature is a date March 9,

17   2011, right?

18   A.  That's true, there is a date there.

19   Q.  And this document is in English and Spanish; is that

20   correct?

21   A.  Yes, that's right.

22   Q.  Mr. Najera, do you read Spanish?

23   A.  Yes.

24   Q.  So you read this document before you signed this document;

25   is that correct?

G75KNAJ4                        P. Najera - cross

1   A.  He never let us read it.

2   Q.  So you just signed something without reading it?  That's

3   your testimony; is that correct?

4   A.  I asked him what this was for.  He said it's for us to get

5   paid.  So how am I going to -- he said --

6           THE INTERPRETER:  Interpreter's correction:

7   A.  Just sign it; if not, you won't get paid.

8           MR. XUE:  Move to strike, your Honor.

9   A.  Not all of this was complete.  He had never filled out all

10  of this.  He just did this later.  All he told us was to sign

11  here, where the signature is.  This did not have the date, nor

12  what was underneath, nor did it have this part over here.  If

13  so, I would never have signed it, I wouldn't have signed it

14  because over here it's saying that we were being paid 10.87.

15  Q.  So, in fact, this document contain your regular rate, 7.25

16  and overtime rate 10.87; is that correct?

17  A.  He did all of this later on, just like he did with this

18  one, later on, because none of this was there.

19  Q.  So, is it your habit always sign blank papers?

20  A.  No.

21          MR. XUE:  Your Honor, I would like to move for

22  admission of this first page of Defense Exhibit H.

23          THE COURT:  Is there an objection?

24          MR. ANDROPHY:  No objection.

25          MR. XUE:  Your Honor, may I publish it to the jury?

1          THE COURT:  What are you going to mark this first

2     page?

3          MR. XUE:  Maybe H1 or HA; however your Honor choose.

4          THE COURT:  You choose.

5          MR. XUE:  H1 would probably be better.

6          THE COURT:  Okay, H1 is received.

7          (Defendant's Exhibit H1 received in evidence)

8     Q.  Mr. Najera, isn't it correct that your first day of

9     employment is March 9, 2011, it's not June 2009?

10    A.  Could you please repeat that question?

11    Q.  Isn't it correct, in fact, your first day of employment is

12    March 2011, not June 2009?

13    A.  That's a lie.

14    Q.  Isn't -- if you look at section 2 of this document, it says

15    notice given, it says at hiring.  When you sign this document,

16    did you see this section?

17    A.  No.

18    Q.  Do you have any documents showing you, in fact, worked for

19    Gotham Pizza starting June 2009, any document at all?

20    A.  No, I have none.

21    Q.  Did you keep a diary?

22    A.  No.

23    Q.  So, up to March 9, 2011, you continued to work for Gotham

24    Pizza until about March 2012; is that correct?

25          MR. XUE:  Actually, withdraw that question, your

G75KNAJ4                        P. Najera - cross

1    Honor.

2    Q.  You continued to work for Gotham Pizza until about end of

3    February 2012; is that correct?

4    A.  Until March of 2012.

5    Q.  At that time you were fired, again, right?

6    A.  Yes, that's right.

7    Q.  And you were fired by Kenny because you were drinking at

8    work; is that correct?

9    A.  That's a lie.

10             MR. XUE:  Your Honor, I would like to direct the

11   witness' attention to page 2 of Defense Exhibit H.

12   Q.  I would like -- actually, I would like to move for

13   admission for all the rest of the document in Defense H.

14             MR. ANDROPHY:  No objection.

15             THE COURT:  Is this equivalent, is this identical to

16   Exhibit 3, Plaintiffs' Exhibit 3?

17             MR. XUE:  No, your Honor.  It seems like --

18             THE COURT:  Yes or no.

19             MR. XUE:  It's similar.  I did not compare page by

20   page but it's -- my document, one-sided.  It seems like their

21   document would be two-sided.

22             THE COURT:  Ladies and gentlemen, we're going to take

23   a break here, we'll take your afternoon recess.  Spend about

24   five or ten minutes.  Let Ms. Rojas know when you're ready to

25   resume.  You can leave your binders on your chair.  You don't

G75KNAJ4                          P. Najera - cross

1    have to cart them around.  No one will look at them during the

2    break.

3                  (Continued on next page)

1          (Jury not present)

2          THE COURT:  You may step down.

3          I don't think it's material if the difference, the

4     only difference, between the exhibits is that they're copied on

5     two sides of the paper as opposed to one side of the paper.  Is

6     there any other difference between the second to last page of

7     Exhibit H and what was received into evidence as Exhibit 3?

8          MR. XUE:  Your Honor, it seems like it's the same

9     thing.  I just want, if the plaintiffs can stipulate when the

10    plaintiff signed this document, it was one-sided papers instead

11    of two-sided, I don't have a problem.

12         THE COURT:  Okay, great.  Any problem with that

13    stipulation?  You can tell these aren't original documents,

14    either set; they look like xeroxes.

15         MR. ANDROPHY:  Right, I have no problem with that.  I

16    will note that at least --

17         THE DEPUTY CLERK:  Counsel, please stand.

18         MR. ANDROPHY:  I will note that, at least in the copy

19    set I'm looking at, for some reason it does appear that there

20    are a few odd weeks that are in defendants' exhibit and are not

21    in plaintiffs.  That was unintentional but I have no problem

22    with Defendants' Exhibit H being admitted.

23         THE COURT:  Fine, fine.  Thank you for that

24    cooperation with each other.

25         So, when the jury comes back in, I'll receive

1    Exhibit H.  I think it's already clear on the record before the

2    jury that there was no objection to that receipt.

3              MR. XUE:  Okay.  Thank you, your Honor.

4              THE COURT:  Good.

5              Counsel, is there any other issue we need to address

6    during this break?

7              MR. ANDROPHY:  Not from plaintiffs.

8              MR. XUE:  Nothing from defense, your Honor.

9              MR. LABUDA:  Your Honor, just a point of procedure:

10   Sometimes I hear the plaintiffs talking amongst themselves.

11   It's a little distracting; so I'm wondering if the Court could

12   just direct the plaintiffs, while the testimony is going on,

13   because I can't hear what's being said.

14             THE COURT:  Well, I have several things to say at the

15   end of the day.  I'll start now.  And I noticed the defendants

16   at various points shaking their heads in disagreement with some

17   testimony that's been given.  So what I'm about to say applies

18   to each of the plaintiffs and to both of the defendants.  The

19   only time you can communicate with this jury is when you're

20   under oath on the witness stand.  If you're not under oath on

21   the witness stand and you wish to talk to anyone, you must keep

22   your voice very low and be very quiet so that no one overhears

23   you except the person you're speaking to quietly, and you

24   shouldn't demonstrate at all agreement or disagreement with

25   what's being said by the person testifying.  You'll have your

1   chance to give your testimony when you're under oath and on the

2   witness stand.

3          So, there were a couple of examples of testimony and

4   either a plaintiff would agree with it or a defendant would

5   disagree with it, and we're just not going to have this from

6   this point going forward.  And I want to thank everyone for

7   your cooperation.  I know this is all important to everybody,

8   plaintiffs and defendants, but one set of rules applies.

9          Anything else?

10         Good.  We'll take a very brief recess.  Be back here

11   in just a few minutes so we can start promptly when the jury is

12   ready to resume.  Thank you.

13         (Recess)

14         MR. XUE:  Your Honor, before the jury come in, I just

15   have one quick question for your Honor.

16         THE COURT:  Yes.

17         MR. XUE:  Your Honor has indicated each party is

18   allocate six hours.  I was wondering whether there is for fixed

19   or your Honor is stay with six hours, because the problem I'm

20   having is, sometime witness simply not answering my questions

21   and I feel very bad to cut them off, they keep going.

22         THE COURT:  We'll talk about the time limits at 5:00,

23   but I think, actually, the witness, the plaintiff, is very

24   responsive.  I think the form of the question is sometimes

25   confusing and invites a lengthier answer than perhaps you

G75KNAJ4                           P. Najera – cross

1    intended.  So you may want to pose questions that are not

2    argumentative and that simply ask factual questions and permit

3    the witness to answer just yes or no.  But we'll revisit these

4    issues at 5:00 o'clock.

5              MR. XUE:  Okay.

6              THE COURT:  Thank you, Mr. Xue.

7              Bring in the jury.

8              THE DEPUTY CLERK:  And if the witness can take the

9    stand?

10             THE COURT:  Yes.  The plaintiff may retake the stand.

11             Mr. Najera.

12             (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

G75KNAJ4                          P. Najera - cross

 1              (Jury present)

 2              THE COURT:  So, ladies and gentlemen of the jury,

 3    we're going to receive Exhibit H.  H is received.

 4              (Defendant's Exhibit H received in evidence)

 5              MR. XUE:  Your Honor, instead of publishing it to the

 6    jury, I would just leave it for the jury to review at the

 7    deliberation stage.

 8              I will represent to the Court Exhibit H contains --

 9              THE COURT:  No, Counsel, no representation.  You may

10    continue.

11              MR. XUE:  Okay.

12    Q.  Mr. Najera, for how many weeks did you sign this weekly

13    hour pay record?

14    A.  You're speaking about this?

15    Q.  Yes.

16    A.  This was signed once a week.

17    Q.  Okay.  Until you were terminated; is that correct?

18    A.  What was the question?

19    Q.  You sign every week until you were terminated from Gotham

20    Pizza; is that correct?

21    A.  Of course, because I can't keep signing it if I'm not there

22    anymore.

23    Q.  I just want to make sure you indeed sign it every week

24    until -- from March 2011 till you were terminated?

25    A.  Yes.  We would turn in the signed paper at the nighttime.

1    Q.  In fact, you were paid based on hours you put down

2    yourself, right?

3    A.  I would do it sometimes and Rodrigo would do it some of the

4    time.

5    Q.  At no time you ever complained to Michael or Kenny that

6    they failed to pay you for all hours of your work; is that

7    correct?

8    A.  Yes, I never made any complaint.  I only complained that

9    one time when he paid me back the $100.

10   Q.  As a delivery worker, you also received tip when you were

11   performing your work; is that correct?

12   A.  Yes.

13   Q.  And you receive all the cash tipped every day; is that

14   correct?

15   A.  Well, not the ones that were online and credit card.

16   Q.  But my question is about cash tip.  Did you receive it

17   every day when you receive it from customer?

18   A.  Of course, because the customers were paying us for the

19   pizzas.

20   Q.  For credit card tip, Seamless tip, do you know when -- do

21   you know when Gotham Pizza would receive payment from Seamless

22   and credit card company?

23   A.  Yes.

24   Q.  How often?

25   A.  Once a week.

G75KNAJ4                         P. Najera - cross

 1  Q.  And you were paid once a week for a credit card tip and

 2  Seamless tip; is that correct?

 3  A.  Yes.

 4  Q.  And for credit card companies, they always charge you fee

 5  for three, four percent of the dollar money received against

 6  Gotham Pizza; is that correct?

 7  A.  They would charge us 15 percent.

 8  Q.  In fact, they charge you zero percent for credit card tip;

 9  is that correct?  Gotham Pizza give the entire amount on the

10  credit card of a tip to you without deducting the credit card

11  fee?

12          THE COURT:  Okay, lower your voice, Mr. Xue --

13  Q.  Is that correct?

14          THE COURT:  -- and just place your question anew so we

15  get it clearly.

16          MR. XUE:  Okay.

17  Q.  Mr. Najera, is it correct Gotham Pizza give you the entire

18  sum of tip left on the credit card without even deducting the

19  fees charged by the credit card company every week?

20  A.  That's a lie.  I always was short 20 to 30 dollars, 15

21  dollars, until that time when I was short $100 and I complained

22  to the man.

23          MR. XUE:  Your Honor, I would like to publish the

24  first page of Defense Exhibit H.

25          THE COURT:  I think that's H1 in evidence.

1          MR. XUE:  Page 2, your Honor.

2          THE COURT:  Oh, okay.

3          MR. XUE:  The second page.

4          THE COURT:  Okay.

5     BY MR. XUE:

6     Q.  Mr. Najera, you were asked to put down the credit card tip

7     you received every day; is that correct?

8     A.  That's right.

9     Q.  So this to make sure that you would be able to double-check

10    when you received payment that in fact you received the credit

11    card tip; is that correct?

12    A.  That's right.

13    Q.  Now, you were also asked to put down Seamless Web tip

14    abbreviation "SW tip" on the last column, last row, every day

15    on the tip you were supposed to receive, right?

16          THE COURT:  Last row?

17          MR. XUE:  Yes.

18    A.  Yes, that's right.  Some of the time I would do it and some

19    of the time Rodrigo would do it.

20    Q.  Rodrigo is another employee at Gotham Pizza, right?

21    A.  That's right.

22    Q.  And so you can have a dollar amount to check when you

23    receive your pay, whether you indeed received the tip from

24    Seamless; is that correct?

25    A.  Yes, that's right.

1   Q.  Were you aware that Seamless charge Gotham Pizza about 14

2   to 15 percent for all the charge, all the money receive through

3   Seamless?

4   A.  Yes.  That's the reason why he charged us that.  Once he

5   took away all of the Seamless for some time because he didn't

6   want to pay it to us but then, after a while, he started paying

7   us back.

8   Q.  So, it's your understanding he deduct the Seamless tip

9   because Seamless deduct the money he receive; is that correct?

10  A.  What I understand is that he was charging us the money.

11  Q.  Because he did not receive the money from Seamless; is that

12  correct?

13  A.  Who did not receive the money from Seamless?

14  Q.  Gotham Pizza did not receive the money for amount from

15  Seamless because Seamless have a fee they deduct; is that

16  correct?

17  A.  And Gotham Pizza was charging it -- charging us for it.

18  Q.  Mr. Najera, you indicate you don't have any document

19  showing you work for Gotham Pizza in 2009.  Did you have any

20  document showing you worked for Gotham Pizza in 2010?

21  A.  I don't have anything at all but I do have a telephone that

22  Michael sold to me in 2010.  Yes, he sold me an iPhone.  He

23  sold it to me around 2010.  I paid him 250 for the phone.

24  Q.  Mr. Najera, you also testified that you saw Lana Shamailov

25  went to the restaurant to eat or sometime took food, maybe

G75KNAJ4                          P. Najera – cross

1   takeout orders from the restaurant; is that correct?

2   A.  That is correct, and I sometimes even served her on 87th

3   Street.

4   Q.  Okay.  Do you know Michael Shamailov has a sister called

5   Jennifer Shamailov?

6   A.  I don't know that.

7   Q.  Do you know Jennifer Shamailov also have blond hair?

8   A.  I just told you that I don't know her.

9   Q.  Do you know actually she indeed went to Gotham Pizza many

10  times?

11          THE COURT:  Was that a question?

12          There's an objection.  Sustained.

13  Q.  Is it possible you may be confusing Lana Shamailov with

14  someone else?

15          THE COURT:  Sustained.

16  Q.  Did Lana Shamailov ever pay you?

17  A.  Never.

18  Q.  Did Lana Shamailov ever set your schedule?

19  A.  She would only come to get food.  She didn't –- she wasn't

20  very much in charge at all of the restaurant.

21  Q.  Did Michael ever introduce her to you?

22  A.  No.

23  Q.  You indicate when you were working for Gotham Pizza you

24  purchased three bikes.  Is that correct?

25  A.  That's right.

G75KNAJ4                        P. Najera - cross

1   Q.  Do you have receipt for any of these bikes?

2   A.  It's been quite a few years now; I did not keep the

3   receipts.

4   Q.  When did you purchase the first bike?

5   A.  When I started working at the restaurant.

6   Q.  When was that?

7   A.  In 2009.

8   Q.  When did you --

9   A.  Around June.

10  Q.  When did you purchase the second bike?

11  A.  I bought that one around 2010.

12  Q.  And when did you purchase the third bike?

13  A.  I bought that one pretty much right away, in 2010, because

14  the two bicycles practically got stolen at the same time.

15  Q.  Did you ever file police report saying your bike got

16  stolen?

17  A.  No.

18  Q.  Did you ever tell Michael Shamailov that your bike got

19  stolen, you need him to buy you a bike?

20  A.  No, no.  When he called us back, he told us, you have to

21  have a bicycle to work.

22  Q.  And, in fact, before you started with Gotham Pizza, you

23  already have a bicycle; is that correct?

24  A.  I was working at a Mexican restaurant right near there,

25  over on 75th, as a cook, so I did not have a bicycle.  Yes, it

1    was on 75th and First.

2    Q.  So did you ask Michael to pay for your first bike?

3    A.  If he told us that we have to have a bicycle in order to

4    work, then he's telling us that he's not going to buy us a

5    bicycle.

6    Q.  Did you also ride a bicycle home every day and ride a

7    bicycle to work every day?

8    A.  No.

9    Q.  So you just park your bike at Gotham Pizza at the end of

10   the day; is that what you're testifying?

11   A.  Yes.  When I got off work early, then the guys who were

12   working with me would put the bicycle inside the restaurant for

13   me at night.

14   Q.  You testify that Rodrigo hire you, right?

15   A.  That's right.

16   Q.  It's not Michael Shamailov hire you?

17   A.  When I arrived, the only one who was there was Rodrigo.  I

18   assumed that he must have been told that he needed someone to

19   work.

20   Q.  So Michael did not tell you you need a bike to work, right?

21   A.  Yes, he did.  Well, Rodrigo said to me, you need to have a

22   bike to get the work, do you have a bike?  And I told him no.

23        Later on, I spoke with Michael and Kenny.  They said

24   to me, you're in luck, you've got a job, but you need a bike to

25   be able to work.

G75KNAJ4

1    Q.  By the time Michael or Kenny talked to you, you already

2    worked there for over a week; is that correct?

3    A.  That was the same day.

4    Q.  You testify you first talk to Michael about your pay when

5    you receive your pay at the end of the week.  Do you remember

6    that testimony?

7             MR. ANDROPHY:  Objection.

8             THE COURT:  Excuse me.  There's an objection.

9             Sustained.

10            MR. XUE:  Your Honor, I have no more questions for

11   this witness.

12            THE COURT:  Any redirect?

13            MR. ANDROPHY:  May I just have one moment, your Honor?

14            (Pause)

15            MR. ANDROPHY:  No further questions.

16            THE COURT:  You may step down.

17            (Witness excused)

18            THE COURT:  Next witness?

19            MR. ANDROPHY:  Plaintiffs call Eleuterio Alonso.

20    ELEUTERIO ALONSO CHABLE,

21        called as a witness by the Plaintiffs,

22        having been duly sworn, testified as follows:

23            THE DEPUTY CLERK:  Please state your full name for the

24   record and spell out your first and last names.

25            THE WITNESS:  My name is Eleuterio Alonso Chable.

1    E-l-e-u-t-e-r-i-o A-l-o-n-s-o, Chable, C-h-a-b-l-e.

2    DIRECT EXAMINATION

3    BY MR. ANDROPHY:

4    Q.  Mr. Alonso, did you ever work for Gotham Pizza?

5    A.  Yes, sir.

6    Q.  Did you work at one location or more than one location?

7    A.  In one more; in two of them.

8    Q.  Which locations did you work at?

9    A.  I started working at 87th and First Avenue.

10   Q.  When did you begin working at Gotham Pizza?

11   A.  July of 2009.

12   Q.  How did you come to find your job at Gotham Pizza?

13   A.  A pizza man who used to work there recommended me.  His

14   name was Carlos Altamirano.

15   Q.  At some point did you go into Gotham Pizza to ask for a

16   job?

17   A.  Well, yes, but when I went there, then it turned out that

18   they only needed people for half a day and then the owners

19   weren't there yet.  So he told me to come back three hours

20   later to have an interview.

21   Q.  What happened next?

22   A.  I went back two, two and a half, maybe three hours after,

23   and then the owner of the pizzeria was there.  His name is

24   Michael.  And then the one who was there, Fausto Ramales, was

25   the one who was there, and he told me to go across the street,

1    there was a Mustang car across the street, and he told me go

2    over there, the owners are there, you can talk to them.

3    Q.  So what did you discuss?

4         MR. ANDROPHY:  Withdrawn.

5    Q.  So who did you then go and speak with?

6    A.  With the owner of the pizzeria, his name is Michael, and

7    then Kenny, Kenny who is at the pizza place also, he was there

8    too.

9    Q.  What did you discuss with Michael and Kenny?

10   A.  Yes, I was told that he needed somebody to deliver pizzas,

11   and then he told me that, yes, I could have the job but he

12   asked me if I had -- I told him that I did not have a bike.

13   Since it was only three days since I came from Mexico, I knew

14   nothing about all this.  And then one person who was there told

15   me, I do have a bike and I can sell it to you for $180 so that

16   you can work there.  And I stayed to work there that afternoon.

17   Q.  Did you discuss anything else with Michael and Kenny at

18   that time?

19   A.  Well, he told me that if I wanted to work, I could have it

20   and he was going to pay me 250 -- rather, from 240 to 250 per

21   week, plus tips.

22   Q.  Do you know who decided how much pay you would receive?

23   A.  Mr. Michael.

24   Q.  And how do you know that he's the one who decided your pay?

25   A.  Because I talk to him about that.

G75KNAJ4                    Alonso - direct

1   Q.  So you've testified you started working at the First Avenue

2   location.  At some point did you move to the York Avenue

3   location?

4   A.  Yes; around midterm, while I was working there.

5   Q.  Around the mid point of your total employment at Gotham

6   Pizza?

7   A.  Yes, yes, sure.

8   Q.  When did you completely stop working for Gotham Pizza?

9   A.  Yes, I started in July of 2009 and I left in October of

10  2012.

11  Q.  While you worked, during the period that you were working

12  at the First Avenue location of Gotham Pizza, were you ever

13  sent to the York Avenue location?

14  A.  Several times, when they didn't have enough personnel over

15  there, I used to go.

16  Q.  And similarly, while you worked at the York Avenue

17  location, were you ever sent to work at the First Avenue

18  location?

19  A.  That's right, that's the way it was.

20  Q.  And did you see whether any other people who were working

21  at one location had to go and work at the other location?

22  A.  Yes.  There was a man who was dressed with a gray shirt,

23  and mainly Prisco, he used to do that too.

24  Q.  Were you ever sent from one location to bring food from a

25  different location of Gotham Pizza?

1   A.   Yes.  That happened all the time.

2   Q.   How often did that happen, that you got to bring items from

3   one location of Gotham Pizza to another?

4   A.   Five or six times per week.

5   Q.   What types of items would you have to bring from one

6   location to another?

7   A.   We used to bring cheese, when there was no cheese, from one

8   location to another; flour; everything for pizzas, you know,

9   plastic bags, but then what we did during the summer is that

10  every morning I had to bring ice from one location to another.

11  Q.   Thank you.

12          What was your job at Gotham Pizza?

13  A.   I was hired as a delivery man, yes.

14  Q.   Can you describe everything that you had to do at Gotham

15  Pizza while you worked there?

16  A.   Yes.  They started telling me that I had to prepare the

17  dough and grate cheese and also chop up everything that you put

18  on a pizza, the sauce, and then set up the boxes mainly, and

19  bring everything up for the pizza people, who were preparing

20  the pizzas, and also take care of the counter, and clean the

21  windows; Monday and Tuesday, to receive all the merchandise

22  they buy for the location; clean the bathroom, uh-huh; and

23  mainly every day we had to clean the tables because that

24  pizzeria is quite busy.  And then every other minute you had to

25  clean the tables.  So that really was a change, because I

1    almost worked more inside.

2    Q.  Was there any one type of thing that you -- or one type of

3    work that you spent most of your time doing?

4    A.  Yes, to prepare everything, everything.

5    Q.  What do you mean by "prepare everything"?

6    A.  Well, I go there early to prepare all the cheese for the

7    pizzas, and that was the most important thing; the sauce, you

8    know, the pizza sauce, and also the marinara sauce.  Those were

9    the more -- the important ones.  And the most important thing

10   was to have the location clean.  At 11:00 everything had to be

11   ready so that the pizza place could function.

12   Q.  Was the pizzeria usually quiet or were there many customers

13   coming to the pizzeria?

14   A.  From 11:00 on, you had clients.

15   Q.  How many deliveries would you make on a typical day?

16   A.  Well, you know, during my shift, I would make about 16 to

17   18 deliveries.  There were not too many.

18   Q.  How many delivery workers worked at Gotham Pizza on a

19   typical day?

20   A.  My shift, we were just two.  And then at 4:00 or 5:00 p.m.,

21   two other people came and changed with us for that shift of the

22   afternoon.

23   Q.  Would your shift overlap at all with the two who came in

24   the afternoon?

25   A.  But for a long time they only had me only for the morning

1   but there was a big rollover of people because nobody really

2   stayed there too long because they didn't pay very well.  Then

3   they actually started using me also to work in the afternoon.

4   There was one person who actually worked to cover their shifts

5   and, you know, one person work even up to seven days a week.

6   Q.  What was your schedule when you first started working at

7   Gotham Pizza?

8   A.  Sometimes it was from 10:30 a.m. to 10:00 p.m.

9   Q.  How many days per week did you work that schedule?

10  A.  Well, we got six days but, as I was saying before,

11  frequently we didn't have enough people, so I had to work seven

12  days.

13  Q.  Do you recall approximately how often you would have to

14  work seven days a week?

15  A.  Well, not -- well, actually, maybe three weeks would go by

16  and then the fourth week we have somebody missing.

17  Q.  Now, apart from number of days per week, did the hours that

18  you worked change at all from week to week, or were they the

19  same from week to week, when you first started working?

20  A.  They changed.

21  Q.  At some point did your general schedule change?

22  A.  Well, yes.  I was set to do two days -- rather, three days

23  in the morning and three days in the afternoon or evening.

24  Q.  Now, when you say the morning, what times would your shift

25  be?

1    A.  From 10:30 a.m. to 10:00 p.m.

2    Q.  What was the usual afternoon shift on days you had an

3    afternoon shift?

4    A.  Well, it was from 4:00 p.m. and sometimes until 1:30.

5    Actually, sometimes even later because they wanted to finish

6    all the dough, all the pizza that they had there, so sometimes

7    even after 2:00 a.m.

8    Q.  Do you see the binder in front of you that's labeled

9    Plaintiffs' Exhibits?

10   A.  Yes.

11   Q.  Could you open to tab number 8.

12   A.  Here it is.

13   Q.  Can you take a moment and look through the pages there at

14   tab number 8 and let me know if you recognize those documents.

15   A.  Uh-huh, yes.

16   Q.  And what are they?

17   A.  Well, these were the pages that were prepared mid-term when

18   I was working there.  These are the pages that had the hours,

19   and those have like how much we were paid for hours and how

20   much per tip but these are when he was already paying 4.65 per

21   hour.

22        MR. ANDROPHY:  I'll ask that Plaintiffs' Exhibit 8 be

23   admitted into evidence.

24        MR. XUE:  No objection, your Honor.

25        THE COURT:  Received.

G75KNAJ4                        Alonso - direct

1              (Plaintiffs' Exhibit 8 received in evidence)

2              MR. ANDROPHY:  May I publish the first page of

3     Plaintiffs' Exhibit 8 to the jury?

4              THE COURT:  Yes.

5     BY MR. ANDROPHY:

6     Q.  Is your signature on the documents at Plaintiffs' Exhibit

7     8?

8     A.  Yes.

9     Q.  Do you know approximately when these documents at

10    Plaintiffs' Exhibit 8 are from?

11    A.  For the pizza man, the one who's in charge, explain to

12    me -- what's his name?  Well, his last name is Ramales.  He is

13    the pizza man in York Avenue, Rodrigo Ramales.  When he

14    presented this page to me, I asked him why.  And then he said

15    that from that day on I could not get my tips every day, like I

16    used to, that I was going to get them weekly because he was

17    having problems with Seamless, so that he could actually

18    control the tips because he was losing because of a percentage

19    that the company was charging him.

20    Q.  Are there any dates on any of the pages that you have in

21    front of you as Plaintiffs' Exhibit 8?

22    A.  No.

23    Q.  Do you know what years these documents are from?

24    A.  That was around mid-2010 but I don't recall very well.

25    Q.  Did you write the times in the row that says "Hours" on the

1   pages in Exhibit 8?

2   A.  Well, this one?  I didn't fill this one out.  Ramales is

3   the one who filled this, but this is handwriting is Rodrigo

4   Ramales' writing.

5   Q.  For some of the other weeks -- or for the other weeks,

6   other than the first page here, did you write in your hours, or

7   did Mr. Ramales write in your hours?

8   A.  This one?  I wrote this one -- no, rather, this one was

9   Rodrigo Ramales' writing and this one is mine because I don't

10  know how to write very well.

11  Q.  Okay.

12          Are there some that you wrote in and others that

13  Mr. Ramales wrote in?

14  A.  Yes.

15  Q.  As far as you know, are the hours written in accurate?

16  A.  Yes.

17  Q.  Now, did you use these types of sheets the whole time you

18  worked at Gotham Pizza?

19  A.  Not all the time, no.

20  Q.  What did you do before these sheets were used?  What, if

21  anything, did you do to keep track of the hours that you

22  worked?

23  A.  At the beginning, we just got paid weekly.  It didn't

24  matter the hours.  I was paid in cash 250 a week, and the tips,

25  I was given the tips every single day at the end of the day,

G75KNAJ4                         Alonso - direct

1   yes.

2   Q.  If you could look through the sheets at Plaintiffs' Exhibit

3   8, and tell me, do any of these sheets say anything about what

4   you received from your pay -- or what you received as your pay,

5   apart from tips?

6   A.  Well, they're all the same, you know, I just recall them

7   like -- they were just like that.  They just had this and the

8   signature, no date, no total, no nothing, nothing.  4.65 per

9   hour and that's it.

10  Q.  Now, when you worked at Gotham Pizza, did you ever see any

11  document or receive any document that said how much you were

12  being paid?

13  A.  No.  We just signed this page.  Rodrigo used to tell me

14  that I had to sign it one day before so that he would have to

15  present it to Michael so that the following day I would be

16  getting paid.

17         THE INTERPRETER:  Correction by the interpreter:

18  A.  If I didn't sign it, I would not get paid.

19  Q.  When you began working at Gotham Pizza, how much were you

20  paid?

21  A.  250.

22  Q.  And how were you paid, cash or check?

23  A.  In cash, cash.

24  Q.  Did you receive any written statement of the pay?

25  A.  No.

G75KNAJ4                          Alonso - direct

1   Q.  Did you have to sign anything when you were paid, at first?

2            THE INTERPRETER:  Could you please repeat the

3   question?

4   Q.  Did you have to sign anything when you were paid, at first?

5   A.  Yes.

6   Q.  What did you have to sign?

7   A.  Well, they would bring a notebook, like just of amounts

8   received.

9   Q.  Did that notebook say how much you were being paid?

10  A.  No, no, just my name, that I was already -- I had been

11  paid, to justify that I had been paid.

12  Q.  If your hours changed, were you paid a different amount

13  than $250 per week?

14  A.  No, no.

15  Q.  Now, at some point did your pay change?

16  A.  Well, that's when he said that he already had -- how do you

17  call it -- with Seamless, that he had to have a control,

18  different control of that.  And that's when he changed and he

19  said, I'm going to pay 4.50 per hour and not 250 per week

20  anymore but you're going to leave the tips over here.

21           Well, then he would then pay us and at the end of the

22  week he would actually put everything together, all the tips,

23  but, you know, I already kept also some notations on my money

24  and then my numbers differed from his numbers that he used to

25  pay me.

G75KNAJ4                          Alonso - direct

1   Q.  Okay.  What was your rate of pay at that time?

2   A.  I'm sorry?

3   Q.  When your pay changed, what was your new rate of pay?

4   A.  4.65 an hour.

5   Q.  Did anyone explain why you were going to be paid 4.65 per

6   hour instead of the $250 per week that you had been paid?

7   A.  Not on that point.  All he said is that he had to balance

8   his accounts because he was having a lot of trouble with the

9   Internet, the orders that came in through the Internet,

10  something like that, and he did not tell me directly; rather,

11  he told Rodrigo Ramales to tell me and the guys.  That's how it

12  was.

13  Q.  Did you receive -- sorry, did you have something more to

14  your answer?

15  A.  Yes.

16          THE INTERPRETER:  Your Honor, may the interpreter ask

17  the witness to break up his answers into smaller parts?  I can

18  interpret what he said so far.

19          THE WITNESS:  Well, when I did this, the payment rules

20  changed and the thing is, we were earning very little, so the

21  tips really helped a lot with our expenses but for the same

22  reason or --

23          THE INTERPRETER:  Interpreter's correction:

24          THE WITNESS:  -- rather, we weren't really given a

25  reason.  That's why some other people left but I stayed because

1    I needed a job.

2    Q.  Is your answer complete now?

3    A.  Yes.  I'm sorry.

4    Q.  Now, at that time, did you receive $4.65 per hour for all

5    hours worked or were you paid at a different rate for hours

6    above 40 in the week?

7    A.  It was 4.65 an hour.  That's what came out on my account.

8    That's why I explained everything I just did a little while

9    ago.

10   Q.  4.65 an hour for all hours?

11   A.  All hours.  Well, that's why verbally I asked Rodrigo

12   Ramales why it came out like that when you were saying to me

13   that after the 40 hours you were going to pay me 7.56 or --

14   well, I don't remember, seven and how much.  But that's not how

15   it went.

16   Q.  At some point, had they told you they would pay you a

17   different rate for the hours above 40 each week?

18   A.  Yes, but it never happened.

19   Q.  Did you receive any extra pay above the 4.65 per hour for

20   days when you worked more than ten hours?

21   A.  No.

22   Q.  Were you paid 4.65 per hour to the end of your employment?

23   A.  Yes.

24   Q.  Did you receive your tips at the end of each day or at the

25   end of each week?

1    A.  After this, at the end of every week, together with my

2    salary.

3    Q.  What do you mean when you say "after this"?

4    A.  After the period that was halfway through how long I

5    worked.  When I started, I would get paid every day and I would

6    get my tips every day and there was no problem, but after about

7    a year and when I was working for him, then he would just pay

8    me everything at the end of the week and tips together with

9    everything.

10   Q.  Did you receive all of the tips that you earned during the

11   week?

12   A.  Not according to my calculations.  According to his, yes,

13   but I always came up 30, 40 dollars, up to 60 dollars short.

14   Q.  Looking at Exhibit 8, can you explain how you would come to

15   write in the amounts that are written in for SW tips or

16   Seamless tips?

17   A.  Yes, because this is what we would make in tips in one day.

18   We would keep the cash, whatever we were paid in cash, as the

19   tip, but credit cards and Seamless would be left to be paid to

20   us together with the week's work.

21   Q.  Did you ever complain to anyone about not being paid the

22   full amount of tips, according to your calculation?

23   A.  Every weekend, I would say to Rodrigo Ramales, I'm missing

24   money.  And he would say, go ask Michael about it.  And I did

25   ask him two or three times.  And he said to me, let me check on

1    it.  And then after that, nothing happened.

2    Q.  On an average week, how much of your tips were withheld

3    from you?

4    A.  In one week, like a percentage?  Well, from 30 to 40

5    dollars per week.

6    Q.  During your time working at Gotham Pizza, did you ever

7    receive any document that stated how much you were going to be

8    paid?

9    A.  No.  We would just sign this and then he would take this to

10   do his own calculations, at home or wherever, I don't know, and

11   then the next day he would pay us.

12   Q.  Other than these time sheets and the notebook you described

13   before that you signed to confirm payment, were there any other

14   documents you had to sign?

15   A.  No, no, just this and that.

16   Q.  How did you make deliveries when you worked at Gotham

17   Pizza?

18   A.  By bicycle.

19   Q.  Did the pizzeria provide that or did you purchase it?

20   A.  No, I bought them.

21   Q.  How many bikes did you have to purchase?

22   A.  During the period of time I worked for them, I bought four

23   bicycles.

24   Q.  How much did they cost?

25   A.  The first one I bought cost me 180 when I started with

1    them; two for 250; and the last one, towards the end of my

2    work, I bought for $600.

3    Q.  Why did you have to buy four bikes?

4    A.  The first one, I had just arrived from Mexico and I got

5    conned, it was no good, it lasted a very short time.  I had to

6    buy another one around two months later, the one for 250.  And

7    it got damaged because in the area where we work, the streets

8    are very torn up.  And I would use it to come and go from my

9    house in the Bronx to my job on 87th because there was just not

10   enough for me to spend money on the train.  I was accumulating

11   very little money in tips.

12   Q.  Did you also have to spend money for repairs to the

13   bicycles?

14   A.  Yes.

15   Q.  How much did you spend on repairs?

16   A.  For repairs?  Well, just to go and change the tires would

17   cost 75 to 80 dollars.

18   Q.  How often would you have to do that?

19   A.  Sometimes three times a month or twice.  Several times a

20   year.

21   Q.  Were there any other repairs you had to do on the bike?

22   A.  Yes.  It was very important to buy lights for safety.  We

23   would buy helmets, jackets --

24        THE INTERPRETER:  Interpreter's correction:

25   A.  Vests and lights.

```
 1   Q.  Do you recall how much you spent on those items?
 2   A.  Well, the helmets would cost me about $60; the vests, 25;
 3   and the lights for the bicycle would cost me about 130 to 140.
 4   The city would require it for our safety.
 5   Q.  Did Gotham Pizza --
 6           THE COURT:  Excuse me, Counsel.  You can place that
 7   question and that will be your last for the day.
 8           MR. ANDROPHY:  Okay.  Thank you.
 9   Q.  Did Gotham Pizza ever give you money to pay for either the
10   bicycles, the repairs or the bicycle equipment?
11   A.  Never.
12           THE COURT:  Okay, ladies and gentlemen.  I'm going to
13   ask you to take the binders into the jury room with you but
14   don't open them when they're in the jury room, just leave them
15   closed, and we'll leave them in the jury room overnight.
16   Again, they're binders, those of you who are using them, for
17   your own purpose; no one should take any binder except their
18   own.
19           I wish you a very good night and we'll see you
20   tomorrow morning at 9:30.  We'll be ready to resume testimony.
21   Thanks so much.  Have a nice evening.
22           (Continued on next page)
23
24
25
```

G75KNAJ4                           Alonso - direct

1              (Jury not present)

2              THE WITNESS:  Thank you.

3              (Witness temporarily excused)

4              THE COURT:  I'll check these numbers later, but I have

5    recorded for plaintiffs' counsel today one hour and 44 minutes

6    and for defense counsel, 57 minutes.

7              Let's talk a little bit about some issues that have

8    arisen, and I want to certainly hear any points that counsel

9    wish to raise before we break for the day.

10             Mr. Xue, in your opening, towards the end of your

11   opening, you asked the jury to essentially agree with the

12   conclusion that you drew.  You referred to yourself:  "I draw."

13   Counsel, of course, can't testify before the jury -- your own

14   personal opinion is not to be placed before the jury -- so I'm

15   going to ask you not to repeat that kind of statement in your

16   summation.

17             MR. XUE:  Understood, your Honor.

18             THE COURT:  Thank you so much.

19             I think that I should prepare a charge on fabrication

20   of documents, a kind of spoliation charge.  I'll be turning to

21   that but I invite counsel to submit any such charge that they

22   would like me to consider as well.

23             Of course, it may be highly relevant to the jury

24   whether an employee complained about their wages or any of the

25   payment practices during their employment but, of course,

G75KNAJ4                          Alonso - direct

1      there's no duty under the law to complain and you're required

2      to be paid what the law requires you to be paid, whether you've

3      complained or not.  So I'll be fashioning a charge along those

4      lines too.  I think that was particularly important, given the

5      defense opening but also some of the questions.

6               The defense opening also tried to create sympathy for

7      the defendants by talking about the defendants' company as a

8      small struggling business.  Of course, businesses, large or

9      small, whether wholly owned by a single person or owned by

10     shareholders and traded on the New York Stock Exchange, must

11     comply with our nation's labor laws and the labor laws of New

12     York State.  So I'll be crafting a charge along those lines

13     too.  I'm happy to consider any charge you want to submit to me

14     along those lines.

15              Mr. Androphy, I know that it may be something that is

16     just a nervous tick, but I'd appreciate it if you not thank

17     witnesses for their answers.  It eats up time but everyone is

18     just supposed to give their testimony; no thanks required.

19              We have an issue with respect to Plaintiff Alonso's

20     spelling of his last name.  I believe as it was laid on the

21     record, just after he was administered the oath, it was

22     translated, whatever he said, was translated as A-l-o-n-s-o.

23     In the caption, it's z-o, not s-o.  So it doesn't matter to me

24     but we should have his correct name.  We can change captions --

25     all is well -- I just want to make sure that we focus on that

1    and use the proper spelling for his name.

2              As your requests to charge at page 34 reflect -- and

3    this is one of the issues I said I'd raise with you at the end

4    of the day -- the law in New York, labor law, requires an

5    employer to provide certain notices to its employees.  And one

6    of them has to do with notice at the beginning of their

7    employment.  At page 34 you address that issue and indicate

8    that the burden of proof for this claim is on the defendant.

9    As I understand it, there is agreement on that, and I think we

10   found a provision of the law which confirms that, so as far as

11   I know, however, that's the only issue in the case where the

12   burden is going to be on the defendants, as opposed to on the

13   plaintiffs, and that's how I'm preparing my jury charge.  So I

14   just want counsel, if I've missed something else, to be alert

15   to that and let me know tomorrow.  Good.

16             So, Counsel, is there anything that you wish to raise

17   with me before we break for the day?  Otherwise, I'll see you

18   at 9:00 a.m. tomorrow bright and early.

19             MR. ANDROPHY:  Yes, your Honor.  One item:  We may

20   have a witness in particular Mr. Cenan Menedi, whose name has

21   come up, Kenny, Cenan Menedi's nickname that he was known by.

22   We expect him to come to testify tomorrow.  Based on his work

23   availability, it may be later in the day, in the afternoon, and

24   plaintiffs may be done presenting our case before he arrives.

25   I wanted to know if the Court would entertain allowing him to

1   testify out of order, basically allow the plaintiffs to end

2   their case but for his testimony, if he's only available in the

3   afternoon and we've completed our case.

4           THE COURT:  This is how I manage this kind of issue in

5   a trial:  I ask counsel to discuss it with each other.  I urge

6   everyone to cooperate in the scheduling of witnesses.  It's a

7   kind of issue that often arises at trial and, in my experience,

8   people cooperate with each other and take people out of order.

9   Sometimes defense witnesses are called in the middle of the

10  plaintiff's case, we sometimes even break a particular witness'

11  testimony in order to accommodate particular needs of a

12  witness.  Similarly, sometimes plaintiff's witnesses can only

13  be available on what we schedule as the defense case.  And, in

14  my experience, people have no problems, we explain this to the

15  jury, counsel cooperate with each other.

16          So I anticipate no problem, and why don't we take a

17  brief break after we've finished talking with each other.  You

18  can always discuss it with each other.  If there is a problem,

19  I'll come back on the bench and I'll hear everybody and I'll

20  give you a ruling.

21          MR. ANDROPHY:  Thank you, your Honor.

22          MR. LABUDA:  And, your Honor, just one other issue was

23  the -- we had raised the issue earlier in terms of the six-hour

24  time limit.  I know the Court had indicated how much time the

25  plaintiff and the defendant had taken on each side's case.  I'm

1    inferring, I don't know if correctly or incorrectly, that the

2    Court does want us to stick with those six-hour time limits

3    simply because of the time noted but we wanted some further

4    clarification just for future witnesses.

5                THE COURT:  Yes, absolutely.  I think everybody's

6    planned, given my ruling last week, on how to present their

7    case within the time limits.  Again, the time limit does not

8    include your summation; it's only the time you're on your feet

9    before this jury, either for opening statement, direct or

10   cross.  So I did say, however, if people wanted to renew their

11   application at the end of today, I'd, of course, give you an

12   opportunity to be heard.  So if you have an application to make

13   at this point, I will hear you, but otherwise everybody is

14   assumed to be working within the six-hour limit and plan

15   accordingly.

16               MR. LABUDA:  Okay.  Thank you, your Honor.

17               THE COURT:  Okay.  Anything else we need to discuss

18   tonight?

19               Good.  So why don't I just ask you to consult quickly

20   with each other right now to see if there's a problem about

21   witness scheduling; and if there is, I'll hear you.

22               MR. LABUDA:  Your Honor, we haven't consulted and this

23   is the first time it was raised, but we have no objection.

24               THE COURT:  Thank you.  And I remind you again, in the

25   future, always raise issues with each other.  No one should be

G75KNAJ4                          Alonso - direct

1    blindsided or put in the awkward position of having to agree or

2    not agree on the fly.

3              Good.  Thank you so much.  Enjoy your evening.  I'll

4    see you tomorrow morning at 9:00 a.m.  Thank you.

5              (Adjourned to July 6, 2016 at 9:00 a.m.)

6                              * * *

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1                      INDEX OF EXAMINATION

2    Examination of:                          Page

3    PRISCO NAJERA

4    Direct By Mr. Androphy . . . . . . . . . . . .59

5    Cross By Mr. Xue . . . . . . . . . . . . . . .77

6    ELEUTERIO ALONSO CHABLE

7    Direct By Mr. Androphy . . . . . . . . . . . 102

8                      PLAINTIFF EXHIBITS

9    Exhibit No.                            Received

10    3  . . . . . . . . . . . . . . . . . . . . .68

11    8  . . . . . . . . . . . . . . . . . . . . 109

12                      DEFENDANT EXHIBITS

13   Exhibit No.                            Received

14    H1  . . . . . . . . . . . . . . . . . . . .86

15    H  . . . . . . . . . . . . . . . . . . . . .93

16

17

18

19

20

21

22

23

24

25
```