G76KNAJ1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

PRISCO NAJERA, et al.,

                    Plaintiffs,

          v.                              12 CV 3133 (DLC)

1443 GOTHAM PIZZA INC.,
et al.,

                    Defendants.

------------------------------x
                                          New York, N.Y.
                                          July 6, 2016
                                          9:00 a.m.

Before:

                    HON. DENISE COTE,

                                          District Judge

                         APPEARANCES

MICHAEL FAILLACE & ASSOCIATES PC
     Attorneys for Plaintiffs
BY:  JOSHUA S. ANDROPHY
     SHAWN RAYMOND CLARK

MILMAN LABUDA LAW GROUP PLLC
     Attorneys for Defendants
BY:  JOSEPH MARTIN LABUDA
     -and-
XUE & ASSOCIATES PC
BY:  BENJAMIN B. XUE

ALSO PRESENT:  CARMEN BARROS, Interpreter (Spanish)
               MARCIA GOTLER, Interpreter (Spanish)

G76KNAJ1

1              (Trial resumed; jury not present)

2              THE COURT:  Good morning, everyone.  Please be seated.

3              COUNSEL:  Good morning, your Honor.

4              THE COURT:  Let's deal with a credit or offset for

5    meal breaks.  I'm going to deny the defendants' request that

6    the jury be charged regarding that or that the defendants be

7    able to take any credit in the calculations of this trial.

8              The defendants contend that the jury should be

9    instructed that the defendants are entitled to an offset or

10   credit for breaks that they allowed the plaintiffs to take

11   during their employment at Gotham Pizza.

12             Under FLSA regulations, bona fide meal periods are not

13   work time.  CFR Section 785.19(a).  Bona fide meal periods are

14   breaks in which an employee is completely relieved from duty

15   for the purposes of eating regular meals.  A break is not a

16   bona fide meal period if the employee is required to perform

17   any duties, whether active or inactive, while eating.  An

18   employer need not pay employees for time spent on bona fide

19   meal periods but must pay employees for meal breaks during

20   which a worker performs activities predominantly for the

21   benefit of the employer.  Reich, 121 F.3d at 64.

22             Here, the defendants contend that every plaintiff

23   received, and was compensated for, three 30-minute breaks per

24   day -- one in the morning, one in the afternoon, and one in the

25   evening.  Thus, assuming that these breaks constitute bona fide

G76KNAJ1

1    meal periods, the issue is whether the defendants, having

2    already compensated the plaintiffs for those breaks, are

3    entitled to a credit because they were not required to do so

4    under the FLSA.

5            The defendants have not identified, and the Court is

6    not aware of, any authority for the proposition that once an

7    employer has paid employees for breaks, that it can take a

8    credit for such payments if it is found liable for violations

9    of the FLSA or New York Labor Law.

10           Similarly, the Court is not aware of any authority

11   permitting the defendants to subtract hours for which they paid

12   employees for breaks in computing the regular hourly rate for

13   an employee.

14           The Court also notes that none of the time sheets

15   introduced into evidence so far appears to reflect any breaks

16   for meals.  Because there's neither a legal nor factual basis

17   to permit a credit or offset to the defendants, the defendants'

18   request to so charge the jury is denied.

19           I note as well that allowing an ex post facto meal

20   break credit invites fraud and undermines the goals of the

21   federal and state labor laws.  The law requires clear and

22   complete notice of the terms of compensation to be provided

23   contemporaneously to employees, indeed with each paystub.

24   Here, the defendants provided no such written notice of any

25   meal break credit.

G76KNAJ1

1          The other issue that we have left open was the

2     spelling of Plaintiff Alonso's name.  Is it a Z or S?  Or do we

3     know so far?

4          MR. ANDROPHY:  I think I'll go with the way that he

5     spelled it himself, so with an S.  That's how he spelled it

6     yesterday in court.

7          THE COURT:  Okay.  I just want to make sure you have

8     confirmed, through the interpreter, with Mr. Alonso that there

9     wasn't an error in interpretation.  So you'll let me know one

10    way or the other --

11         MR. ANDROPHY:  Okay.  Thank you.

12         THE COURT:  -- later.  Thank you.

13         Does the plaintiff have any issues to raise?

14         MR. ANDROPHY:  Just one issue relating to the jury

15    charges, specifically the charge for tip misappropriation.  The

16    defendants have raised in their questioning that SeamlessWeb

17    would charge a percentage to the employer.  And I believe they

18    asked Prisco Najera if he was aware of that.  And they seem to

19    be making an argument that taking a percentage of the tips for

20    such orders was justified based on the company charging a

21    percentage.

22         The current charge for unlawful tip misappropriation

23    does contain a sentence relating to credit card processing

24    fees.  And this is on page 32 of the jury charge's proposed

25    jury instruction number 22.  It does not include currently any

1    instruction relating to Internet orders or SeamlessWeb orders,

2    and we think it would be appropriate to have such an addition.

3             THE COURT:  Give me a moment.

4             So I should have instructed the jury -- of course, I

5    wasn't requested at that time -- that the evidence with respect

6    to what I believe was a 15 percent charge by SeamlessWeb was

7    hearsay.  The plaintiff was reporting a conversation with a

8    managerial employee of the defendants.  And that's not proof

9    that the 15 percent actually is taken by SeamlessWeb or what it

10   is applied to.

11            The charge, as I am now planning to give it, as to the

12   withholding-of-tips claim, notes that when tips are charged on

13   credit cards, the employer must return to the employee the full

14   amount of the tip charged on the credit card minus the prorated

15   portion of the tip taken by the credit card company.  That

16   comes directly from the regulation, and that's Section

17   146-2.20.  So I think I should just add a sentence that says,

18   similarly, "When tips are charged through a SeamlessWeb

19   transaction, the employer must return to the employee the full

20   amount of the tip minus the prorated portion of the tip taken

21   by SeamlessWeb."  So it basically applies the same standard to

22   a SeamlessWeb transaction.

23            Is that agreeable to the plaintiff?

24            MR. ANDROPHY:  Your Honor, I think there is case

25   law -- I unfortunately do not have the citation with me at this

G76KNAJ1

1    moment, but there is case law within this district that says

2    that SeamlessWeb orders are treated differently or other

3    Internet service orders are treated differently than credit

4    card orders and that employers are not permitted to take such

5    deductions from SeamlessWeb orders.  I apologize, I don't have

6    the citation right now.  I can provide it, I guess, at our next

7    break later today, if that's acceptable.

8             THE COURT:  I apologize for not being a SeamlessWeb

9    user; I'm one of those old-fashioned people who actually cooks.

10   I assume, if a customer orders on SeamlessWeb, they can charge

11   the food that's being delivered through a credit card

12   transaction.

13            MR. ANDROPHY:  Correct.

14            THE COURT:  And if they do that, I assume they can add

15   the tip or, I'm assuming again, they can choose not to add the

16   tip and yet to give the delivery person a cash tip.  Is that

17   correct?

18            MR. ANDROPHY:  That is correct, your Honor.

19            THE COURT:  So, if it's a credit card transaction

20   through a SeamlessWeb order, then it's already covered by the

21   regulation which I just read.  So what we're talking about is

22   something in addition to the credit card processing fee, and it

23   is an extra charge made by SeamlessWeb for the transaction.  Is

24   that what we're talking about?

25            MR. ANDROPHY:  Your Honor, I don't think that's quite

G76KNAJ1

correct.  I believe the customer using the credit card pays

Seamless, Seamless might then have to pay a charge to the

credit card fee but Seamless has a contract with the restaurant

and the restaurant has to pay a percentage of that -- under

those contracts, the restaurant has to pay a percentage to

Seamless.  And there's a decision from this district, from

Judge Nathan, holding that -- I don't have the case in front of

me so I don't want to misstate it but holding that that's

treated differently than the credit card processing fee, which

an employer is allowed to make a deduction from the tip, so

holding that that's not permitted for a SeamlessWeb or similar

Internet service.

          THE COURT:  So, does a restaurant, on one of these

orders -- what information is on the paperwork that a

restaurant receives when there's a SeamlessWeb transaction?

Does it separately show the credit card processing fee and the

SeamlessWeb charge?

          MR. ANDROPHY:  My understanding is that for a single

order, on the order, it will have the amount of the food, the

amount of the tax, the amount of the tips, that the customer

put on that order.

          My understanding also is that --

          THE COURT:  Excuse me one second.

          (Pause)

          MR. ANDROPHY:  My understanding also is that Seamless

will then bill the restaurant, which is the customer of
Seamless, I believe, on a monthly basis or they'll provide them
with, I guess it's not really billing, it's maybe Seamless is
paying them, based on the orders that are placed through
Seamless for that restaurant but they'll take off a percentage
as a processing fee.

THE COURT:  Okay.  I think it would be helpful to me
to see an exemplar of the paperwork we're talking about.
Obviously, on certain exhibits that were received in evidence
yesterday, worksheet type of exhibits that record the hours of
an employee and the tips received by an employee, there are
three different lines of information for tips -- cash tips,
credit card tips, and SeamlessWeb tips.  So you'll get me, if
you can -- if we don't have them at all in this evidentiary
record and won't at the trial, that's sort of interesting in
and of itself, but we'll look for the Judge Nathan decision
and, of course, defense counsel are free to point me to any
other authority.

So it's not clear to me that I should allow the
employer to take a pro rata portion of the tip on a SeamlessWeb
charge that is separate from a credit card processing fee, and
I'll reserve decision on that and look at Judge Nathan's
decision and any other authority that counsel want me to look
at.  Thank you.

Any other issue from plaintiffs' counsel?

G76KNAJ1

1          MR. ANDROPHY:  No, your Honor.

2          THE COURT:  Okay.

3          Defense counsel, any issues to discuss?

4          MR. LABUDA:  Yes, your Honor.  Just with respect to

5    the meal break time, part of our request, your Honor, was not

6    only with respect to the credit or the setoff but just an

7    instruction in general with respect to the fact that if they

8    did take an uninterrupted break, that that is noncompensable

9    time.  I just wanted to get some clarity to that.

10         Your Honor indicated at the beginning of the

11   conversation that breaks were noncompensable time.  And that

12   was part of our request as well, that not only did we think

13   that that time is noncompensable but we also wanted to get a

14   credit for it.  And we understand your Honor's position with

15   respect to the credit setoff; I just wanted to get clarity on

16   the issue of the fact that the jury would be instructed if, in

17   fact, the evidence established that the plaintiffs took an

18   uninterrupted break, that that was noncompensable time that the

19   jury can consider.

20         THE COURT:  No, I deny that request.  As I

21   explained -- and I'm relying on your letter of July 1st -- you

22   compensated the employees for that time.  That's a decision you

23   made at the time, and so you cannot unwind that now, for the

24   reasons I explained.  There's no basis in the law to do that.

25         So the jury has no basis to use a defendant's

G76KNAJ1

1   assertion that someone had a bona fide meal break, as defined

2   in the law, and that that should affect how many hours they

3   worked in any particular week or their regular rate of pay or

4   any other decision they have to make here about a violation of

5   the law.  And indeed, under 403, it would seriously confuse

6   them, I think, for me to charge them about something that the

7   defendants didn't take advantage of.

8           MR. LABUDA:  Your Honor, the only issue that we had is

9   that if, in fact, the jury determined that they took these

10  hour-and-a-half breaks each day, it may affect the amount of

11  hours that they deem they actually worked as opposed to hours

12  that they didn't work.  And so, even though we may have paid

13  them for it, the law would indicate, based on the Fair Labor

14  Standards Act, that they can't be compensated for that time.

15  And if the jury were to determine, oh, well, they were paid 60

16  hours, so they must have worked 60 hours and we don't have any

17  instructions with respect to a break, they may, in fact,

18  determine that those payments should be made in overtime pay,

19  which wouldn't be appropriate under the law.

20          THE COURT:  If I were to charge them at all, if the

21  record reflected -- and it doesn't so far -- that there was

22  anything like a bona fide meal break given here, but if the

23  record began to develop that evidence, I would charge them, in

24  fact, the opposite.  Because the defendants compensated the

25  plaintiffs for that meal break time during their periods of

G76KNAJ1

1    employment, they may not now retroactively seek to unwind that

2    decision that the defendants made back then, for the reasons

3    I've already explained.

4              So, if this becomes an issue of any prominence at all,

5    to clarify the issues for the jury, I'm going to instruct them

6    that meal break time should not reduce in their calculations

7    the number of hours plaintiff worked during the week or a

8    determination of their regular rate of pay for the plaintiff.

9              MR. LABUDA:  Okay.  Your Honor, just one procedural

10   issue:  This is one of the days that I needed to leave early.

11   I just wanted to let the Court know I would like to leave

12   around 11:00.

13             THE COURT:  That's fine.  Do you want to just leave,

14   which would be fine and which is what normally would happen, or

15   would you like me to say something to the jury?

16             MR. LABUDA:  If your Honor wouldn't mind saying it

17   just at the beginning of the day, that attorneys may leave the

18   room and that -- I just don't want them to think that I'm rude

19   in any way or the Court to think I'm rude in any way.

20             THE COURT:  Absolutely.  I certainly don't think

21   you're rude and I'll do my best to make sure the jury doesn't

22   draw that inference.

23             MR. LABUDA:  Okay.  Thank you, your Honor.

24             THE COURT:  Yes.

25             So, Counsel, my goal, which I can't make the

G76KNAJ1

commitment I'm going to meet yet but I'm hoping to meet, is

that I'm going to give you a verdict form for one of the

plaintiffs as an exemplar.  I hope to give it to you during the

lunch break and then at 5:00 o'clock hear any requests or

comments you have on it.  Then I'll create sort of a final

verdict form from those comments and apply it for all five

plaintiffs, but it's a lot of work on our part to create a

verdict form -- well, it's been a lot of work to create a

verdict form at all, for one plaintiff, and I'd like to have

some finality with respect to that before I apply it five

times.  It's not the kind of thing where we can easily

duplicate it.  We really have to spend time inputting.  So

thank you so much.  That's my goal.  I hope to meet it but

we'll see if we don't.

          Good.  Anything else defense counsel wishes to raise?

          MR. XUE:  Your Honor, just one more issue.  Plaintiff

has indicated that they would like to call a nonparty witness,

Cenan Menedi, also known as Kenny, to testify.  There is

ongoing litigation between Kenny and Michael Shamailov,

actually, Kenny also and Lana Shamailov.  I guess it would be

touched upon either at direct --

          THE COURT:  I'm sorry, it would be?

          MR. XUE:  It would be, the issue will come up at

direct and cross but I don't want it to be a full-blown issue

at this trial because it's not related to this trial, but I

G76KNAJ1

1    think if the question is asked, to be limited to whether there

2    is ongoing business dispute between Kenny and Michael or Kenny

3    and Michael and Lana.

4            THE COURT:  May I ask, since I don't know about the

5    litigation -- at least I don't remember if counsel have told me

6    about it -- is it litigation in federal court?

7            MR. XUE:  No, it's in state court litigation.  Kenny

8    is claiming he is partner, basically a part owner of the

9    business, and which Michael deny.  So the party were

10   represented by different counsel.  I'm not involved in that

11   case.

12           THE COURT:  So it's not a New York Labor Law or FLSA

13   claim?

14           MR. XUE:  No, it's not.

15           THE COURT:  But obviously it would go directly to the

16   bias --

17           MR. XUE:  Yes.

18           THE COURT:  -- of the witness.  At least the

19   defendants, I expect, will argue that it goes to the bias of

20   Kenny, should he testify.  Am I right?

21           MR. XUE:  Yes, yes.

22           THE COURT:  Okay.

23           MR. XUE:  I would like to question him but probably I

24   don't want to go too far.  I don't want to -- if I question him

25   there's ongoing litigation unrelated to labor law, I don't want

G76KNAJ1

1    to create impression, open a door for plaintiff to ask

2    everything about that litigation.

3              THE COURT:  Well, we'll take it one question at a

4    time, but it's not unrelated in the sense that it concerns

5    Kenny's work at Gotham Pizza, am I right, and whether he was a

6    joint employer or a manager or employee at Gotham Pizza?

7              MR. XUE:  I think both parties agree that he was a

8    manager, he was an employee, it was never disputed; it was

9    stipulated.

10             THE COURT:  Yes, but I'm just pointing out that the

11   litigation is not unconnected to Gotham Pizza.

12             MR. XUE:  That's correct, it's connected to Gotham

13   Pizza.

14             THE COURT:  Okay.

15             So the plaintiffs, if they call Kenny, can explore the

16   issue.  If you think they've explored it in too great a detail,

17   you'll object.  You'll have an opportunity to cross-examine

18   him.  If the plaintiffs haven't explored the issue, you may

19   introduce it and go into such detail as you believe is

20   appropriate.  You will or won't, through that questioning, open

21   the door for redirect examination.

22             Unless I have a specific question or a specific

23   concern that you have about some issue related to the

24   litigation that you think is unrelated to bias or this case,

25   it's hard for me to rule without hearing the questions.

G76KNAJ1

| | |
|---|---|
| 1 | MR. XUE:  But I just want to alert the Court that that |
| 2 | issue may come up. |
| 3 | THE COURT:  Thank you. |
| 4 | MR. XUE:  I just don't want it to -- I just want to |
| 5 | state my position that I don't want the entire case to be tried |
| 6 | in this court. |
| 7 | THE COURT:  Well, that's certainly true.  And under |
| 8 | 403, we're going to make sure that the state court litigation |
| 9 | between Kenny and the Shamailovs does not become a full-blown |
| 10 | trial here.  And to some extent our time limits help counsel |
| 11 | make choices in that regard. |
| 12 | MR. XUE:  Thank you, your Honor. |
| 13 | THE COURT:  Good. |
| 14 | But I want to thank you, Mr. Xue, for giving me this |
| 15 | background because if there are objections now, I'll understand |
| 16 | the context.  So very much thank you. |
| 17 | MR. ANDROPHY:  I do want to let the Court know, I |
| 18 | think yesterday I said I expect Mr. Menedi to come this |
| 19 | afternoon to testify.  I'm now expecting him Thursday morning. |
| 20 | So I just want to let the Court and defense counsel know that. |
| 21 | THE COURT:  Good.  Thank you. |
| 22 | Anything else? |
| 23 | MR. LABUDA:  Just before we -- |
| 24 | THE COURT:  Yes, Mr. Labuda. |
| 25 | MR. LABUDA:  If we could take a short restroom break? |

G76KNAJ1

1           THE COURT:  Oh, yes.  That's why I wanted to make sure

2     there were no other legal issues.  Everyone can take a break

3     before 9:30.  Ms. Rojas will let us know when there is a jury.

4           Good.  Thank you.

5           (Recess)

6           THE COURT:  We have a jury, but one of our jurors has

7     had some difficulties getting through security because of metal

8     in her body, and so I'm going to meet with the marshals and see

9     what we can work out for a better accommodation that balances

10    correctly a person's need for privacy and the security needs of

11    the courthouse, et cetera.  So that's what Ms. Rojas was

12    conveying to me just a moment ago.

13          I read Judge Nathan's opinion.  We'll talk more about

14    that at the break.  Bring in the jury.  And the plaintiff

15    should resume.  Mr. Alonso.

16          (Continued on next page)

17

18

19

20

21

22

23

24

25

1          (Jury present)

2              THE COURT:  Good morning, ladies and gentlemen.

3              JURY MEMBERS:  Good morning.

4              THE COURT:  Ms. Rojas has shared the concerns that one

5      of you have expressed, about moving through the security lines

6      here.  I'm just going to refer to it generally.  I'm going to

7      address it and see what we can do about the situation and get

8      back to you.  I thank you very much for bringing that to our

9      attention.  Much appreciated.  Obviously, all of us -- the

10     plaintiffs, the defendants, myself -- are deeply grateful to

11     citizens who come and perform jury service.  You can already

12     see how important it is, the important issues for the

13     plaintiffs and the defendants here that you will decide, and we

14     want to make jury service as positive an experience as we can

15     for you.

16             Okay, we'll continue.  Counsel.

17      ELEUTERIO ALONSO CHABLE, resumed.

18     DIRECT EXAMINATION CONTINUED

19     BY MR. ANDROPHY:

20     Q.  Mr. Alonso, when did you stop working for Gotham Pizza?

21     A.  October of 2012.

22             MR. ANDROPHY:  I have no further questions for

23     Mr. Alonso at this time.

24             THE COURT:  Oh, by the way, ladies and gentlemen, I

25     forgot to mention to you that from time to time one or more of

1    the lawyers may be leaving the courtroom for part of the day or

2    a substantial part of the day.  They're just dealing with other

3    matters; it means nothing.

4    CROSS-EXAMINATION

5    BY MR. LABUDA:

6    Q.  Good morning, Mr. Alonso.

7    A.  Good morning.

8    Q.  Do you have any documents with respect to the hours that

9    you worked or the pay that you received?

10   A.  No, sir.

11   Q.  You had indicated yesterday that sometimes the pay that you

12   received in tips didn't jibe with the amount that was on your

13   time and pay sheet.  Do you recall that testimony?

14   A.  No, it didn't match.

15   Q.  Okay.  Do you recall -- withdrawn.

16           You kept notes of your pay while you were employed at

17   Gotham; is that correct?

18   A.  I have a weekly note or notation or a daily -- of the daily

19   money that I made.

20   Q.  And you don't have those papers anymore, correct?

21   A.  No.  At the end of the week, I would throw them away.

22   Q.  You destroyed them; is that correct?

23   A.  Yes, yes.

24   Q.  You also kept track of the tips the same way, correct, that

25   indicated how much you made in tips?  You kept that on a piece

1    of paper as well?

2    A.   Yes.   I would do my accounting and then I would actually

3    talk to Mr. Rodrigo and tell him that what he was giving me

4    didn't match.

5    Q.   Okay.   You also threw those papers out as well, correct?

6    A.   Yes, because I also kept it in my mind.

7    Q.   And you would throw them away each week; is that right?

8    A.   Every week.

9    Q.   Now, with respect to the end of your employment, you quit

10   your employment at Gotham, correct?

11   A.   Yes, for the same reason.

12   Q.   Okay.   And you quit because one of your coworkers told you

13   to join this lawsuit, correct?

14   A.   No, not exactly.   I didn't know; it was later on.

15   Q.   Well, didn't Mr. Najera solicit you to join the lawsuit?

16   A.   It was later on, when I met him by chance.

17   Q.   And he's the one that told you about the lawsuit and told

18   you to join, correct?

19   A.   Well, I told them that I was a little bit -- I felt a

20   little bit uncomfortable because I felt that the gentleman

21   still owed me money that he hadn't paid me, and so, you know --

22   well, he told me, you can join if you want to.   But I made my

23   own decision.

24   Q.   And then after you decided to join, you quit Gotham,

25   correct?

1    A.  Yes, exactly, and I never went back.

2    Q.  Later on, you had a meeting with Michael Shamailov and some

3    of your other coworkers after you started the lawsuit, correct?

4    A.  Yes.

5    Q.  And you told Michael that you wanted to drop the lawsuit,

6    correct?

7    A.  It wasn't exactly like that.  He asked me whether we could

8    reach an agreement, and he asked me to do it personally.  And I

9    said no, because I do have my lawyer and if you have anything

10   to talk about, you have to do it with him.  It was then that

11   there was an agreement, and we went out to court to do that.

12   Q.  While you were working at Gotham, you took three breaks a

13   day, correct -- in the morning, the afternoon and the

14   evening -- correct?

15             MR. ANDROPHY:  Objection.

16             THE COURT:  Overruled.

17   A.  No.

18   Q.  How many breaks did you take per day?

19   A.  None.

20   Q.  None?  Okay.

21   A.  No, no.

22   Q.  No breaks?

23   A.  No.

24   Q.  So you would work about 11 hours a day but no break; is

25   that your testimony?

1    A.  Sure.  Can I explain?

2    Q.  No.  I just want to get an answer to my question.

3            So no break?

4    A.  Yes, that's fine.

5            MR. LABUDA:  I'd like to show the witness an exhibit.

6    May I approach, your Honor?

7            THE COURT:  I wanted to make sure all counsel

8    understand there's no need to request permission of the Court

9    to approach to show a document to a witness.

10           MR. LABUDA:  Okay.  Thank you, your Honor.

11           THE COURT:  Do you want to state for the record what

12   you are presenting to the witness?

13           MR. LABUDA:  Sorry.  This is Defendants' Exhibit II

14   for identification.

15   BY MR. LABUDA:

16   Q.  Mr. Alonso, in this case, you filled out some paperwork in

17   conjunction with this lawsuit, with your lawyer, correct?

18   A.  Yes.

19   Q.  If you'd look at Exhibit II, the last page, that's your

20   signature, correct?

21   A.  It's not signed.

22   Q.  The last page?

23   A.  No.

24   Q.  It's the last page.  There.

25           That's your signature, correct?

G76KNAJ1                    Alonso - cross

1   A.  Yes, but it's not the original one.  This is a copy of my

2   signature.

3   Q.  Okay, it's your signature.

4             THE COURT:  Excuse me, Counsel.

5             Ladies and gentlemen, disregard counsel's comment.

6             MR. LABUDA:  Okay.

7   Q.  Okay.  That's a copy of your signature, correct?

8   A.  Yes.

9   Q.  And you signed that paper and gave it to your lawyer,

10  right?

11  A.  No, because it's not my signature.  If you show me the

12  original, then I'll tell you.

13            MR. LABUDA:  Well, we would offer this document into

14  evidence.  He's indicated --

15            THE COURT:  Excuse me, Counsel.

16            MR. LABUDA:  Yes.

17            THE COURT:  Is there an objection?

18            MR. ANDROPHY:  Yes, your Honor.

19            THE COURT:  Okay.  Sustained for now.  I'll reserve

20  for argument later.  You may continue.

21            MR. LABUDA:  Okay.

22  BY MR. LABUDA:

23  Q.  Let me just ask you again:  Is that a copy of your

24  signature?

25  A.  Yes, sir.

G76KNAJ1                         Alonso - cross

1   Q.  And you signed this in conjunction with this lawsuit,

2   correct?

3   A.  For this lawsuit, yes, sir, with my lawyer.

4   Q.  Okay.

5            MR. LABUDA:  I renew my offer for this document.

6            THE WITNESS:  Because he represented me.

7            MR. ANDROPHY:  Objection as to the admission.

8            THE COURT:  Sustained for now.  You may raise it

9   later.

10            MR. LABUDA:  Okay.

11   BY MR. LABUDA:

12   Q.  Did you ever indicate to anyone that you took a break at

13   Gotham Pizza when you were working there?

14   A.  No, never.

15   Q.  And you never acknowledged that you took a 20-minute break

16   every day; is that correct?

17   A.  Well, no.  Could I explain?

18   Q.  No.  You can just answer the question.

19   A.  Yes.

20   Q.  Okay.  So you never told anyone that you took a 20-minute

21   break each day, correct?

22   A.  We used to eat and work.  It was a pizza slice.

23   Q.  And if anybody said that you took a 20-minute break, they

24   would not be telling the truth; is that correct?

25   A.  That would be correct.

G76KNAJ1                        Alonso - cross

1    Q.   Now, when you're -- you generally worked around 56 hours

2    each week; is that right?

3              THE COURT:   Counsel, I don't want to suggest something

4    to you that you don't want to do, but, of course, you may use

5    the document in any event to see if it refreshes recollection,

6    whether or not it's in evidence, but I'm sure you are aware of

7    that.

8              MR. LABUDA:   Yes, yes.

9              THE COURT:   Thank you.

10             MR. LABUDA:   What was the last question?

11             THE COURT:   You generally worked around 56 hours each

12   week; is that right?

13             THE WITNESS:   Correct.

14   BY MR. LABUDA:

15   Q.   And when your pay changed from a flat rate to the hourly,

16   you made approximately $450 a week; is that right?

17   A.   It would be 250 for the week and then plus tips, so it

18   would end up being about 400 or 450.

19   Q.   But at some point you said your pay rate changed, correct?

20   A.   Yes.  We were later told that we would be paid 4.65 per

21   hour.

22   Q.   Yes.  And when you said you were getting paid 4.65 per

23   hour, isn't it correct that you received approximately $450 in

24   pay each week?

25   A.   Well, it would be about the same as before because then I

G76KNAJ1                    Alonso - cross

1   would get everything together with the tips, uh-huh.

2   Q.  And how much did you make in tips each week?

3   A.  Well, it varied.  It's the amounts that are on the papers.

4   It would be 18 or 22 -- well, up to 30 dollars a day.  That was

5   Seamless, credit cards, and also we also had $20 when we were

6   paid tips in cash.

7               (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    Q.  And with respect to the bikes, I believe you said that

2    while you were employed you bought several bikes when you were

3    employed at Gotham, is that correct?

4    A.  Yes.

5    Q.  You said you had to replace the bikes because they got

6    ruined on the streets in the Bronx when you were commuting from

7    your apartment to work and vice-versa, correct?

8    A.  Well, it was not just because of that trip.  It was ruined

9    not only because I use them to go from my house to work, but

10   also I use them for work.

11   Q.  And do you have any receipts for any of these bikes that

12   you say you purchased?

13   A.  I don't have them anymore.  It's a long time ago that

14   happens.

15   Q.  You threw them out as well, correct?

16   A.  Uh-huh.

17            THE COURT:  Excuse me.  Is that a yes or a no?

18            THE WITNESS:  Ok.  Yes.  I threw them away.

19   Q.  You never told Michael about the fact that you bought these

20   bikes, correct?

21   A.  Well, no.  Because we had -- any comments about the safety

22   equipment, he didn't really listen, so he wasn't going to

23   listen about the bikes.

24   Q.  So you never told him, correct?

25   A.  Well, we wouldn't tell him directly, but we told the person

G76MNAJ2                    Alonso - cross

1    in charge if he would help with the repairs.  But we were told

2    that that was our personal problem.

3    Q.  And when your pay changed you were paid the same way as

4    Prisco Najera, your fellow delivery person, correct?

5               MR. ANDROPHY:  Objection.

6               THE COURT:  Sustained.  No answer.  Sustained.

7    Q.  Were you paid the same way as Prisco Najera?

8               MR. ANDROPHY:  Objection.

9               THE COURT:  Sustained.  You can reformulate that.

10   Q.  Do you know how Prisco Najera was paid?

11   A.  No.

12   Q.  Do you know if he was paid the same amount as you each

13   week?

14   A.  No.

15   Q.  Did you ever discuss your pay with Prisco Najera?

16   A.  No.  We never talked about that.

17   Q.  You did the same work, is that right?

18   A.  That's right.

19   Q.  And would you have expected to get paid the same way for

20   doing the same work?

21   A.  That was a promise that was made to me from the beginning,

22   but it never came true.

23   Q.  So you were promised to be paid the same way as the other

24   delivery people, is that right?

25   A.  No.  I was told that if I learn how to do my job really

1    well and I did well, then he would increase my salary, but he

2    never did.

3    Q.  Your pay changed at some point, right?

4    A.  Well, the only difference is that before I was paid per

5    week and then it was counted per hour.  That was the only

6    difference.  But I received --

7              THE INTERPRETER:  Correction by the interpreter.

8    A.  He gave me the same amount.

9    Q.  You heard Prisco testify that he was paid $7.25 per hour,

10   correct?

11             MR. ANDROPHY:  Objection.

12             THE COURT:  Sustained.

13   Q.  Do you understand that Prisco was paid 7.25 per hour?

14             MR. ANDROPHY:  Objection.

15             THE COURT:  Sustained.

16   Q.  You were paid 7.25 an hour, not 4.65, correct?

17   A.  4.65 an hour.

18   Q.  Yesterday you testified that you were paid 4.50 an hour.

19   Do you recall that testimony?

20   A.  4.65.

21   Q.  So if you testified that it was 4.50 yesterday, that would

22   be incorrect?

23   A.  4.65 an hour.

24             MR. LABUDA:  No other questions, your Honor.

25             MR. ANDROPHY:  I have no questions.

G76MNAJ2                        Alonso – cross

1              THE COURT:  Ladies and gentlemen, this is going to be

2     very rare.  I am going to take a little side bar, but I'll hear

3     counsel very quickly at the side bar here on Exhibit II.

4              (Continued on next page)

G76MNAJ2                          Alonso - cross

1              (At the side bar)

2              THE COURT:  What's the basis for your objection?

3              MR. ANDROPHY:  The objection is to the admission as an

4        exhibit.  It can be used to refresh recollection if they are to

5        impeach.

6              THE COURT:  If his signature comes in, it's an

7        admission against interests, isn't it?  What is the basis for

8        the objection?

9              MR. CLARK:  The entirety of the document.

10             MR. ANDROPHY:  The entirety of the document is going

11       to be admitted.

12             THE COURT:  Defense counsel, with respect to II, is

13       there a portion of this document you want to receive in

14       evidence as opposed to the entirety?

15             MR. LABUDA:  No.  The entire document.

16             THE COURT:  Objection sustained.  Thank you.

17             (Continued on next page)

18

19

20

21

22

23

24

25

G76MNAJ2                        Ramirez - direct

```
 1                (In open court)

 2                THE COURT:  You may step down.

 3                (Witness excused)

 4                THE COURT:  Plaintiffs may call their next witness.

 5                MR. ANDROPHY:  Plaintiffs call Wilfredo Ramirez.

 6      WILFREDO RAMIREZ,

 7           a Plaintiff, called as a witness on his own behalf,

 8           having been duly sworn, testified as follows:

 9      DIRECT EXAMINATION

10      BY MR. CLARK:

11      Q.  Good morning, Mr. Ramirez.  Did you ever work for Gotham

12      Pizza?

13      A.  Yes.

14      Q.  And what is Gotham Pizza?

15      A.  It's a pizza parlor.

16      Q.  Did you work at one location of Gotham Pizza or more than

17      one?

18      A.  I worked in one and then another one that he has on 87th

19      and First.

20      Q.  Where were both locations?

21      A.  One is on 19th and Ninth.

22      Q.  And where is the other?

23      A.  On 87th or 86th and First Avenue.

24      Q.  When did you begin working at Gotham Pizza?

25      A.  May 25, 2011.
```

SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

G76MNAJ2                         Ramirez - direct

1    Q.   And which location did you start out at?

2    A.   On 19th and Ninth.

3    Q.   When did you stop working for Gotham Pizza?

4    A.   December 31, 2012.

5    Q.   What location of Gotham Pizza were you at when you stopped

6    working?

7    A.   On 19th and Ninth.

8    Q.   How long were you at the other location, the one on 86th

9    and First?

10   A.   About five days.

11   Q.   And when was that?

12   A.   That was in October, I believe, if I'm not mistaken, it was

13   October of 2012.

14   Q.   And why were you at that other location?

15   A.   When the storm happened, Sandy, they closed 19th and Ninth.

16   Q.   And how did you find your job at Gotham Pizza?

17   A.   I was out on the street looking for a job and I went into

18   the other store on 77th and York.

19   Q.   And then what happened?

20   A.   I went in to ask for a job there and left my phone number.

21   Q.   And did someone call you?

22   A.   Yes.  A person named Rodrigo called me the following day.

23   Q.   What did he tell you?

24   A.   He asked me --

25            THE INTERPRETER:  Interpreter's correction.

G76MNAJ2                    Ramirez - direct

1    A.  He told me if I still needed a job, he had one on 19th and

2    Ninth.

3    Q.  And did you go in for an interview?

4    A.  I appeared there the following day on 19th and Ninth.

5    Q.  And then what happened?

6    A.  There was someone there named Israel.  I don't know his

7    last name.  And he was in charge of the store.

8    Q.  And what did he discuss with you?

9    A.  He told me that if I wanted to work, there was a job there.

10   Q.  And did you take that job?

11   A.  Yes.

12   Q.  Did Israel discuss with you what your schedule would be?

13   A.  He told me that when the owner arrived he would give me the

14   schedule and tell me how much I would be paid.

15   Q.  And when did the owner arrive?

16   A.  That night.

17   Q.  And did he tell you what your schedule would be?

18   A.  Yes.

19   Q.  Did he tell you what you would be paid?

20   A.  Yes.  325.

21   Q.  And 325, is that in cash, check, or something else?

22   A.  Cash.

23   Q.  Did he tell you how often you would be paid $325?

24   A.  Every week.

25   Q.  And did he tell you what you would do at Gotham Pizza?

1     A.   Yes.

2     Q.   What did he tell you that you would do?

3     A.   Making deliveries, preparing stuff, sweeping, mopping, and

4     cleaning the tables every five minutes.

5     Q.   Anything else?

6     A.   Yes.   That was it.

7     Q.   And overall would you spend more of your day doing

8     deliveries or other jobs at Gotham Pizza?

9     A.   It was inside preparing stuff.

10    Q.   And what did he say would be your schedule when you started

11    working at Gotham Pizza?

12    A.   Yes.   It was from Monday -- I mean Tuesday, Tuesday and

13    Wednesday, 10 a.m. until 11 p.m.   On Thursday it was from 1

14    until 12.   On Friday it was from 11 until 1 a.m.   Saturday was

15    from 12 to 12.   On Sunday it was from 6 p.m. to 11 p.m.

16    Q.   And was that your schedule throughout your entire

17    employment?

18    A.   Yes.

19    Q.   And when you started working at Gotham Pizza, did you write

20    down the hours that you worked?

21    A.   Yes.   My starting time and ending time.

22    Q.   And where did you write that down?

23    A.   There was a piece of paper where it would say your name and

24    you had to put down your schedule.

25    Q.   And what was done with that paper after you wrote it in for

1    the week?

2    A.  When the week came to an end it would be signed and given

3    to the owner.

4    Q.  After doing that would you ever see the document again?

5    A.  No.

6    Q.  And were you ever given a copy of that document at any time

7    during your employment at Gotham Pizza?

8    A.  No.

9    Q.  Earlier you testified that at first at Gotham Pizza you

10   were paid $325 per week, is that correct?

11   A.  Yes.

12   Q.  And who would pay you each week when you first started at

13   Gotham Pizza?

14   A.  Michael.

15   Q.  And was any written statement of your pay ever given to you

16   with your pay each week?

17           MR. LABUDA:  Objection.

18           THE COURT:  Overruled.

19   A.  No.

20   Q.  And if you worked more hours than usual, were you ever paid

21   anything more?

22   A.  No.

23   Q.  Did your pay change at some point during your employment at

24   Gotham Pizza?

25   A.  After two or three months, when the owner gave me a raise,

G76MNAJ2                         Ramirez - direct

```
 1    $25.  Then he was paying me 350.
 2    Q.  It was, again, $350 in cash?
 3    A.  Yes.
 4    Q.  And was there any change in who would pay you every week?
 5    A.  No.  It was Michael.
 6    Q.  And were you paid any extra amount for days that you worked
 7    more than 10 hours?
 8    A.  No.
 9    Q.  And did you receive any kind of pay stub or wage statement
10    with your $350?
11    A.  No.
12    Q.  And at that point were you required to sign any kind of
13    document to get paid?
14    A.  Just the paper that the schedules were on.
15    Q.  And did you receive any kind of tips when you were working
16    at Gotham Pizza?
17    A.  Just the tips from when we would make the deliveries.
18    Q.  And did you always receive 100 percent of the tips that you
19    were entitled to receive?
20    A.  I'm sorry.  Could you please repeat that.
21    Q.  Were any tips withheld from your tips when you received
22    them each week?
23              MR. XUE:  Objection.
24              THE COURT:  Overruled.
25    A.  Not in my case.
```

1    Q.  And were you ever given any kind of document not mentioned

2    so far about how much you would be paid?

3    A.  No.

4              MR. CLARK:  We have no further questions for this

5    witness.

6              MR. XUE:  May I proceed, your Honor?

7              THE COURT:  Yes.

8    CROSS-EXAMINATION

9    BY MR. XUE:

10   Q.  Good morning, Mr. Ramirez.  You have testified you started

11   working for Gotham Pizza in May 2011, right?

12   A.  Yes.

13   Q.  And were you required to turn in your time sheet every week

14   after you start working for Gotham Pizza?

15   A.  Yes.

16   Q.  And how many time sheets did you turn in after you worked

17   for Gotham Pizza until you quit?

18             MR. CLARK:  Objection.

19             THE COURT:  Overruled.

20   A.  No.  I don't remember.

21   Q.  Is it correct that you are talking about 30 time sheets?

22   A.  No.  I don't remember how many time sheets.

23   Q.  In fact you work for Gotham Pizza for about six months, is

24   that correct?

25   A.  No.

1   Q.  How many months did you work for Gotham Pizza?

2   A.  Well, I started on that date I already said.

3   Q.  And how many months did you work for Gotham Pizza?

4   A.  I don't have that in my head.

5   Q.  Who did you meet at Gotham Pizza when you were offered the

6   job?

7   A.  Rodrigo called me to come and work there.

8   Q.  But you also testified that you later met with Israel, is

9   that right?

10  A.  When I went to see the job.

11  Q.  Which location was that?  Was it at 19th and Ninth?

12  A.  Yes, 19th and Ninth.

13  Q.  Do you know Israel's last name?

14  A.  No.  Just by his first name, Israel.  I never asked him

15  what his last name was.

16  Q.  Was he also a delivery guy?

17  A.  He was the pizza man and counter man.

18  Q.  While you were working for Gotham Pizza, did you talk to

19  other delivery persons about their pay?

20  A.  No.

21  Q.  Were you paid hourly instead of weekly?

22  A.  Weekly, not hourly.

23  Q.  You received your pay every week, but was your pay

24  calculated based on the hours you turned in?

25  A.  I was told that I would be getting paid per week and not

1   per hour.

2   Q.  Did you ask the owner how much you would receive every week

3   on average?

4   A.  No.  He just told me that he was going to pay me 325 a

5   week.

6   Q.  How many hours a week did you work?

7   A.  Yes.  A few times I did the math and it was 71 hours, 70 to

8   71 hours.

9   Q.  Do you recall that you respond to this firm's interrogatory

10  questions during the course of this litigation?

11  A.  No.

12          MR. XUE:  I am going to show the witness Exhibit PP.

13  Q.  I am going to help you turn to the last page of PP.  Is

14  this your signature, sir?

15  A.  Yes.

16          MR. XUE:  Your Honor, I would like to direct

17  witness -- I would like to actually read from a transcript two

18  response to my interrogatory questions.  First I move -- I

19  don't think I need the whole document in.

20          THE COURT:  Which paragraphs then are you offering

21  into evidence?

22          MR. XUE:  Yes.  One is response to my question No. 3.

23  It's on page 5.  It's on page 5.  Your Honor, it's about his

24  schedule.

25          THE COURT:  I see a section addressed to interrogatory

G76MNAJ2                          Ramirez - cross

1    No. 3.  It has two paragraphs and I take it the second

2    paragraph, which is one sentence, is what you want to read.  Am

3    I right?

4              MR. XUE:  Yes.  It's about his weekly pay, how much.

5              THE COURT:  Yes.  And the second section that you wish

6    to read.

7              MR. XUE:  Second section is about his schedule.  It's

8    response to question No. 8.  It's the last paragraph of

9    response.

10             THE COURT:  Any objection?

11             MR. CLARK:  No objection, your Honor.

12             THE COURT:  Thank you.  You may read the two passages

13   you have identified into the record.

14             MR. XUE:  Yes.

15             THE COURT:  Those two passages are received.

16             (Defendant's Exhibit PP received in evidence)

17             MR. XUE:  Thank you.  Subject to --

18             THE COURT:  I'm sorry, no.

19             MR. XUE:  Do you need me to read the question?

20             THE COURT:  I'm sorry.  I should not have interrupted.

21   Please continue, Mr. Xue.  Just where you were reading.

22             MR. XUE:  Plaintiff responds that he was paid 350 per

23   week cash and was paid every Tuesday.  And in terms of

24   schedule, this is his response, I believe, for the record, 10

25   a.m. to 11 p.m. Tuesday, Wednesday, and then 1 p.m. to 12 a.m.

1   on Thursday --

2              THE INTERPRETER:  I'm sorry, counselor.  The

3   interpreter is not keeping up.

4              THE COURT:  8.

5              THE INTERPRETER:  Thank you very much.

6              THE COURT:  Let's start again at that line, at 8.

7              MR. XUE:  10 a.m. to 11 p.m. Tuesday, Wednesday; and 1

8   p.m. to 12 a.m. on Thursday; 11 a.m. to 1 a.m. on Fridays;

9   Saturday from 12 p.m. to 12 a.m.; Sunday from 6 p.m. to 11 p.m.

10             THE COURT:  Are you going to complete --

11             MR. XUE:  It says Tuesdays, Wednesdays, and Thursdays.

12             THE COURT:  And Sundays.

13             MR. XUE:  And Sundays.  Tuesday, Wednesday, and

14  Sundays.

15             THE COURT:  Thank you.

16  Q.  Sir, you get Monday off every week, right?

17  A.  During the time I was working there.

18  Q.  I did a calculation.  Your average --

19             THE COURT:  Excuse me, counsel.

20  Q.  Isn't it correct that your total hour every week is about

21  57 hours a week instead of 72 hours per week you testified to?

22             MR. CLARK:  Objection.

23             THE COURT:  Overruled.

24  A.  It's 71 hours.

25             MR. XUE:  I have no more questions for this witness.

G76MNAJ2                    Tapia - direct

1              MR. CLARK:  No redirect, your Honor.

2              THE COURT:  You may step down.

3              (Witness excused)

4              THE COURT:  Next witness.

5              MR. ANDROPHY:  Plaintiffs call Aureliono Tapia.

6              THE COURT:  Mr. Tapia, if you could take the witness

7    stand and remain standing, please.

8     AURELIONO TAPIA,

9         a Plaintiff, called as a witness on his own behalf,

10        having been duly sworn, testified as follows:

11   DIRECT EXAMINATION

12   BY MR. ANDROPHY:

13   Q.  Mr. Tapia, did you ever work for Gotham Pizza?

14   A.  That's true.

15   Q.  And you work at one location or more than one location?

16   A.  In two locations.

17   Q.  Which locations did you work at?

18   A.  On 77th and York Avenue and on 51st and Eighth Avenue.

19   Q.  Which location did you work at first?

20   A.  On 77th.

21   Q.  When did you begin working at Gotham Pizza?

22   A.  Around 2011, March of 2011.

23   Q.  How did you come to find your job at Gotham Pizza?

24   A.  At that time I was out of a job, and I walked down the

25   street from one business to the next looking for work.

G76MNAJ2                         Tapia - direct

1  Q.  Did you at some point walk into Gotham Pizza looking for

2  work?

3  A.  That's right.  I entered into that pizzeria.

4  Q.  Who did you meet at that time?

5  A.  Rodrigo Ramales.

6  Q.  Did you ask him for a job?

7  A.  Yes, that's right, I asked him for a job.

8  Q.  What did he say to you?

9  A.  He asked me to give him a minute to speak with his boss,

10 Manuel.

11 Q.  Then what happened?

12 A.  And a little while later he said it would be fine and asked

13 if I had a bicycle.  And he said that if I got the bike that I

14 could stay there that same day.

15 Q.  So what happened next?

16 A.  Well I needed it, so I said yes, I would go find a bike.

17 Q.  Did you start working that day?

18 A.  That's right.

19 Q.  At some point around the time you started working did you

20 meet with Michael Shamailov?

21 A.  No.  I saw -- no.  I saw him that night.

22 Q.  You saw Michael that first night, the same day that you

23 started working?

24 A.  Yeah.

25 Q.  Did you meet with anyone else together with Michael?

1   A.  No.  As a matter of fact, because I could not communicate,

2   because I cannot speak English, anything I wanted to find out

3   about I would ask Rodrigo.

4   Q.  Did you discuss anything with Michael that night?

5   A.  No.

6   Q.  Before you started working, did anyone tell you how much

7   you would be paid?

8   A.  No, never.

9   Q.  Did anyone tell you what your schedule would be before you

10  started working?

11  A.  No.

12  Q.  Did you ever receive or were you ever told a regular

13  schedule that you would work at Gotham Pizza?

14  A.  Yes.  During the second week.

15  Q.  What did you do as your job at Gotham Pizza?

16  A.  I did food deliveries, prep work of everything.

17  Q.  Anything else?

18  A.  Yes.  Well, I would do everything the other delivery men

19  would do, cut peppers, cheese, make boxes, clean up,

20  everything.

21  Q.  You started working at the York Avenue location, correct?

22  A.  That's right.

23  Q.  And at some point did you stop working at York Avenue

24  location of Gotham Pizza?

25  A.  Yes.

1    Q.   What did you do then?

2    A.   I left that job and I found another job where I was getting

3    paid so-so.

4    Q.   When was it that you left the York Avenue location of

5    Gotham Pizza?

6    A.   Like around December of 2012.

7    Q.   And then after that did you ever return to work at any

8    Gotham Pizza pizzeria?

9    A.   That's right.

10   Q.   How did that come about?

11   A.   Michael called me.  He told me he was opening up a pizzeria

12   on 51st.  He asked me to come to work for him, and he said he

13   would pay me better.

14   Q.   What did he offer to pay you?

15   A.   7 an hour.  But then I told him that I was fine at my job.

16   And then he offered to pay me even more, $8 an hour.

17   Q.   Did you accept the job at that time?

18   A.   I told him that was fine.

19   Q.   And when was this when you accepted the new job at Gotham

20   Pizza on 51st Street?

21   A.   I don't remember the exact date, but it was around like

22   2012, like November or December.  I don't remember.

23   Q.   Just to clarify, I'm asking when you started your job at

24   the 51st Street location, not when you left the York Avenue

25   location.  Do you recall when that was?

1    A.  Yes.  December 2013.

2    Q.  Did you do the same job at 51st Street that you did at the

3    York Avenue location?

4    A.  No.  51st and Eighth.

5    Q.  Did you do the same job at the location at 51st and Eighth

6    that you did at the York Avenue location?

7    A.  It was the same.

8    Q.  And did you start working at the Eighth Avenue and 51st

9    Street location around the same time that that location opened

10   for business?

11   A.  Yes.

12         MR. ANDROPHY:  If I may approach the witness and

13   identify an exhibit for him.

14         I've opened the exhibit binder in front of the witness

15   to Plaintiff's Exhibit 10.

16   Q.  Mr. Tapia, can you look through the pages at that tab and

17   tell me if you recognize those documents?

18   A.  Yes.  This is the timetable for the week.

19         MR. ANDROPHY:  I ask that Plaintiff's Exhibit 10 be

20   admitted into evidence.

21         THE COURT:  Received.

22         (Plaintiff's Exhibit 10 received in evidence)

23         MR. ANDROPHY:  May I publish it to the jury.

24         THE COURT:  Yes.

25   Q.  Do you see on the page in front of you, and I believe it's

1    also on the screen in front of you, there is a row that says

2    hours.

3    A.  Yes.

4    Q.  Did you write those times in every day?

5    A.  Every day it was.

6    Q.  And is your signature on the page in front of you?

7    A.  Yes, that's right.

8    Q.  When would you sign this document?

9    A.  Weekends.

10   Q.  And on this document would you also write in the amounts

11   for tips that are written on that document?

12   A.  The tips, that's right.  Only the credit cards.

13   Q.  Did someone else write in the cash tips?

14   A.  Well, cash, also, there, because he used to request from us

15   that we should give him what we made from cash tips.

16   Q.  Did you sign this document at the same time that you were

17   paid?

18   A.  No.  It was a day before.

19   Q.  And then what would you do with the paper after signing it?

20   A.  Well, we left it at the pizza parlor and he used to pick it

21   up and took it away with him.

22   Q.  Who is that?  Who would take it?

23   A.  Michael.

24   Q.  Were you ever given a copy of this document while you

25   worked at Gotham Pizza?

1    A.  No, never ever.

2    Q.  Did anyone at Gotham Pizza ever show you this document when

3    you were being paid?

4    A.  No, nobody.

5    Q.  Take a moment to look through the pages at Exhibit 10, not

6    just the first page, and tell me if any of those documents show

7    you how much you were paid by your employer apart from tips?

8    A.  I'm sorry.  You told me to look at --

9    Q.  The documents at tab 10 in that binder.

10           THE COURT:  And you want him to notice or look for

11   what?

12           MR. ANDROPHY:  To let me know if any of them indicate

13   how much he was paid apart from tips.

14   Q.  Have you looked through most of the pages?

15   A.  Yes.

16   Q.  Did any of them show how much you were paid for the week?

17   A.  No.  None of them.

18   Q.  Did you ever receive any documents at Gotham Pizza that

19   said how much you were paid for a week?

20   A.  No, never.

21   Q.  Did you fill out and sign papers like Exhibit 10 the whole

22   time you worked at Gotham Pizza at both the York Avenue and

23   Eighth Avenue locations?

24   A.  You mean if I signed any other document or any other type

25   of paper?

1   Q.  My question is if you find these documents like are in

2   Exhibit 10 every week that you worked at Gotham Pizza.

3   A.  Well, when I started working, no.  These papers did not

4   exist.

5   Q.  Did you do anything before you started using these papers

6   to record your time each week?

7   A.  Yes.  We had to prepare our list of how much or how many

8   hours we worked that week, and then we have to fill out a paper

9   that he gave us.

10  Q.  Just to clarify, before you filled out these papers, did

11  you write down the hours you worked on a different paper?

12  A.  That's right.

13  Q.  Now, the first page, the one that's displayed on the screen

14  has a date on it, correct?

15  A.  Uh-huh.

16          THE COURT:  Is that yes?

17          THE WITNESS:  Well, during the time I worked there,

18  there was no paper that had any date.

19  Q.  You don't recall seeing the date on that paper when you

20  signed it?

21  A.  No.  They didn't have any.

22  Q.  And you just looked through all of the other papers a

23  couple of moments ago.  Are there dates on the other papers at

24  Plaintiff's Exhibit 10?

25  A.  I was signing all that time.  No papers had any dates.

G76MNAJ2                          Tapia - direct

1    Q.  The papers in front of you in Plaintiff's Exhibit 10, other

2    than the first page, do those have dates in them?

3            THE COURT:  The document is in evidence, counsel.  We

4    can move on.

5            MR. ANDROPHY:  I withdraw that question.

6    Q.  Were you given copies of these sheets while you worked at

7    Gotham Pizza?

8    A.  Excuse me?

9            (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

G76KNAJ3                    Tapia - direct

1    BY MR. ANDROPHY:

2    Q.  Were you given copies of these sheets while you worked at

3    Gotham Pizza?

4    A.  No, none.

5    Q.  In the documents in front of you, at Plaintiffs' Exhibit

6    10, are you able to tell which sheets are from when you worked

7    at York Avenue and which are from Eighth Avenue?

8         Let me ask you differently:  The first page, the one

9    that's displayed on the screen, do you know whether that's from

10   when you worked at York Avenue or from when you worked at

11   Eighth Avenue?

12   A.  York Avenue.

13   Q.  How do you know?

14   A.  Because of the off day I had and also because the hours

15   were different.

16   Q.  Okay.  So that first page indicates Monday was your day

17   off.  Is it fair to say that was your usual day off when you

18   worked at York Avenue?

19   A.  Yes, York Avenue.

20   Q.  So is it fair to say that any of these schedules that has

21   Monday as your day off is most likely from York Avenue?

22   A.  That's right.

23        MR. ANDROPHY:  I'm going to approach the witness and

24   turn him to another page.  It's the page with the stamp at the

25   bottom numbered 31.  If I may display that same page 31.

G76KNAJ3                          Tapia - direct

1    Q.  Are you able to tell whether this page, with the number 31

2    at the bottom, was from when you worked at York Avenue or

3    Eighth Avenue?

4    A.  No; that was Eighth Avenue.

5    Q.  How do you know?

6    A.  Because the hours are different.

7    Q.  Okay.  So the hours on this page are consistent with the

8    hours you generally worked at Eighth Avenue?

9    A.  That's right.

10   Q.  Is there anything else about the page that indicates that

11   this is from Eighth Avenue rather than York Avenue?

12   A.  All the hours are different; that's why.

13   Q.  What was your usual day off at Gotham Pizza on Eighth

14   Avenue?

15   A.  Sundays.

16   Q.  So if in any of these records it shows Sunday as your day

17   off, is it likely that that's a record from when you worked at

18   Eighth Avenue?

19   A.  That's correct.

20   Q.  Now, what was your usual schedule when you worked at Gotham

21   Pizza at York Avenue?

22   A.  Well, on Mondays I would come in at 10:30 and I would be

23   there until 9:30 or 10:30.

24   Q.  To clarify, I'm asking about York Avenue.

25   A.  Yes, that's right.

G76KNAJ3                    Tapia - direct

1    Q.  Can you tell me again, then, what your usual schedule was

2    at Gotham Pizza on York Avenue?

3    A.  I don't remember exactly the hours in York.

4    Q.  Well, what days of the week would you work at York Avenue?

5    A.  Six days a week.

6    Q.  Do you recall what your usual hours were on any of those

7    days?

8    A.  Well, I don't remember exactly because people were always

9    missing because of questions of money they weren't paid.

10   Q.  So your hours might be different from week to week; is that

11   correct?

12   A.  That's right.

13   Q.  The records in Plaintiffs' Exhibit 10, for the weeks that

14   have Monday off, are those accurate reflections of the hours

15   you worked those weeks?

16   A.  Well, but sometimes when I had a day off and then I did

17   work that day, we couldn't write on this column that we

18   actually worked that day.  They didn't allow us to do that.

19   They didn't allow us to put it on this list.

20   Q.  So it's your testimony that there were some days that you

21   worked but you indicated on the paper that you were off?

22   A.  Yes, we had to write "off."

23   Q.  How often did that happen?

24   A.  Two, three times a month.

25   Q.  Who told you to do that?

G76KNAJ3                        Tapia - direct

1    A.   Rodrigo did.   As a matter of fact, can I --

2    Q.   Is there something you need to clarify?

3    A.   Yes.   I had -- there is a paper where I actually checked

4    off the days that I worked because they didn't allow us to

5    erase that.

6    Q.   Are you referring to one of the papers in Plaintiffs'

7    Exhibit 10?

8    A.   Yes, like in this one.

9    Q.   That was referring to page numbered 16?

10   A.   That's right.

11   Q.   Can you explain for the jury what you're telling us about

12   this sheet?

13   A.   Well, we just had to write down the hours for six days a

14   week.

15   Q.   Okay.   What was your rate of pay at Gotham Pizza at York

16   Avenue when you first started, not including tips?

17   A.   I was paid 4.65 an hour.

18   Q.   Were you paid by cash or check?

19   A.   Cash.

20   Q.   Did anyone at Gotham Pizza ever show you a document that

21   said how much you were being paid for any week?

22   A.   No.

23   Q.   Were you paid at a higher rate of pay for hours above 40

24   hours each week?

25   A.   Well, not really.   Well, what I understood or what I have

1     understood is that what I was paid was the same amount per

2     week.

3     Q.  Were you paid any additional pay, other than the $4.65 per

4     hour, for days when you were at work for more than ten hours?

5     A.  No, it was the same.

6     Q.  Were you able to keep all the tips that you received while

7     you worked at Gotham Pizza on York Avenue?

8     A.  No; they would take away a percentage.

9     Q.  Do you recall what percentage they took away?

10    A.  Not exactly, I don't know, but I always had missing $30.

11    It depends on the tips I made.  If I made less in tips, then

12    less was deducted.

13    Q.  How did you know that you weren't receiving the full amount

14    of your tips?

15    A.  Because we had a list, you know, at the end of the week, we

16    calculated more or less how much we were to receive but it

17    didn't match with what we were supposed to receive.  There was

18    always something missing.

19    Q.  Did you ever complain to anyone about this?

20    A.  Well, I told Rodrigo, and he told me that I should talk to

21    Kenny.  And, yes, he told me that he had to withdraw a

22    percentage.  I didn't understand very well whether it was a

23    3 percent or 30 percent.

24    Q.  Did he explain why they were taking out a percentage?

25    A.  Because the credit card, the company, they charged them.

G76KNAJ3                          Tapia - direct

1   Q.  How much would be missing from your tips per week, on

2   average?

3   A.  About 20, 30 dollars.

4   Q.  When you worked at Gotham Pizza on Eighth Avenue, were you

5   paid the same amount?

6           THE COURT:  Excuse me, Counsel, is this a good time

7   for a break?

8           MR. ANDROPHY:  It could be, yes.

9           THE COURT:  I'm sorry.

10          MR. ANDROPHY:  Yes, yes, your Honor.

11          THE COURT:  Good.

12          Ladies and gentlemen, let's take our mid-morning

13  recess at this point.  Take five or ten minutes, what you need.

14  Let Ms. Rojas know when you're ready to resume.  Thank you.

15  Leave the binders on your chairs.

16          (Continued on next page)

17

18

19

20

21

22

23

24

25

G76KNAJ3                         Tapia – direct

1            (Jury not present)

2            THE COURT:  Counsel, is there anything we need to

3    discuss at the break?

4            MR. ANDROPHY:  Nothing from plaintiff.

5            MR. XUE:  Nothing from the defense.

6            THE COURT:  Thank you.

7            (Recess)

8            THE COURT:  The witness may retake the witness stand.

9            So, Counsel, I met with the marshals during the break

10   about that screening process issue, and I think we've resolved

11   it.  I'm preparing a letter for the marshals that will describe

12   the particular issue.

13           Good.  Bring in the jury.

14           (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

1          (Jury present)

2               THE COURT:  Counsel.

3     BY MR. ANDROPHY:

4     Q.  Mr. Tapia, when you worked at Gotham Pizza Eighth Avenue,

5     what was your rate of pay?

6     A.  $8 an hour.

7     Q.  Were you paid a higher rate for hours above 40 in a week?

8     A.  It was all the same.

9     Q.  Were you paid any additional pay for days you were at work

10    for more than ten hours?

11    A.  No, all the same.

12    Q.  Did the restaurant take any part of your tips while you

13    worked at Eighth Avenue?

14    A.  Yes, a percentage, from credit cards and Seamless.  I'm

15    talking about the credit cards, yes.

16    Q.  And how much, on average, would you not receive from your

17    tips when you worked at Gotham Pizza at Eighth Avenue?

18    A.  20 or 30 dollars.

19    Q.  When you were paid at Gotham Pizza on Eighth Avenue, were

20    you given any wage statement or any other paper that said how

21    much you were being paid?

22    A.  No, none.

23    Q.  During your employment at Gotham Pizza, at both locations,

24    were you ever given any document that stated how much you would

25    be paid?

 1    A.  No.

 2    Q.  Did you ever have to sign any documents other than those

 3    we've looked at already as Plaintiffs' Exhibit 10?

 4    A.  Yes.

 5    Q.  What documents did you have to sign?

 6    A.  A document.  I don't know what it was for.

 7            MR. ANDROPHY:  I'm showing the witness the document

 8    that's been marked as Defendants' Exhibit YY.

 9    Q.  Is that document the document you were just referring to

10    when you said you had to sign another document?

11    A.  I wouldn't be able to tell you because at the time I did

12    not pay attention to what paper it was.

13    Q.  Okay.  Can you turn to page 2 of that document in front of

14    you.

15            Is that your signature on page 2?

16    A.  That's right.

17    Q.  Can you explain how you came to sign this document?

18    A.  Yes.  Well, Michael asked me to sign a paper.

19    Q.  Did anyone explain to you what the paper was?

20    A.  No.

21    Q.  Did Michael tell you anything about why he wanted you to

22    sign that paper?

23    A.  Michael did not say anything to me.  He came with a

24    person -- it might have been his attorney -- who said to me --

25    well, to put it better, he asked me some questions.

G76KNAJ3                      Tapia - direct

1    Q.   What questions did this person ask you?

2    A.   About food, about whether or not we could eat in the

3    pizzeria, about whether we could take drinks without any

4    problem.

5    Q.   Do you read English?

6    A.   No.

7    Q.   Did you read and understand this document when you signed

8    it?

9    A.   Never, never.  I did not read it at all.

10   Q.   Was a copy of this document provided for you in Spanish?

11   A.   No.

12   Q.   What's the highest level of education you've completed?

13   A.   I just went to school until fifth grade.

14   Q.   Was that here in the United States or somewhere else?

15   A.   In Mexico.

16   Q.   If you could turn back to the first page of the document,

17   do you see in paragraph 4, where it says, "I have" --

18             THE COURT:  Excuse me.  The document is not in

19   evidence.

20             MR. ANDROPHY:  I move for admission of Defendants'

21   Exhibit YY.

22             MR. XUE:  No objection.

23             THE COURT:  3received.

24             (Defendants' Exhibit YY received in evidence)

25   Q.   Do you see in paragraph 4 where it says, "I have always

G76KNAJ3                        Tapia - direct

1    been paid properly for all hours I worked, including time and

2    one half my regular rate for all overtime hours"?

3              THE INTERPRETER:  Counselor, should the interpreter

4    translate that sentence?

5              MR. ANDROPHY:  Yes, please.

6    A.  I'm sorry?

7    Q.  Do you see in paragraph 4 -- and I'll ask the interpreter

8    to read paragraph 4 in Spanish to you -- where it says, "I have

9    always been paid properly for all hours I worked, including

10   time and one half my regular rate for all overtime hours"?

11   A.  Yes.

12   Q.  Was that true at the time that you signed this document?

13   A.  I did not know that.

14   Q.  Was that true at that time?  Were you being paid one and a

15   half times for overtime at the time you signed the document?

16   A.  No.

17   Q.  Do you see the first line underneath what's called the

18   caption of that document, where it says, "I, Aureliono Tapia,

19   pursuant to 28, U.S.C.," and then there's an indication that

20   means Section 1746?  Do you see that?

21   A.  Yes.

22   Q.  Do you understand what that means?

23   A.  No.

24   Q.  Did you understand, when you signed this document, what

25   that meant?

G76KNAJ3                         Tapia - direct

 1    A.  No, not at all.

 2    Q.  In paragraph 5 --

 3          MR. ANDROPHY:  If the interpreter can translate that

 4    to the witness.

 5    Q.  Was that true at the time that you signed this document?

 6    A.  No.

 7    Q.  Turn to the second page, paragraph 6.

 8          MR. ANDROPHY:  And, again, if the interpreter can

 9    translate that paragraph to the witness.

10    Q.  Was that true --

11          THE INTERPRETER:  I'm sorry, the interpreter has one

12    more sentence to go.

13          MR. ANDROPHY:  Sorry.

14    Q.  Was that paragraph true at the time that you signed this

15    document?

16    A.  No.

17          MR. ANDROPHY:  If the interpreter can translate

18    paragraph 7 to the witness.

19    Q.  Was that true, particularly that you did not know of other

20    employees being underpaid at Gotham Pizza?

21    A.  No, no.

22          MR. ANDROPHY:  If the interpreter can read paragraph 8

23    for the witness or translate paragraph 8 for the witness.

24    Q.  Is it true that no other plaintiffs complained about their

25    pay at Gotham Pizza?

G76KNAJ3                          Tapia - direct

1   A.   Quite the opposite; everyone complained that they were not

2   satisfied with what they were being paid.

3           MR. ANDROPHY:   Could the interpreter translate

4   paragraph 9 for the witness.

5   Q.   Is it true that you saw other employees get paid at Gotham

6   Pizza?

7   A.   No, never.

8           MR. ANDROPHY:   If the interpreter can translate

9   paragraph 10.

10  Q.   Was it true, when you signed the document, both that you

11  were provided free meals and that you took breaks to eat those

12  meals?

13  A.   The meals were free but not the break.

14          MR. ANDROPHY:   Lastly, if the interpreter can

15  translate the sentences below paragraph 12 for the witness.

16  Q.   Did you understand that paragraph when you signed this

17  document?

18  A.   No.

19  Q.   Did anyone explain --

20  A.   I'm sorry.  If at any time it had been given to me or had

21  been read to me in Spanish, I never would have signed it.

22  Q.   Did anyone explain to you, before you signed this document,

23  that this was a sworn statement that had to be true and was

24  being made subject to the penalty of perjury?

25  A.   No, never.

G76KNAJ3                        Tapia - direct

1   Q.  You can put that document aside for a moment.

2               Did you need to purchase a bicycle for delivery work

3   at Gotham Pizza?

4   A.  That's right.

5   Q.  How many bicycles did you need to purchase?

6   A.  I bought two bicycles.

7   Q.  Why did you purchase two bicycles and not just one?

8   A.  I bought one, and that broke over time, through being used,

9   and then I had to buy another one.

10  Q.  Do you recall how much you paid for each of those bicycles?

11  A.  Yes.  I bought them at the store, and each one of them cost

12  me around $700.

13  Q.  Did you have to spend any additional money on either

14  equipment or repairs to the bicycles?

15  A.  Sure.

16  Q.  Can you be specific about what else you had to spend money

17  on, related to the bicycles?

18  A.  Mainly on tires, on inner tubes, on rims.  Those were the

19  main things that would break.

20  Q.  Do you recall how much you spent to replace and repair

21  these items?

22  A.  Approximately $80 for tires; and the inner tubes, around

23  $20.

24  Q.  Is that per repair or the total amount that you spent while

25  at Gotham Pizza, on these repairs?

1    A.  No, that was per repair.

2    Q.  How often would you have to make repairs on your bicycles?

3    A.  That would depend.  It could be up to two times a month or

4    it could be less.

5    Q.  Did Gotham Pizza reimburse you for the money you spent on

6    your bicycle or repairing your bicycle?

7    A.  No.  That had to come out of our pockets.

8    Q.  Did you need to have a bicycle in order to do your job at

9    Gotham Pizza?

10   A.  That's right.

11   Q.  When did you stop working at Gotham Pizza?

12   A.  December of 2013.

13           MR. ANDROPHY:  Thank you.  I have no further questions

14   for Mr. Tapia at this time.

15   CROSS-EXAMINATION

16   BY MR. XUE:

17   Q.  Good morning, Mr. Tapia.  When you first started working

18   for Gotham Pizza, how were you paid?

19   A.  4.65 per hour.

20   Q.  And then after the first 40 hours, did you get paid any

21   different amount?

22   A.  No.  Everything was the same.

23   Q.  Okay.  You testified you started working for Gotham Pizza

24   in March 2011; is that correct?

25   A.  That's right.

G76KNAJ3                          Tapia - cross

1    Q.  Where were you working before you start working for Gotham

2    Pizza?

3    A.  At a restaurant.

4    Q.  And you were also doing deliveries; is that correct?

5    A.  No.  I was in the kitchen, a cook.

6    Q.  Did you have a bike at that time?

7    A.  No.

8    Q.  So you have no delivery experience at all when you started

9    working for Gotham Pizza?

10   A.  No.

11   Q.  And you claim that at a certain point in time your rate was

12   increased to $8 an hour; is that correct?

13   A.  That's correct.

14   Q.  And you were doing the same line of work for Gotham Pizza?

15   A.  That's correct.

16   Q.  And when was that raise happened?  When did it happen?

17   A.  Well, I was working at 77 and York and then I was working

18   at another place where I was paid better.  Then Michael went

19   looking for me to go work in his pizza parlor.

20   Q.  So you -- basically, you were working for another employer

21   and Michael hire you back, right?

22   A.  That's right.

23   Q.  And for how long did you left for this another employer?

24           THE COURT:  Sustained.  Do you want to rephrase that?

25           MR. XUE:  Yes.

G76KNAJ3                         Tapia - cross

```
1    Q.  For how long did you work for the other employer before you
2    returned to work for Gotham Pizza?
3    A.  It was four or five months, more or less.
4    Q.  So do you remember when did you first quit Gotham Pizza?
5    A.  Not exactly.
6    Q.  Okay.  Is it approximately in December 2012?
7    A.  More or less, around December of 2012.
8    Q.  Now, was it correct you actually worked for the other
9    employer for over six months before you returned to work for
10   Gotham Pizza?
11   A.  Excuse me?
12   Q.  Isn't it correct, after you quit Gotham Pizza, you worked
13   for someone else for over six months?
14   A.  Four or five months, around that.
15   Q.  And you were also doing delivery using your bike; is that
16   correct?
17   A.  No, no.  It was a store, it was a fish store.
18   Q.  So you are saying that you have about a year and a half
19   delivery experience and Michael pay you $8 and give you a raise
20   from 4.65 to $8 just to get you back to work for him; isn't
21   that correct?
22            THE COURT:  Sustained.  If you want to just split that
23   up, Mr. Xue.
24            MR. XUE:  Right.
25   Q.  Are you saying that Michael hire you back, give you a raise
```

G76KNAJ3                        Tapia - cross

1    from 4.65 per hour to $8 an hour even though you only have 1.5

2    year experience in delivery?

3              MR. ANDROPHY:  Objection.

4              THE COURT:  Sustained.

5    Q.  Okay, let me make it easy.

6              Are you testifying that Michael give you a raise from

7    4.65 to $8 in order to get you back to work for him?

8    A.  That's right.

9    Q.  And you heard the other delivery employee testified

10   yesterday and today.  So are you saying your rate is much

11   higher than any of these delivery workers?

12             MR. ANDROPHY:  Objection.

13             THE COURT:  Sustained.

14   Q.  Isn't it correct before you get a raise to $8 per hour, you

15   were paid 7.25 per hour?

16             THE INTERPRETER:  7.25?

17             MR. XUE:  Yes.

18   A.  No.

19   Q.  To your knowledge, whether you have more delivery

20   experience than Prisco Najera?

21             MR. ANDROPHY:  Objection.

22             THE COURT:  Overruled.  Well, sustained as to form.

23   BY MR. XUE:

24   Q.  Do you know how many years' delivery experience Prisco

25   Najera have?

1   A.  I don't know about that.

2   Q.  Did you talk to other delivery employees who were working

3   for Gotham Pizza?

4   A.  Excuse me?

5   Q.  Did you and other delivery employee at Gotham Pizza talk

6   about pays they received?

7   A.  No.

8   Q.  So you never had any discussion with other employee about

9   the pay they received; is that correct?

10  A.  No, never.

11  Q.  Didn't you just testify, when your attorney was asking you

12  that whether other employee complaining about pay, you said

13  every employee was dissatisfied with Gotham Pizza's pay?  Do

14  you recall that testimony?

15  A.  Yes, but they never said how much they were paid.

16  Q.  So how would you know they complain about their pay,

17  everyone is dissatisfied with their pay?  Where did you draw

18  the conclusion from?

19  A.  Well, I --

20          THE INTERPRETER:  The interpreter would have to ask

21  the witness to repeat the answer.

22          THE COURT:  Yes.

23  A.  Well, we never really actually discuss openly or directly

24  how much we were being paid.  But they complained that they

25  weren't happy with the wages they were being paid.

G76KNAJ3                    Tapia - cross

1   Q.  When they complained to you, did you ask how much you were

2   getting paid?

3   A.  No.

4   Q.  So they just complained in general?

5   A.  Yes, yes.

6   Q.  Isn't it true that, in fact, every delivery employee were

7   paid exact same rate at Gotham Pizza?

8   A.  I wouldn't be able to tell you.

9   Q.  When you were working for Gotham Pizza, did you take any

10  days off?  Besides went for work for another employer and the

11  regular days off, did you take any personal days off or

12  vacation days?

13  A.  No.

14  Q.  When you were working for Gotham Pizza, were you arrested

15  and put in jail for several days and then Michael has to bail

16  you out?

17          MR. ANDROPHY:  Objection.

18          THE COURT:  Overruled.

19  A.  Excuse me?

20          MR. XUE:  I will ask the question to be reread back.

21          THE COURT:  Yes.

22          When you were working for Gotham Pizza, were you

23  arrested and put in jail for several days and then Michael has

24  to bail you out?

25          THE WITNESS:  That's correct.

G76KNAJ3                          Tapia - cross

1    Q.  And you were arrested --

2    A.  And it was two days.

3    Q.  -- for domestic abuse at that time, right?

4            MR. ANDROPHY:  Objection.

5            THE COURT:  Sustained.

6            Ladies and gentlemen, you're going to ignore that

7    comment.

8            Counsel.

9    BY MR. XUE:

10   Q.  Do you recall when was that?

11   A.  I don't know exactly, no.

12   Q.  Michael did not fire you after that incident, right?

13   A.  No.

14   Q.  I direct your attention to Exhibit YY, the exhibit your

15   attorney show you.

16           Do you know what's this document?

17   A.  I didn't know but now I do.

18   Q.  Okay.  This is -- what's your understanding as to this

19   document, as of today, what's this document?

20   A.  It were the hours or the wages we were paid.

21   Q.  When you were asked to sign this document, who was present

22   when this document was signed?

23   A.  Michael and the gentleman.

24   Q.  Okay.  So Michael introduce you to his attorney before this

25   document was presented to you, right?

G76KNAJ3                      Tapia - cross

1   A.   That's right.

2   Q.   And that attorney ask Michael to leave the place and just

3   you and the attorney was present when this document was

4   introduced to you; is that correct?

5             MR. ANDROPHY:   Objection.

6             THE COURT:   Sustained as to form.

7   Q.   Isn't it correct before this document was present to you,

8   Michael already left the meeting's place?

9   A.   No.  Michael was there, he was there.

10  Q.   Isn't it correct that this document was read to you

11  sentence by sentence by the attorney?

12            MR. ANDROPHY:   Objection.

13            THE COURT:   Overruled.

14  A.   Well, at that time, I was very, very busy and, you know, I

15  had things to do and what I wanted to do is to actually -- I

16  was trying to make money, not from the money I was already

17  making but the money from the tips, so what I wanted to do was

18  sign the document and get my tips and leave.

19  Q.   That wasn't my question, sir.  My question to you is:  Did

20  that attorney read this document sentence by sentence to you?

21  A.   Well, yes, but I don't understand -- I did not understand.

22  Q.   At no time you said to that attorney you don't understand;

23  is that correct?

24            MR. ANDROPHY:   Objection.

25            THE COURT:   Overruled.

G76KNAJ3                        Tapia - cross

1   A.  I didn't know what the document had to do with.  I thought

2   that it had to do with the pay rate.

3   Q.  So you knew it had everything to do with the pay rate,

4   right?

5   A.  But I never read it, never.

6   Q.  It was read to you; is that correct?

7   A.  Yes, but I don't understand English.

8   Q.  Okay.  But you also never tell the attorney you don't

9   understand what he read; is that correct?

10          MR. ANDROPHY:  Objection.

11          THE COURT:  Sustained as to form.

12          MR. XUE:  Okay.

13  Q.  So how long was your meeting with the attorney?

14  A.  Five minutes, at the most.

15  Q.  Wasn't the meeting last more than 30 minutes at 77 and York

16  Avenue?

17          MR. ANDROPHY:  Objection.

18          THE COURT:  Sustained; form.

19  Q.  Isn't it correct the meeting, in fact, last more than 30

20  minutes?

21  A.  Well, it was approximately five minutes.

22  Q.  So do you use English at work?

23  A.  At work?  No, most people speak Spanish.

24  Q.  How do you communicate with Michael?

25  A.  Through Rodrigo.

G76KNAJ3                     Tapia - cross

1    Q.  You also talk to Michael in English; is that correct?

2    A.  No, that's incorrect.

3    Q.  How long have you been in this country before you signed

4    this document in November 2012?

5    A.  Seven years.

6    Q.  During your meeting with the attorney when you were signing

7    this document, did you at any time tell the attorney you don't

8    understand what he's saying?

9    A.  No, I never said to him anything.

10                 (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1   Q.  You also testified that you have to buy two bikes and each

2   bike cost you $700.  What kinds of bikes did you purchase?

3   A.  It was a specialty bike.  They were expensive.  I wanted

4   something that would be valuable for me.

5   Q.  Very expensive bike, right?

6   A.  That's right.

7   Q.  And you don't remember what's the brand of the bike?

8   A.  I don't know what it is in English.  Special or something

9   like that.

10  Q.  The brand name is Special?

11  A.  Uh-huh, yes.

12  Q.  This is an expensive bike that you had to conduct repairs

13  about twice a month and spent hundred dollars doing repair.  Is

14  that your testimony?

15  A.  More or less.

16  Q.  Did you ever ask Michael for reimbursement for your

17  purchase of the bike and repair costs?

18  A.  No, never, I did not.

19  Q.  Do you use this bike to commute back and forth?

20  A.  Only from work.

21  Q.  And you said you came back to work for Michael about a few

22  months, four, five months after December 2012, and stayed for

23  about a year, is that correct?

24  A.  That's right.

25  Q.  And isn't it the truth that you actually approached

G76MNAJ4                        Tapia – cross

1    Michael, want to come back to work for him instead of he offer

2    you a higher pay to hire you back?

3    A.  No.

4    Q.  So how was your employment with Gotham Pizza terminated at

5    the end?

6    A.  Can I explain a little more?

7    Q.  Yeah.

8    A.  Well, you know, there is a point he came to me and it

9    wasn't really him.  It was Henry or Jerry.  And told me I would

10   have a schedule of 72 hours.

11          THE INTERPRETER:  Correction by the interpreter.

12   A.  I had a schedule of 72 hours and he gave me a schedule for

13   50 hours.  And I wanted to work 72 hours because there were no

14   tips because, otherwise, I could not maintain my family.

15   Q.  So you were working for about 50 hours, so you are not

16   satisfied with the hour, so you quit, is that correct?

17          MR. ANDROPHY:  Objection.

18          THE COURT:  Sustained.

19   Q.  My question to you is, how is your employment terminated?

20   You quit or someone fire you?

21   A.  I left.

22   Q.  You left because you don't want to only work for 50 hour a

23   week, is that correct?

24   A.  That's right.

25   Q.  Because the hour is too little for you?

G76MNAJ4                    Tapia - cross

1    A.  That's right.

2    Q.  You said Michael offer you to come back to work for you.

3    Did he call you or he see you in person?

4    A.  I saw him one time and I told him, I rather told him I had

5    to think it over.

6    Q.  So you were communicating with Michael in English, is that

7    correct?

8    A.  Well, he talked to me and I understood a little bit.

9    Q.  So you do understand what he say to you in English?

10   A.  About the job, yes.  But I don't understand everything.

11   Q.  And I draw your attention to exhibit your attorney

12   previously showed to you, Plaintiff's Exhibit 10.  Can you tell

13   me which of this sheet that you put off, even though you were

14   working?

15          THE INTERPRETER:  Counsel would like to know the hours

16   that he worked?

17   Q.  Let me refresh your testimony.

18          THE COURT:  I'm sorry.  I'll repeat the question.  I

19   draw your attention to Exhibit 10.  Can you tell me on which

20   sheet you put the word off, even though you were working?

21          THE WITNESS:  Well, that's because we saw these papers

22   and in all of them there was that word off and then we did the

23   same thing.

24   Q.  I am not sure I understand you.

25          THE COURT:  Excuse me, counsel.  No comments.  The

1    jury shall disregard.

2    Q.  Is it your testimony that on some dates, even though you

3    were working, you put down on the time sheet you were off?

4    A.  I know some words, but I don't know how to speak.

5    Q.  In fact, you always get a day off every week, is that

6    correct?

7    A.  No.

8    Q.  And you knew the time sheets used to calculate your pay,

9    right?

10   A.  That's right.

11   Q.  So you always make sure you put down all the hours you

12   worked on the time sheets, is that correct?

13   A.  That's right.

14   Q.  So you would not put a date you were working as a date you

15   were off on the time sheets, is that correct?

16   A.  Well, you have to write it down, but on your day off, on

17   the time sheet you have to leave that day blank.

18   Q.  Because you were not working on that day off, right?

19   A.  Even if you do work, he would not allow us to write it down

20   there.

21   Q.  Who would not allow you to do that?

22   A.  The person in charge would tell us that, Rodrigo Ramales.

23   Q.  He's another coworker of yours, right?

24   A.  He's a pizza man, counter man.

25   Q.  He did not use his money to pay you, right?

1    A.  No.  But he communicated with Michael.  He speaks English

2    all the time.

3           MR. XUE:  I have no more questions for you.  Thank

4    you.

5    REDIRECT EXAMINATION

6    BY MR. ANDROPHY:

7    Q.  Mr. Tapia, who was the person or attorney that you met with

8    when you signed the document that we looked at that's

9    Defendant's Exhibit YY?

10   A.  Michael.

11   Q.  Who else were you meeting with?

12   A.  I was at work.

13   Q.  I believe you testified you met with Michael and one other

14   person.  Do you know who the other person was?

15   A.  My understanding is, I'm not really sure whether or not it

16   was the gentleman's attorney, Michael's.

17   Q.  Was it the attorney who was just asking you questions two

18   minutes ago?

19   A.  That's right.

20          MR. ANDROPHY:  Thank you.  I have no further

21   questions, but I would like to request a side bar.

22          THE COURT:  We will deal with this at lunch.

23          Any further recross?

24          MR. XUE:  No, your Honor.

25          THE COURT:  You may step down.

1          (Witness excused)

2          THE COURT:  Next witness.

3          MR. ANDROPHY:  Plaintiffs call Israel Fuentes.

4          THE COURT:  Mr. Fuentes, if you would take the witness

5    stand and remain standing, please.

6     ISRAEL FUENTES,

7          a Plaintiff, called as a witness on his own behalf,

8          having been duly sworn, testified as follows:

9    DIRECT EXAMINATION

10   BY MR. ANDROPHY:

11   Q.  Mr. Fuentes, did you ever work for Gotham Pizza?

12   A.  Yes.

13   Q.  Did you work at one location of Gotham Pizza or more than

14   one location?

15   A.  Three.

16   Q.  Which three locations did you work at?

17   A.  On 19th and Ninth Avenue, 77th and York Avenue, 87th and

18   First Avenue.

19   Q.  Which location did you start working at?

20   A.  On 19th and Ninth.

21   Q.  When did you begin working at Gotham Pizza on 19th and

22   Ninth?

23   A.  Around June of 2008.

24   Q.  How did you come to find your job at Gotham Pizza?

25   A.  My stepfather was working there and he told me that they

1    needed a deliver boy.

2    Q.  Did you then go to the pizzeria to see if you could have

3    the job?

4    A.  Yes.

5    Q.  Who did you meet with?

6    A.  With man in charge who was Fausto Ramales.

7    Q.  What did he tell you?

8    A.  That, yes, in fact they did need a delivery boy and that I

9    should wait until a while, until the owner, Michael, arrived.

10   Q.  Did you then meet with Michael shortly thereafter?

11   A.  Yes, Michael arrived.

12   Q.  And what did you discuss with Michael?

13   A.  Well, all he told me was to start working.

14   Q.  Did Michael discuss your pay with you at that meeting?

15   A.  No.

16   Q.  Did Michael tell you what your schedule would be at that

17   meeting?

18   A.  No.

19   Q.  When did you find out what your pay would be?

20   A.  A week later.  When my week finished up, he paid me.

21   Q.  Do you know who decided how much you were paid?

22   A.  Yes.  Michael.

23   Q.  How did you know that Michael decided how much you were

24   paid?

25   A.  Because Fausto was the one who was in charge and he told me

1   that he had said that was how much he was going to pay me per

2   week.

3   Q.  Fausto told you he had said that was how much.  Who is the

4   he you are referring to?

5   A.  Michael.

6   Q.  What was your job at Gotham Pizza?

7   A.  I made deliveries and all kinds of prep work.

8   Q.  Anything else?

9   A.  Yes.  I had to wash, I had to clean the pizzeria.

10  Q.  On the typical day would you spend more of your day doing

11  deliveries or doing other jobs at Gotham Pizza?

12  A.  Doing jobs in Gotham Pizza.

13  Q.  Did you ever have to bring items from one location of

14  Gotham Pizza to another?

15  A.  Yes.

16  Q.  How often would you have to do that?

17  A.  I would do that two or three times a week.

18  Q.  What types of items would you have to bring?

19  A.  I would have to bring flour, I would bring ice.  But that

20  was at the last pizzeria where I was working on 87th.

21  Q.  Did you stop working at Gotham Pizza on Ninth Avenue at

22  some point?

23  A.  Yes.

24  Q.  And at what location did you work at next?

25  A.  York Avenue.

1  Q.  When did you start working at York Avenue Gotham Pizza?

2  A.  Around October of 2008.

3  Q.  After that, did you ever change locations again?

4  A.  Yes.

5  Q.  And which location did you change to?

6  A.  To 87th and First Avenue.

7  Q.  When did you change from York Avenue to 87th and First

8  Avenue?

9  A.  I had already been working for two and a half years on

10  77th.

11  Q.  When you first started working at Gotham Pizza on Ninth

12  Avenue, what was your usual schedule at Gotham Pizza?

13  A.  I worked on 19th Street from 10:30 until 9 for those three

14  weeks.  That's how it went.

15  Q.  You only worked three weeks at Ninth Avenue, is that

16  correct?

17  A.  Yes.

18  Q.  And when you say you worked from 10:30 a.m. to 9 p.m., how

19  many days per week would you work that schedule?

20  A.  Six days.

21  Q.  Between working at Ninth Avenue and working at York Avenue,

22  did you work somewhere else other than Gotham Pizza?

23  A.  No.

24  Q.  Why did you stop working at Gotham Pizza on Ninth Avenue?

25  A.  It seems that his partner, Kenny, had fired me.

1    Q.  I believe you testified you started again at York Avenue

2    around October 2008, correct?

3    A.  Yes.

4    Q.  What was your schedule when you worked at York Avenue?

5    A.  From 9:30 until 10.

6    Q.  And how many days per week did you work that schedule?

7    A.  I always worked that way at that time, from 9:30 until 10,

8    yes.

9    Q.  My question is how many days per week did you work at

10   Gotham Pizza?

11   A.  Six.

12   Q.  When you worked at Gotham Pizza on Ninth Avenue, did you

13   write down the hours that you worked?

14   A.  No.

15   Q.  When you worked at Gotham Pizza at Ninth Avenue, did anyone

16   keep track of the hours that you worked?

17   A.  No, they didn't either.

18   Q.  While you worked at Gotham Pizza on York Avenue, did you

19   ever write down the hours that you worked?

20   A.  No, not there either.

21   Q.  You testified you next worked at First Avenue Gotham Pizza,

22   correct?

23   A.  Yes.

24   Q.  When you worked at Gotham Pizza on First Avenue, did you

25   write down the hours that you worked?

1   A.  Yes, I did there.

2   Q.  Mr. Fuentes, I'm showing you what's been marked as

3   Plaintiff's Exhibit 24.  Do you recognize this document?

4   A.  Yes.

5   Q.  Can you tell me what this document is?

6   A.  The document where we would write down our hours and our

7   tips.

8            MR. ANDROPHY:  I ask that Plaintiff's Exhibit 24 be

9   admitted into evidence.

10           THE COURT:  Received.

11           (Plaintiff's Exhibit 24 received in evidence)

12           MR. ANDROPHY:  May I publish it to the jury?

13           THE COURT:  Yes.

14  Q.  Did you write down the handwritten hours on this sheet?

15  A.  Yes.

16  Q.  When would you write those down?

17  A.  I would write down my hours and tips every day.

18  Q.  Is that your signature on the page, the first page that's

19  displayed in front of you?

20  A.  Yes.

21  Q.  And what was on this document when you signed it?

22  A.  Only my hours and the tips.  That's it.

23  Q.  How about where it says total amount received, $663, was

24  that on the page?

25  A.  No, that wasn't.

1    Q.   Where it says pay rate $7.25, overtime rate, $10.87, was

2    that on the document when you signed it?

3    A.   No, that wasn't there either.

4    Q.   Where it says spread of hours and tip paid and overtime

5    pay, was that on the document when you signed it?

6    A.   No.

7    Q.   Were the dates on the document at the time that you signed

8    it?

9    A.   No, they weren't.

10   Q.   Did you sign these documents at the time you were paid or

11   at another time?

12   A.   No.  I would sign them first and then he would pay me the

13   next day.

14   Q.   Would anyone put this document in front of you at the time

15   that you were paid?

16   A.   No.

17   Q.   When you worked at Gotham Pizza did you ever see this

18   document with the total amount received information filled in?

19   A.   No.  This is what I'm seeing right now.  I had never seen

20   this before.

21   Q.   Did you ever see this document with the notation pay rate,

22   $7.25?

23   A.   No.

24   Q.   Were you ever paid $7.25 per hour?

25   A.   No.  I was being paid $4.65 an hour and 7.25 for over 40

1    hours.

2    Q.   Were you ever paid $10.87 for your hours over 40?

3    A.   No.

4    Q.   Were you ever paid spread of hours pay, which is an extra

5    hours pay for a day when you are at work for more than 10

6    hours?

7    A.   No.

8    Q.   I am going to show you now another page from this same

9    exhibit.  Mr. Fuentes, you have now in front of you a page that

10   has a notation at the bottom with the number 455.  Is that

11   correct?

12   A.   No.  I didn't understand the question.

13   Q.   The document in front of you or on the screen, there is a

14   notation at the bottom of the page.  Do you see where it says

15   Najera v. Gotham Pizza, three zeros and then the number 455?

16   A.   Yes.

17   Q.   Do you recognize this document?

18   A.   Not at all.  This is not my signature.  And that was never

19   my schedule either.

20   Q.   Did you always sign your hour sheets or did sometimes

21   someone else sign those hour sheets for you?

22   A.   No.  Sometimes another person would sign them.

23   Q.   I am going to put another page on the screen.  You should

24   look at that page.

25             THE COURT:  For the record --

 1                MR. ANDROPHY:  For the record it has the notation

 2     Najera v. Gotham Pizza 000459.

 3     Q.  Do you recognize this document?

 4     A.  Not that one either.  I don't know.  I'm only familiar with

 5     the first one I was shown.

 6                THE COURT:  Counsel, why don't you go on to your next

 7     topic with this witness.  We are just a few minutes away from

 8     the lunch break.

 9                MR. ANDROPHY:  Sure.

10     Q.  When you started working at Gotham Pizza on Ninth Avenue,

11     how much were you paid, not including tips?

12     A.  $300.

13     Q.  For what period of time were you paid that amount?

14     A.  Per week.

15     Q.  How were you paid, cash or check?

16     A.  Cash.

17     Q.  If you ever worked more hours than your usual schedule,

18     were you paid a different amount?

19     A.  No.

20     Q.  Did you receive any written statement of pay when you were

21     paid?

22     A.  No.

23     Q.  When you worked at Gotham Pizza on York Avenue, how much

24     were you paid?

25     A.  I was being paid 250 there because I was making more in

G76MNAJ4

1    tips, a little more in tips.

2    Q.  At York Avenue how were you paid, cash or check?

3    A.  Cash.

4    Q.  Did you receive any additional pay in weeks when you worked

5    more than your usual hours?

6    A.  No.

7    Q.  Did you receive any written statement of pay when you were

8    paid?

9    A.  No, not there either.

10   Q.  When you worked at York Avenue, did you have to sign

11   anything when you were paid?

12   A.  No.

13   Q.  When you went to work at First Avenue, what were you paid?

14   A.  4.65 an hour and 7.25 for overtime.  That's when they

15   started having these papers.

16   Q.  Were you ever paid 7.25 per hour as your regular rate?

17   A.  No.

18   Q.  Were you ever given the copy of your time sheets when you

19   worked at Gotham Pizza?

20   A.  No, never.

21          THE COURT:  Counsel, is this a good time to break for

22   lunch?

23          MR. ANDROPHY:  Yes, your Honor.

24          THE COURT:  Thank you.

25          Ladies and gentlemen, why don't you take those binders

1    with you into the jury room.  They have your numbers on the

2    front cover.  You will just leave them closed in the jury room.

3            I wish you a good lunch break.  We will resume at

4    2:00.  Do not discuss the case.  Thank you.

5            (Jury not present)

6            THE COURT:  Counsel, we have a copy of the voir dire

7    form as an exemplar for one juror.  I am going to ask my law

8    clerk to give counsel a copy and we will mark it as a court

9    exhibit when Ms. Rojas returns.  I'll take your comments and

10   requests on this document at the end of the day and then, of

11   course, we will have a separate set of questions for each

12   plaintiff along these lines once we can at the end of the day

13   finalize it.  This is Court Exhibit 4.

14           There was an issue we were going to discuss at the

15   break.

16           MR. ANDROPHY:  Your Honor, there were two limiting

17   instructions that I would request relating to Mr. Tapia's

18   testimony on cross-examination.

19           One is, he was asked whether he was arrested and if he

20   missed work for that.  I would ask that the jury be given a

21   limiting instruction that they are not to consider the fact

22   that he was arrested in any way.  Certainly the fact that he

23   missed work is understandably something they can consider.  But

24   the reason for that should not affect their determination of

25   his claims.

1          The second issue was Mr. Tapia described a meeting he

2     had.  My understanding from his testimony was it was with Mr.

3     Xue, who then asked him numerous questions, some of which, I

4     think, could be potentially viewed by the jury as testimony by

5     Mr. Xue as he was the one present.

6          So I think a limiting instruction would be

7     appropriate, reminding the jury that questions made by an

8     attorney are not themselves evidence and any of those questions

9     Mr. Xue was asking about a meeting that he apparently was

10    present at should not be taken as testimony by Mr. Xue.

11         MR. XUE:  Your Honor, regarding the first issue, the

12    issue with regard to the dates he's missing work, I don't have

13    problem that your Honor instruct either way.  I don't have

14    issue.

15         The second issue I intentionally stayed away from

16    whether the meeting was with me.  Actually, plaintiff counsel

17    opened the door.  I'm doing my job for my client

18    cross-examining a witness.  I don't think there should be any

19    such instruction on the second.

20         THE COURT:  I agree with Mr. Xue that his questioning

21    did not ask the witness to identify Mr. Xue as the person who

22    was present and, therefore, until redirect the jury did not

23    know that it was Mr. Xue who was acting as the defendants'

24    lawyer when the affidavit was presented to Mr. Tapia.

25         I agree that Mr. Xue's questioning in its form often

G76MNAJ4

1    implied a personal knowledge, but I think for the most part

2    objections were made and sustained and he had to reformulate

3    the question.  Perhaps it was not every question was objected

4    to and reformulated, but obviously the record will reflect

5    whether my recollection is correct or not that many of them

6    were.

7             The correct way to proceed, of course, with such

8    questions, when the lawyer has some personal knowledge, is for

9    the lawyer to very carefully frame the question so there is no

10   implication to the jury that the lawyer has personal knowledge.

11   A lawyer cannot be both a lawyer at trial and a witness at

12   trial, fundamental point.

13            Plaintiff's counsel should not have brought out from

14   the plaintiff that he believed it was Mr. Xue who was present.

15   That should have never been asked.  If I had understood what

16   was coming, I would have objected myself.  As I remember, there

17   was no objection, so the testimony is what it is.  I think I

18   should strike the testimony identifying Mr. Xue as the lawyer.

19            Mr. Xue, you don't speak Spanish, do you?

20            MR. XUE:  I don't.

21            THE COURT:  After this trial is over, after the jury

22   begins deliberations, I'd like to talk with counsel about this

23   issue, about Mr. Xue's presentation of that affidavit to a

24   person who doesn't read English and certainly has limited

25   ability to understand and speak English, at least as I

1    understand it, but that's for another day.  I'm also concerned

2    with the content of the affidavit, the process and the content,

3    but we will address those at a separate time.

4              Right now I have to decide what to do about this

5    testimony that came in and essentially puts Mr. Xue before the

6    jury as a witness, and we can't have that.  So when the jury

7    comes back from lunch I'll strike that portion of Mr. Tapia's

8    testimony that identified -- and I think he wasn't sure in the

9    way he expressed it -- his attempt to identify the lawyer who

10   accompanied the defendant when the affidavit was presented, and

11   I think that's all I am going to do.

12             Anything else, counsel?

13             MR. ANDROPHY:  Just confirm for the Court,

14   Mr. Alonso's last name is spelled with an S, not a Z.

15             THE COURT:  Great.  We will make the appropriate

16   corrections and we will correct the caption.  Thank you.

17             Anything else, counsel, before we break for lunch?

18             Not hearing anything, have a nice lunch.  We will see

19   you at 2.

20             (Luncheon recess)

21             (Continued on next page)

22

23

24

25

G76KNAJ5

```
1                        AFTERNOON SESSION

2                             2:00 PM

3            (In open court; jury not present)

4            THE COURT:  I understand counsel wished for the

5   current tabulation on time.  You can count on me to always give

6   it to you at the end of the day or first thing in the morning

7   but I'm happy to give you my calculations now.

8            The plaintiff has spent three hours and 25 minutes and

9   the defendants have spent two hours and one minute.

10           Bring in the jury.

11           And, Mr. Fuentes, if you'd retake the stand.

12           (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1          (Jury present)

2              THE COURT:  Counsel.

3     ISRAEL FUENTES, resumed.

4    DIRECT EXAMINATION CONTINUED

5    BY MR. ANDROPHY:

6    Q.  Mr. Fuentes, were you ever given any document while you

7    worked at Gotham Pizza on First Avenue that said how much you

8    were paid per week?

9    A.  No.

10   Q.  Did your pay rate ever change again after it went to $4.65

11   per hour and $7.25 for all hours above 40?

12   A.  No.

13   Q.  Did you receive the full amount of tips that you had earned

14   at Gotham Pizza?

15   A.  No.

16   Q.  How do you know that you did not receive the full amount of

17   your tips?

18   A.  Because I would more or less figure out more or less the

19   amount that I was going to be paid, and I always was short 20

20   or 30 dollars.

21   Q.  Did you ever see Lana Shamailov at Gotham Pizza?

22   A.  Yes.

23   Q.  Approximately how often would you see here there?

24   A.  Once or twice a month.

25   Q.  And what would you see her do when she came to Gotham

1    Pizza?

2    A.   She would just come to eat pizza with her child and then

3    later she would leave.

4    Q.   When did you stop working at Gotham Pizza?

5    A.   March of 2012.

6    Q.   Why did you stop working there?

7    A.   His partner fired me under Michael's orders.

8    Q.   When you say "his partner," who are you referring to?

9    A.   Kenny.

10   Q.   Did they give you a reason for why you were being fired?

11   A.   No.  He just fired me.

12   Q.   Did you receive pay for all of the last week that you

13   worked at Gotham Pizza?

14   A.   They owed me for three days.

15   Q.   Did you ever receive that pay?

16   A.   No.

17            MR. ANDROPHY:  I have no further questions at this

18   time.

19            MR. XUE:  May I proceed, your Honor?

20            THE COURT:  Yes.

21   CROSS-EXAMINATION

22   BY MR. XUE:

23   Q.   Good afternoon, Mr. Fuentes.

24   A.   Good afternoon.

25   Q.   Do you remember for how long did you work for Gotham Pizza?

G76KNAJ5                    Fuentes - cross

1   A.  I worked at 19th Street for three weeks, I worked on 77th

2   and York for approximately two years, and I also worked for two

3   years on 87th and First.

4   Q.  You testify at the beginning you were paid $300 a week,

5   right?

6   A.  Yes, at the first pizzeria, on 19th and First.

7   Q.  If you have to work longer hours than your regular

8   schedule, you still get the same amount of pay; is that

9   correct?

10  A.  Yes, 300, it was just 300.

11  Q.  So if you work less hours, you also get the same amount of

12  pay; is that correct?

13  A.  I never worked less hours.  I always worked the same hours,

14  that same schedule.

15  Q.  I draw your attention to Defense Exhibit I.  Let me show it

16  to you.

17          THE INTERPRETER:  Counsel, could you just give the

18  interpreter a minute to clean this up?

19          MR. XUE:  Sure.

20  Q.  I direct your attention to the first page on this document.

21  Did you see your signature here?

22  A.  Yes, that is my signature there.

23          MR. XUE:  Your Honor, I move for admission of this

24  document.

25          THE COURT:  I is received.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1              (Defendants' Exhibit I received in evidence)

2              MR. XUE:  I'd like to publish it to the jury.

3              THE COURT:  When you say this document, do you mean

4      just the first page of the or all the pages?

5              MR. XUE:  Just the first page, your Honor.

6              THE COURT:  Thank you.

7              JURY MEMBERS:  Back one.

8              THE COURT:  Excuse me, ladies and gentlemen.  It's

9      okay.

10             THE WITNESS:  May I speak?

11             THE COURT:  Not yet.  You need to have a question put

12     to you by counsel.

13     BY MR. XUE:

14     Q.  Did you review this document before you signed this

15     document?

16     A.  No.

17     Q.  Did you put a date on this document yourself?

18     A.  No.

19     Q.  This document is in both Spanish and English; is that

20     correct?

21     A.  It seems to be.

22     Q.  When it was presented to you, it was already fill out; is

23     that correct?

24     A.  No.

25     Q.  So when you sign this document, can you describe what's the

1   information on this document?

2   A.  No, because he just had me get into the car he owned and he

3   said to me, sign this.  And that's it.

4   Q.  Who gave this document to you?

5   A.  Michael.

6   Q.  Did you ask him what's this document about?

7   A.  No.

8   Q.  Did you always sign documents without looking at documents?

9   A.  The thing is, he told me that I had to sign that so that he

10  would pay me.  It was just that.

11  Q.  Was February 16, 2011, a pay day?

12  A.  No, I don't recall.

13  Q.  It's –– actually, February 16, 2011 is the first day you

14  start working for Gotham Pizza; is that correct?

15  A.  No.

16  Q.  This document was given to you on the day you were hired;

17  is that correct?

18  A.  No.

19  Q.  I draw your attention to the following page of Defense

20  Exhibit I.

21          THE COURT:  Now, Mr. Xue, before I asked you if you

22  were offering only the first page or the entire set of

23  documents, and I thought you answered you were just offering

24  the first page.

25          MR. XUE:  Oh, your Honor, I was offering to the jury.

G76KNAJ5                       Fuentes - cross

1    I misunderstood your question.

2              THE COURT:  That's fine.

3              MR. XUE:  Sorry about it.

4              THE COURT:  I just want to make sure that the record

5    is clear.

6              So you're offering the entire exhibit?

7              MR. XUE:  Yes.

8              THE COURT:  Any objection?

9              MR. ANDROPHY:  No objection.

10             THE COURT:  The entire exhibit is received.

11             MR. XUE:  Thank you, your Honor.

12   Q.  Mr. Fuentes, you have testified this morning that some of

13   this time sheet were not signed by you.  Is that correct?

14   A.  This one here, this one here, is mine but all of this

15   that's here, that's not mine.  The only thing that was on it

16   were the hours and my signature.  And the one who would sign

17   was Rodrigo, sometimes he would sign mine.

18   Q.  Did you give Rodrigo permission to sign your name to the

19   time sheet?

20   A.  Well, sometimes I would leave at 10:00 and he would collect

21   the papers at closing time at the pizzeria, so sometimes I

22   would leave and he would sign for me.

23   Q.  This document only gets signed once a week; is that

24   correct?

25   A.  Yes.

G76KNAJ5                    Fuentes - cross

1   Q.  So you don't sign it every day, right?

2   A.  No; every week.

3   Q.  So are you saying sometime you are not in the pizzeria for

4   the whole week, Rodrigo sign for you?

5   A.  No.  The thing is that the days that he would pay us,

6   sometimes I would leave earlier and so I didn't sign it and

7   Rodrigo signed it for me.

8   Q.  But in term of the hours recorded on this time sheet, were

9   they actually the hours you worked?

10  A.  Yes.

11  Q.  And can you pick out a page, go through each page, pick out

12  a page which you claim they were not signed by you?

13  A.  (In English) This is mine.

14  Q.  The first page is yours?

15          THE COURT:  Counsel, return to the lectern, please.

16          MR. XUE:  Okay.

17  Q.  So instead, make it easier for the record, I will just go

18  page by page really quick.  First page is yours.  How about

19  second page?  Is it yours?

20  A.  (Through Interpreter)  This one?

21  Q.  Yes, the second page.

22  A.  Yes, that is my signature.

23  Q.  Third page?

24  A.  Yes, that is too.

25  Q.  Fourth page?

1   A.  That's also mine.

2   Q.  Okay, so can you go through the entire document, tell me

3   which page is not signed by you.

4   A.  The fourth one is not mine.

5   Q.  The fourth one is not yours?  Okay.

6           And then continue.

7   A.  The fifth one is mine.  The sixth one is not mine.  That

8   one is mine.  That's mine.  Mine.  Mine.  Mine, that one too.

9   That one is not mine.

10  Q.  Is there a Bates stamp on that one?

11          MR. XUE:  For the record, Bates stamp ending 455.

12  Q.  So who signed this document for you?

13  A.  It looks like Rodrigo.  Rodrigo was the one who would sign

14  for me and at that time that wasn't there, where it says

15  Najera.  As a matter of fact, Rodrigo would also do my schedule

16  sometimes when I forgot to write it in.

17  Q.  Okay.  So this 455 Bates stamped document you claim is

18  signed by Rodrigo.  Did you put in the hours on this document?

19  A.  Yes, just the hours.

20  Q.  Who put the tip information on this document?

21  A.  That was Rodrigo, and he signed it too.

22  Q.  Did you provide the tip information to Rodrigo?

23  A.  Yes.

24  Q.  So, if you look at this sheet, right, your schedule is not

25  from 10:30 to 9:00 every day, right?

1    A.  Because this is the schedule from 87th and First Avenue.

2    Q.  So, on 87th and First Avenue, you often only worked half

3    days, right, on Friday, Sunday, Monday, right, three days a

4    week, half days, right?

5    A.  That was towards the end because in the beginning we were

6    closing at 3:00 a.m. and 5:00 a.m. on Fridays and Saturdays.

7    Q.  Sir, is it true that during your employment with Gotham

8    Pizza you were fired and returned to work for Gotham Pizza on

9    several time -- occasions?

10   A.  That was just one time.

11   Q.  Just one time?

12          And when was that?

13   A.  When I worked on 19th and Ninth.

14   Q.  When, when?

15   A.  When his partner, Kenny, fired me.

16   Q.  What year and what month was that?

17   A.  That was in 2008.

18   Q.  You were also fired in March 2012, right?

19   A.  Yes.  That's when I got fired forever and I didn't go back

20   anymore.

21   Q.  So in 2008, when you were fired, why did you return to work

22   for Gotham Pizza?

23   A.  Because Rodrigo called me.

24   Q.  In Gotham Pizza's management system, who has hire

25   authority, to your knowledge, Kenny or Rodrigo?

1    A.  Kenny.

2    Q.  So why would you return to work even after Kenny fire you

3    and -- how can -- strike that.

4            How can Rodrigo hire you back even though Kenny fire

5    you?

6    A.  Because he didn't have workers.

7    Q.  Wasn't it the case that you -- isn't it true that -- strike

8    that.

9            Isn't it true that during your employment with Gotham

10   Pizza you were hired and fired several times but every time you

11   returned to Gotham Pizza because the pay is better than other

12   pizzerias you have been working with?

13           MR. ANDROPHY:  Objection.

14           THE COURT:  Sustained.

15   Q.  Isn't it true that you returned to work for Gotham Pizza

16   because Gotham Pizza pay you more than anyone else?

17   A.  No.

18   Q.  You indicate when Kenny fire you in March 2012 it was under

19   the direction of Michael.  How did you know that?

20   A.  Because when he fired me, I said, you can't fire me.  And

21   he said to me, this is on Michael's orders, you can't work here

22   anymore, we don't want to see you here again.

23           MR. XUE:  Move to strike, your Honor.  It's hearsay.

24           THE COURT:  Excuse me.

25           Oh.  Overruled.

1    BY MR. XUE:

2    Q.   Do you remember when your attorney questioned you whether

3    there was any reason given to you why you were fired?

4    A.   No.

5    Q.   Do you remember you giving the testimony you have no idea,

6    no reason was given to you?

7    A.   Yes.

8    Q.   So now, what made you suddenly remember what Kenny tell

9    you?

10   A.   What I recall is that Kenny told me that he didn't need me

11   anymore and I should leave.  That was the fight, that I should

12   leave and not come back and I no longer had a job there.

13   Q.   So Kenny did not tell you Michael want him to fire you; is

14   that correct?

15   A.   Michael was giving orders to Kenny, I believe.

16   Q.   Okay.  So now you are saying it's your belief, it's not

17   what Kenny is telling you; is that correct?

18   A.   No.  As a matter of fact, everything that Kenny said, Kenny

19   said to me, I'm not the one giving the orders, it's Michael.

20   Q.   And when did this conversation happen?

21   A.   When he fired me.

22   Q.   During your employment at Gotham Pizza, isn't it true that

23   you were paid 7.25 per hour?

24   A.   No.

25   Q.   What was your regular rate at Gotham Pizza?

G76KNAJ5                          Fuentes - cross

1   A.  When I was working at 19th and Ninth, I was paid $300 a

2   week; and when I was at 77th and York, I was paid 250 a week.

3   When I was working at 87 and First, I was paid 4.65 an hour,

4   and any time that I worked more than 40 hours, I was paid 7.25.

5   Q.  So you are very conscious about how much pay you receive

6   every week, right?

7   A.  Well, I knew that I was paid that because I made my

8   calculations.

9   Q.  So you calculate your own pay every week; is that correct?

10  A.  Yes, each week.

11  Q.  So when the money was paid to you short for 20, 30 dollars

12  every week, you knew about it; is that correct?

13  A.  Yes.

14  Q.  Did you raise the issue with Michael or Kenny, saying you

15  were short 20, 30 dollars when you receive your pay?

16  A.  I told Rodrigo and Rodrigo told me that it's that we were

17  charged for the taxes or Seamless.  Seamless and credit card.

18  Q.  So you never brought the issue to Michael, right?

19  A.  No.

20  Q.  Did you ever ask Michael to reimburse you for any repairs,

21  bike or purchase a bike?

22  A.  No.

23          MR. XUE:  I have no more questions for this witness.

24          MR. ANDROPHY:  No redirect.

25          THE COURT:  You may step down.

1                (Witness excused)

2                THE COURT:  Next witness?

3                MR. ANDROPHY:  Plaintiffs call Lana Shamailov.

4                THE COURT:  Ms. Shamailov, if you could come up here

5      and take the witness stand.

6                Counsel, do you want to retrieve your books or do you

7      want to use them with this witness?

8                MR. ANDROPHY:  Let me retrieve some of them.

9                THE COURT:  Ms. Shamailov, if you could just take the

10     witness stand and remain standing for a moment.

11               MR. ANDROPHY:  Also, I have for the Court a binder of

12     deposition transcripts.

13               THE COURT:  Ms. Shamailov, please take the stand and

14     remaining standing.

15      LANA SHAMAILOV,

16          called as a witness by the Plaintiffs,

17          having been duly sworn, testified as follows:

18               THE COURT:  Please state your full name and spell both

19     your first and last name for the record.

20               THE WITNESS:  Lana Shamailov, L-a-n-a

21     S-h-a-m-a-i-l-o-v.

22               THE COURT:  Counsel.

23     DIRECT EXAMINATION

24     BY MR. ANDROPHY:

25     Q.  Ms. Shamailov, are you a shareholder of 144 Ninth Gotham

1    Pizza, Inc.?

2    A.  No.

3    Q.  Sorry?

4    A.  No.

5            THE COURT:  And, Ms. Shamailov, if you'd just pull

6    your chair up.  And that mic moves and you can bring it under

7    your chin so you can speak into the mic.

8            There you go.  And keep your voice up so we can all

9    hear you.  Thank you so much.

10   Q.  Are you a shareholder of 852 Eighth Gotham Pizza, Inc.?

11   A.  No.

12   Q.  Are you a shareholder of 1443 York Gotham Pizza, Inc.?

13   A.  No.

14   Q.  Are you a shareholder of 1667 First Gotham Pizza, Inc.?

15   A.  No.

16   Q.  Can you please turn to Exhibit A in the binder in front of

17   you.  Let me know if you need some assistance.

18   A.  Okay.

19   Q.  Can you turn to the fifth page of that document.

20           Do you see that your name is listed in item (e) of

21   that document?

22   A.  Yes, I do see.

23   Q.  And do you see beneath that where it says "Shareholder's

24   Percentage of Stock Ownership for Tax Year"?

25           THE COURT:  Excuse me, Counsel.  This document isn't

G76KNAJ5                    L. Shamailov - direct

1    in evidence.

2              MR. XUE:  Objection.

3    Q.  Have you seen this document before?

4    A.  No.

5    Q.  Did you receive this page, this fifth page, of Exhibit A,

6    which has your name on it?

7    A.  No.

8              MR. XUE:  Objection.

9              THE COURT:  Overruled.

10   Q.  Your testimony is that you never received this tax document

11   that has your name and address on it?

12   A.  That's right, I never received it.

13             MR. ANDROPHY:  I ask that this Defendants' Exhibit A

14   be admitted into evidence.

15             MR. XUE:  Objection, your Honor; there's no foundation

16   been laid.

17             THE COURT:  Sustained.

18             MR. ANDROPHY:  I ask I be permitted to inquire of the

19   witness for impeachment purposes?

20             THE COURT:  Certainly.

21   BY MR. ANDROPHY:

22   Q.  Is it your understanding that this document is false where

23   it lists you as the 100 percent shareholder?

24             MR. XUE:  Objection.

25             THE COURT:  Sustained.

1  Q.  Can you turn to Exhibit B in the binder in front of you?

2            THE COURT:  B?

3            MR. ANDROPHY:  Yes.

4            THE COURT:  B as in boy?

5            MR. ANDROPHY:  B as in boy.

6  Q.  Can you turn to the fifth page of that document.

7            Do you recognize this document?

8  A.  No.

9  Q.  Do you see your name and address on this document?

10  A.  I do see.

11  Q.  Did you ever receive this document?

12  A.  No.

13  Q.  In 2011, were you a shareholder of 144 Ninth Gotham

14  Pizza, Inc.?

15  A.  No.

16  Q.  Turn to Exhibit C.  If you can turn to the fifth page of

17  that document.  Do you recognize this document?  Sorry, I'll

18  wait for you.

19  A.  No.

20  Q.  Do you see your name and address on this document?

21  A.  Yes.

22  Q.  Did you ever receive this document?

23  A.  No, I have not.

24  Q.  In 2010, were you the shareholder of 1443 York Gotham

25  Pizza, Inc.?

G76KNAJ5                          L. Shamailov - direct

1    A.  No.

2    Q.  If you can turn to Exhibit D, and if you can turn to the

3    fifth page of that document.  Do you recognize that document?

4    A.  No.

5    Q.  Do you see your name and address on that document?

6    A.  Yes.

7    Q.  Did you ever receive this document?

8    A.  No.

9    Q.  In 2011, were you a shareholder of 1443 York Gotham

10   Pizza, Inc.?

11   A.  No.

12   Q.  Can you turn to the fifth page of Exhibit E.  Do you

13   recognize that document?

14   A.  No.

15   Q.  Does it have your name and address on it?

16   A.  Yes.

17   Q.  In 2010, were you a shareholder of 1667 First Gotham

18   Pizza, Inc.?

19   A.  No.

20   Q.  Turn to the fifth page of Exhibit F.  Do you recognize that

21   document?

22   A.  No.

23   Q.  Does it have your name and address on it?

24   A.  Yes.

25   Q.  In 2011, were you a shareholder of 1667 First Gotham

G76KNAJ5                        L. Shamailov - direct

1    Pizza, Inc.?

2    A.  No.

3    Q.  Turn to Exhibit G.  And if you could turn to the page with

4    a Bates stamp the notation at the bottom that says Flores v.

5    Gotham Pizza 000176.  It's about 14 pages in.

6              THE COURT:  Do you see the numbers at the very bottom

7    of the page?  Very, very bottom, small numbers.

8              THE WITNESS:  Okay.

9              THE COURT:  Page 176.

10             THE WITNESS:  Thank you.

11   Q.  Do you recognize this document?

12   A.  No.

13   Q.  Does this document have your name and address on it?

14   A.  Yes.

15   Q.  In 2013, were you a shareholder of 852 Eighth Gotham

16   Pizza, Inc.?

17   A.  No.

18   Q.  Did you ever receive any income from 852 Eighth Gotham

19   Pizza, Inc.?

20   A.  No.

21   Q.  Did you ever receive any income from 144 Ninth Gotham

22   Pizza, Inc.?

23   A.  No.

24   Q.  Did you ever receive any income from 1443 York Gotham

25   Pizza, Inc.?

1   A.  No.

2   Q.  Did you ever receive any income from 1667 First Gotham

3   Pizza, Inc.?

4   A.  No.

5   Q.  Are you familiar with a group of pizza restaurants called

6   Gotham Pizza?

7   A.  No.

8   Q.  Prior to coming to this trial this week, had you ever heard

9   of a group of restaurants called Gotham Pizza?

10  A.  No.

11  Q.  Have you ever been to Gotham Pizza?

12  A.  No.

13  Q.  You've never set foot in any location of Gotham Pizza?

14  A.  No.

15  Q.  You've never gone into a Gotham Pizza and recommended that

16  certain employees be fired?

17  A.  No.

18  Q.  Is it true that you are officially listed as the chief

19  executive officer of 1443 York Gotham Pizza, Inc., on filings?

20  A.  Not of my knowledge, no.

21  Q.  Ms. Shamailov, I'm showing you what's been marked as

22  Plaintiffs' Exhibit 20 for identification.  Do you see your

23  name on this document?

24  A.  Yes.

25  Q.  Does seeing this document refresh your recollection as to

G76KNAJ5                          L. Shamailov - direct

1    whether you are the chairman or chief executive officer of 1443

2    York Gotham Pizza, Inc.?

3    A.  Can you repeat that question?

4    Q.  Does seeing this document refresh your recollection as to

5    whether you are the chairman or chief executive officer of 1443

6    York Gotham Pizza, Inc.?

7    A.  First time I'm seeing this document.

8    Q.  Have you ever signed any documents on behalf of Gotham

9    Pizza?

10   A.  No.

11   Q.  Have you ever applied for trademarks for the mark Gotham

12   Pizza?

13   A.  No.

14   Q.  Can you turn to Plaintiffs' Exhibit 21 in the binder in

15   front of you.

16   A.  This binder or other binder?

17   Q.  The one on top.

18          Do you recognize this document?

19   A.  No.

20   Q.  Do you see your name on this document, towards the bottom?

21   A.  Yes.

22   Q.  Do you have an understanding of what this document is?

23   A.  No, I don't understand.

24          MR. ANDROPHY:  I ask that Plaintiffs' Exhibit 21 be

25   admitted.

 1              MR. XUE:  Objection.

 2              THE COURT:  Sustained.

 3   Q.  Can you turn to Plaintiffs' Exhibit 22.  Can you turn to

 4   the second page of that document.  Do you see your name listed

 5   as an owner --

 6              MR. XUE:  Objection.

 7              THE COURT:  Sustained as to form.

 8   Q.  Do you see your name listed on the second page of the

 9   document?

10   A.  Repeat that question, please.

11   Q.  Do you see your name listed on the second page of the

12   document?

13   A.  Yes.

14   Q.  Are you the owner of the service mark for Gotham Pizza?

15   A.  No.

16   Q.  Apart from this case, have you ever been a party to a

17   lawsuit concerning wages paid to employees at Gotham Pizza

18   restaurants?

19   A.  No.

20   Q.  Have you seen this document before?

21              THE COURT:  What's the exhibit number, Counsel?

22              MR. ANDROPHY:  This was not premarked as an exhibit.

23              THE COURT:  Well, all exhibits must be premarked.  So

24   what's its number?

25              MR. ANDROPHY:  Plaintiffs' Exhibit 25.

1          THE COURT:  Thank you.

2          Continue.

3   BY MR. ANDROPHY:

4   Q.  Do you recognize this document?

5   A.  No.

6   Q.  Do you see your name on this document?

7   A.  I see, yes.

8   Q.  Does this document refresh your recollection as to whether

9   you were a defendant in the lawsuit by employees of Gotham

10  Pizza?

11  A.  Not of my knowledge.  First time I'm seeing this paper, by

12  you.

13          MR. ANDROPHY:  I have no further questions at this

14  time.

15          MR. XUE:  May I proceed, your Honor?

16          THE COURT:  Yes.

17  CROSS-EXAMINATION

18  BY MR. XUE:

19  Q.  Ms. Shamailov, do you have any operational control of any

20  Gotham Pizza's restaurants?

21  A.  No, I do not.

22  Q.  Do you work for Gotham Pizza?

23  A.  No, I don't.

24  Q.  What do you -- are you a housewife?

25  A.  I'm a housewife, I raise my son, yes.

G76KNAJ5

1  Q.  Do you set any of these plaintiffs' pay?

2  A.  No.

3  Q.  In fact, before today, have you ever meet with any of these

4  plaintiff?

5  A.  No.

6  Q.  Have you ever set any of these plaintiff schedule?

7  A.  No.

8  Q.  Have you ever supervised or control these plaintiffs' work

9  condition?

10  A.  No.

11  Q.  Did you keep any employment record of these plaintiffs?

12  A.  No.

13          MR. XUE:  No more questions.

14          THE COURT:  Any further questions?

15          MR. ANDROPHY:  No, your Honor.

16          THE COURT:  You may step down.

17          (Witness excused)

18          THE COURT:  Next witness.

19          MR. ANDROPHY:  The plaintiffs call Michael Shamailov.

20   MICHAEL SHAMAILOV,

21      called as a witness by the Plaintiffs,

22      having been duly sworn, testified as follows:

23          THE DEPUTY CLERK:  Please state your full name for the

24  record.

25          THE WITNESS:  Michael Shamailov.

1              THE DEPUTY CLERK:  Could you please spell out your

2    last name.

3              THE WITNESS:  S-h-a-m-a-i-l-o-v.

4              THE DEPUTY CLERK:  Thank you.

5    DIRECT EXAMINATION

6    BY MR. ANDROPHY:

7    Q.  Mr. Shamailov, are you an owner of any Gotham Pizza

8    entities?

9    A.  Yes.

10   Q.  Are you the shareholder of any Gotham Pizza entities?

11   A.  No.

12   Q.  Who is the shareholder of 1443 York Gotham Pizza, Inc.?

13   A.  My wife, Lana Shamailov.

14   Q.  And who is the shareholder or are the shareholders of 144

15   Ninth Gotham Pizza, Inc.?

16   A.  Lana Shamailov.

17   Q.  And who is the shareholder or are the shareholders of 852

18   Eighth Gotham Pizza, Inc.?

19   A.  Lana Shamailov.

20   Q.  And who is the shareholder or are the shareholders of 1667

21   First Gotham Pizza, Inc.?

22   A.  Lana Shamailov.

23   Q.  And she's, for each of those entities, the sole

24   shareholder?

25   A.  Yes.

G76KNAJ5                        M. Shamailov - direct

1    Q.  Did you personally set up each of those businesses?

2    A.  That's correct.

3    Q.  Did you set those up so that your wife would be the

4    shareholder?

5    A.  Yes.

6    Q.  Why did you set those up so that she would be the

7    shareholder?

8    A.  Well, I had a near-death experience before I ever opened

9    this business and I wanted to make sure that my family would be

10   safe and there would be no issues in case something happened,

11   so I put everything under my wife's name.

12   Q.  To your knowledge, was she aware, prior to today, that she

13   is the shareholder of those companies?

14   A.  No.

15   Q.  Did you ask for her permission before setting up those

16   companies with your wife as the shareholder?

17   A.  I did not.

18   Q.  Is she aware that she is listed with the New York

19   Department of State as the chairman or chief executive officer

20   of 1443 York Gotham Pizza, Inc.?

21   A.  No, she's not aware.

22   Q.  Did you ask for her permission before setting her up as the

23   chairman or chief executive officer?

24   A.  No, I did not.

25   Q.  Does she conduct any of the business for 1443 York Gotham

1    Pizza, Inc.?

2    A.  No, she doesn't.

3    Q.  Does she conduct any activities consistent with the title

4    of chief executive officer for that entity?

5    A.  None whatsoever.

6    Q.  Is she listed as chief executive officer for any other

7    corporations, any other Gotham Pizza corporations?

8    A.  No.

9    Q.  So, without asking her permission or consent, you set up

10   these companies in her name; is that correct?

11   A.  That's correct.

12   Q.  Have you ever used anyone else's name for business?

13   A.  No.

14   Q.  Did you ever use Cenan Menedi's name for your business

15   credit card?

16           MR. XUE:  Objection.

17           THE COURT:  Overruled.

18   A.  No, I did not.

19   Q.  Did you ever apply for credit cards using Cenan Menedi's

20   name?

21   A.  No.

22   Q.  Are you aware that there is a lawsuit alleging that you did

23   so?

24   A.  I am aware.

25   Q.  Throughout the time period that's been testified about by

G76KNAJ5                        M. Shamailov – direct

1   the plaintiffs, have you been the only person in charge of all

2   locations of Gotham Pizza?

3   A.  Yes.

4   Q.  And you're personally always involved in scheduling

5   employees; isn't that correct?

6   A.  Not always.

7   Q.  Have you at times been involved in scheduling employees?

8   A.  Yes.

9   Q.  Who else would be involved in scheduling employees?

10  A.  Cenan Menedi, known as Kenny.

11  Q.  Did you always have authority to hire and fire employees?

12  A.  Yes, I did.

13  Q.  Did anyone else have that authority?

14  A.  Yes.  Cenan Menedi, known as Kenny.

15  Q.  Isn't it true that your wife as times would come into

16  Gotham Pizza, identify employees who she didn't like how they

17  looked or looked at her, and asked that they be fired?

18  A.  No, she didn't.

19              MR. XUE:  Objection.

20              THE COURT:  Overruled.

21  A.  No, she didn't.

22  Q.  Did your wife ever go into any Gotham Pizza location in the

23  period from 2008 to 2013?

24  A.  No.

25  Q.  Not even to buy pizza?

G76KNAJ5                        M. Shamailov - direct

1    A.  No.

2    Q.  Have you always, for Gotham Pizza, been the person who

3    decides how much to pay employees?

4    A.  No.

5    Q.  Who has decided that?

6    A.  Cenan Menedi, known as Kenny, as well.

7    Q.  Have you always had a role in deciding how much to pay

8    employees?

9    A.  I've had.

10   Q.  What role would Mr. Menedi have in deciding how much to pay

11   employees?

12   A.  He would make his suggestions.

13   Q.  Would you retain final say on how much an employee was

14   paid?

15   A.  No.  We would both make the decision together.

16   Q.  Were you ultimately the one who would be -- the one who

17   would decide how much to pay employees?

18   A.  If he didn't want to decide, he would leave it up to me.

19   Q.  Did you ever disagree with him on how much --

20   A.  Yes.

21   Q.  -- employees should be paid?

22   A.  Yes.

23   Q.  And did you have the authority to overrule him?

24   A.  Yes, I did.

25   Q.  Are you familiar with a lawsuit that was filed in 2010 by

1    employees of Gotham Pizza who claimed that they were not paid

2    correctly?

3             MR. XUE:  Objection.

4             THE COURT:  Overruled.

5    A.  Yes, I'm aware.

6    Q.  Were you aware of that in 2010 and 2011?

7    A.  Excuse me?

8    Q.  Were you aware of that lawsuit at the time, in 2010?

9    A.  Yes.  I received the lawsuit, so I was aware of it.

10   Q.  After receiving that lawsuit, did you make any changes to

11   Gotham Pizza's pay practices?

12   A.  No.

13   Q.  Were employees at Gotham Pizza locations ever sent from one

14   location to another location to bring food or other items?

15   A.  No.

16   Q.  Were Gotham Pizza employees working at one location ever

17   sent to another location to cover for employees who might be

18   absent?

19   A.  On an emergency basis, yes.

20   Q.  How often would that happen?

21   A.  I would say maybe once every three months.

22   Q.  Did you operate all four Gotham Pizza locations?

23   A.  Yes.

24   Q.  Were there ever employees who worked for some period of

25   time at one location and then were moved to another Gotham

1   Pizza location for a significant duration, several months?

2   A.   There were.

3   Q.   Do you recall if that happened in 2008 with any employees?

4   A.   I'm sorry, which employees?

5   Q.   If there were any employees who were employed at one

6   location and then were permanently moved to another Gotham

7   Pizza location.

8   A.   In two thousand and?

9   Q.   '8.

10  A.   2008?  I believe we had only one location.

11  Q.   How about in 2009?

12  A.   2009?  The second location had just opened.  So, no.

13  Q.   Well, when the second location opened, did you transfer any

14  employees to go work -- who were working at the first location,

15  to go work at the second location?

16  A.   No, because then the first location would not have any

17  employees, so I had to hire from scratch new ones.

18  Q.   Which was the first location of Gotham Pizza?

19  A.   1443 York Avenue.

20  Q.   And what was the second location?

21  A.   144 Ninth Avenue.

22  Q.   And what was the third location?

23  A.   1667 First Avenue.

24  Q.   Do you recall what years --

25  A.   Yes.

1    Q.  -- the locations opened?

2    A.  1443 York Avenue opened in January 2007; 144 Ninth Avenue,

3    I believe, November of 2009; and First Avenue opened

4    April 2010.

5    Q.  And then when did the location on 15th Street and Eighth

6    Avenue open?

7    A.  June or July of 2013.

8    Q.  Is it true that you are currently in the process of opening

9    a fifth location of Gotham Pizza?

10   A.  That is correct.

11   Q.  And where is that going to be located?

12   A.  On Third Avenue and 12th Street.

13   Q.  When do you expect it to open?

14            MR. XUE:  Objection.

15            THE COURT:  Overruled.

16   A.  A couple of weeks, hopefully.

17   Q.  Did Gotham Pizza ever give wage statement or other type of

18   receipt for employees who were paid in cash?

19   A.  Yes.

20   Q.  So Gotham Pizza -- your testimony, is that at some point

21   they were given receipts for the cash payments that they were

22   paid?

23   A.  Not exactly a receipt but copies of the pay time sheets,

24   which had all the information on there.

25   Q.  During what period of time or what years were employees

G76KNAJ5                    M. Shamailov - direct

1   given those receipts?

2   A.  Throughout all duration.

3   Q.  Including 2012, 2013?

4   A.  Yes.

5            MR. ANDROPHY:  I've handed the witness a copy of a

6   binder with deposition transcripts.  I've given one to the

7   Court.  I apologize, it's not tabbed, but this is the second

8   deposition in that binder.

9   Q.  Do you recall that you testified at a deposition in this

10  action?

11  A.  Yes.

12  Q.  And that was in September of 2014; is that correct?

13  A.  That's correct.

14  Q.  And at that time, you were under oath; is that correct?

15  A.  That's correct.

16  Q.  And, therefore, you told the truth?

17  A.  Yes.

18  Q.  May I direct your attention to page 45 of your deposition,

19  starting at line 23.  Were you asked the following questions

20  and did you give the following answers?

21  "Q.  After this theft in 2012, did Gotham Pizza continue to

22  give and keep records of those receipts that employees would be

23  given with the cash payment?

24  "A.  No.

25  "Q.  So Gotham Pizza stopped giving those receipts?

G76KNAJ5                    M. Shamailov - direct

1    "A.  Yes.

2    "Q.  What was the reason for that?

3    "A.  I was too busy to be able to handle all the paperwork.  I

4    didn't make a receipt because everything was already on the

5    time sheet that was signed when payment was given to them.

6    "Q.  Do you recall at what point exactly Gotham Pizza stopped

7    giving these receipts to employees?

8    "A.  I would say right after the robbery."

9             Did you give those answers to those questions?

10   A.  Yes.

11   Q.  So, isn't it true that in 2012 you stopped giving these pay

12   receipts to employees?

13   A.  Yes.

14   Q.  Were employees given copies of their time sheets when they

15   were paid?

16   A.  No.

17   Q.  At any time were employees given copies of those time

18   sheets?

19   A.  In the beginning.

20   Q.  Approximately what period of time?

21   A.  From 2010 to 2012.

22   Q.  Did those time sheets include pay information?

23   A.  Yes.

24   Q.  Did they include pay information for all employees?

25   A.  Yes.

G76KNAJ5                       M. Shamailov - direct

1    Q.  Turn, in that binder I've just placed in front of you, to

2    Plaintiffs' Exhibit 8.  Can you identify that document?

3    A.  It's a time sheet.

4    Q.  It's for the employee Eleuterio Alonso, correct?

5    A.  Correct.

6    Q.  Does that contain any pay information on it?

7    A.  No.

8    Q.  Are you able to tell from this document what time it's

9    from?

10   A.  No.

11   Q.  Turn to tab 10.  Can you identify that document?

12   A.  Yes.

13   Q.  And what is it?

14   A.  It's a time sheet.

15   Q.  Is there any pay information on it?

16   A.  No.

17   Q.  Look at the screen at this page, which is from Plaintiffs'

18   Exhibit 3.  Do you recognize this document?

19   A.  Yes.

20   Q.  And what is it?

21   A.  It's a time sheet.

22   Q.  That's for Prisco Najera, correct?

23   A.  Correct.

24   Q.  Isn't it correct that you added the pay information on this

25   sheet long after Mr. Najera had worked that week in 2012?

G76KNAJ5                        M. Shamailov – direct

1    A.  No, not correct.

2    Q.  When did you put that -- sorry, withdrawn.

3           Who wrote in the amount received?

4    A.  I did.

5    Q.  And the pay rate and overtime rate, did you write that in?

6    A.  Yes.

7    Q.  And when did you write that in?

8    A.  As I was doing payroll.

9           THE INTERPRETER:  Your Honor, could the witness be

10   asked to speak louder into the microphone for the interpreter's

11   benefit?

12          THE COURT:  Yes.  Thank you.

13          THE WITNESS:  I'll move up.

14          THE COURT:  Thank you very much.  And the microphone

15   moves.

16   BY MR. ANDROPHY:

17   Q.  If you turn to tab 4, do you recognize the document in

18   Plaintiffs' Exhibit 4?

19   A.  Yes.

20   Q.  What is it?

21   A.  It's a time sheet.

22   Q.  What employee is that time sheet for?

23   A.  It says Jose Luis Ortega.

24   Q.  Do you recall --

25          MR. ANDROPHY:  Sorry, withdrawn.

1              MR. XUE:  Objection.

2              THE COURT:  Overruled.

3              MR. ANDROPHY:  I ask that Plaintiffs' Exhibit 4 be

4     admitted.

5              THE COURT:  Any objection?

6              MR. XUE:  Objection, your Honor; it's not part of this

7     case.

8              THE COURT:  Overruled.  Received.

9              (Plaintiffs' Exhibit 4 received in evidence)

10             MR. ANDROPHY:  May I show the document to the jury?

11    Q.  Is there any pay information on this page?

12    A.  No.

13    Q.  Is there any pay information in any of these pages at

14    Plaintiffs' Exhibit 4 for Jose Luis Ortega?

15    A.  I'm not sure what page, but maybe the tenth page has the

16    total amount in tips earned and total amount of hours worked,

17    just on that one page so far.

18    Q.  Is that the page that has the notation 000256 at the

19    bottom?

20    A.  254.

21    Q.  254.  Referring to the page that's now shown on the screen?

22    A.  No.

23             THE COURT:  Do you see the numbers at the very, very

24    bottom of the page?

25             THE WITNESS:  Yes.

G76KNAJ5                        M. Shamailov – direct

1                THE COURT:  The very small numbers.

2                THE WITNESS:  It is --

3                THE COURT:  Is the page you were referring to with pay

4      information 254?

5                THE WITNESS:  Sorry, it's 252, 252.

6                THE COURT:  252?

7                THE WITNESS:  Oh, no, I'm still lost.

8      Q.  Is it this page I've got now displayed on the screen?

9      A.  Yes.

10     Q.  So this page has the total hours and tips but it does not

11     have the other pay information?

12     A.  That's correct.

13     Q.  Do you recall when Mr. Ortega worked at Gotham Pizza?

14     A.  No.

15                (Continued on next page)

16

17

18

19

20

21

22

23

24

25

1              THE COURT:  Is this a good time for an afternoon

2        break, counsel?

3              MR. ANDROPHY:  Yes, your Honor.

4              THE COURT:  Thank you.  Ladies and gentlemen, you can

5        just leave your binders there.  I understand some of you would

6        like some extra paper.  Ms. Rojas is going to just bring a

7        stack of extra paper into the jury room that's blank,

8        absolutely blank.  We are going to show it to counsel first so

9        they can confirm that.  Just take what you want.  Thank you.

10             (Jury not present)

11             THE COURT:  Counsel, is there anything we need to

12       discuss at the break?

13             MR. ANDROPHY:  Nothing at this time.

14             MR. XUE:  Nothing from the defense.

15             THE COURT:  With respect to those documents, some of

16       which, particularly from the trademark office, look like could

17       be official records, they need a certification to come in.  And

18       counsel didn't indicate to me that they have a certification to

19       support them.

20             The jury will tell us when they are ready to resume.

21       Thank you.

22             (Recess)

23             THE COURT:  Mr. Shamailov, you can retake the stand.

24             Bring in the jury.

25             (Jury present)

1          THE COURT:  Counsel, you may resume.

2     BY MR. ANDROPHY:

3     Q.  Turn to tab 5 in that binder.  Do you see this document

4     marked Plaintiff's Exhibit 5?

5     A.  Yes.

6     Q.  Do you recognize this document?

7     A.  Yes.

8     Q.  What is it?

9     A.  It's a time sheet.

10    Q.  And who was it for?

11    A.  It was Najera Romano.

12          MR. ANDROPHY:  I ask that Plaintiff's Exhibit 5 be

13    admitted.

14          THE COURT:  Received.

15          (Plaintiff's Exhibit 5 received in evidence)

16    Q.  It's correct that there is no pay information on the first

17    page of this document, correct?

18    A.  Correct.

19    Q.  It's correct that there is no pay information on any of

20    those pages on Plaintiff's Exhibit 5, correct?  You can take a

21    moment to look through it.

22          THE COURT:  The document is in evidence, counsel.  Why

23    don't we move on to the next question.

24    Q.  Can you turn to tab 6, Plaintiff's Exhibit 6.  Do you

25    recognize the document there?

```
1    A.  Yes.
2    Q.  And is that a time sheet for Fausto Ramales?
3    A.  Yes.
4            MR. ANDROPHY:  I ask that Plaintiff's Exhibit 6 be
5    admitted into evidence.
6            MR. XUE:  Objection.  Cumulative.
7            THE COURT:  Overruled.  Received.
8            (Plaintiff's Exhibit 6 received in evidence)
9    Q.  On Plaintiff's Exhibit 6 there is no pay information on
10   that sheet, correct?
11   A.  Correct.
12   Q.  Are you able to tell from what time period what year that
13   this time sheet is from?
14   A.  I remember after 2012 I did not fill in the information.
15   Q.  So you believe this is from after 2012?
16   A.  Correct.
17   Q.  Can you turn to Plaintiff's Exhibit 7.  Do you recognize
18   this document?
19   A.  Yes.
20   Q.  And what is it?
21   A.  Time sheet.
22   Q.  For Luis Antonio Canizal, correct.
23   A.  Correct.
24           MR. ANDROPHY:  We ask that Plaintiff's Exhibit 7 be
25   admitted.
```

1              MR. XUE:  Objection.

2              THE COURT:  Overruled.

3    Q.  Does Plaintiff's Exhibit 7 identify the pay to the

4    employee?

5    A.  No.

6              THE COURT:  7 is received.

7              (Plaintiff's Exhibit 7 received in evidence)

8    Q.  Turn to Plaintiff's Exhibit 9.  Do you recognize this

9    document?

10   A.  No.

11   Q.  Is this a time sheet for an employee Adalberto Navarro

12   Flores?

13   A.  It's a time sheet, but I don't recognize this employee.

14   Q.  Is this time sheet for Gotham Pizza?

15   A.  I am not sure at this moment since it's not my employee.

16   Could be duplicated.

17   Q.  Did you provide this document to your attorney in this case

18   to produce in this action?

19   A.  I don't think so.  Actually, I do recall the individual.

20   This is his time sheet, yes.

21   Q.  This is a document from Gotham Pizza?

22   A.  Yes.

23             MR. ANDROPHY:  I ask that Plaintiff's Exhibit 9 be

24   admitted into evidence.

25             THE COURT:  9 is received.

1           (Plaintiff's Exhibit 9 received in evidence)

2    Q.  Is there any pay information on this document?

3    A.  No.

4    Q.  Can you turn to Plaintiff's Exhibit 11 in the binder in

5    front of you.  Do you recognize the document there?

6    A.  Yes.

7    Q.  And what is it?

8    A.  Time sheet.

9    Q.  And for which employee?

10   A.  Israel Suarez.

11   Q.  Is there any pay information on that?

12   A.  No.

13           MR. ANDROPHY:  I ask that Plaintiff's 11 be admitted.

14           THE COURT:  Received.

15           (Plaintiff's Exhibit 11 received in evidence)

16   Q.  Can you turn to tab 12.  Do you recognize the document at

17   tab 12?

18   A.  Yes.

19   Q.  And is this a time sheet for Manuel Montiel Lopez?

20   A.  Yes.

21           MR. ANDROPHY:  I ask that Plaintiff's Exhibit 12 be

22   admitted.

23           THE COURT:  Received.

24           (Plaintiff's Exhibit 12 received in evidence)

25   Q.  Is there any pay information on this document?

G76MNAJ6                         M. Shamailov – direct

1    A.  No.

2    Q.  Is it correct that there are some people who worked at

3    Gotham Pizza who you were unable to find records for the hours

4    that they worked?

5    A.  I'm sorry.  Repeat the question.

6    Q.  Is it correct that you were not able to find records of the

7    hours worked by all plaintiffs in this case at Gotham Pizza?

8    A.  That's correct.

9    Q.  You were unable to find records for Wilfredo Ramirez, is

10   that correct?

11   A.  That's correct.

12   Q.  Do you know if there were ever any records for Mr. Ramirez?

13   A.  Yes.

14   Q.  Do you know what happened to those records?

15   A.  It was -- there was a robbery at one of my locations and

16   all the records had been missing from the robbery.

17   Q.  Did you ever prepare an application for trademarks for

18   Gotham Pizza?

19   A.  Yes.

20   Q.  And you do that in your own name or someone else's name?

21   A.  Someone else's name.

22   Q.  Whose name did you do that in?

23   A.  Lana Shamailov.

24   Q.  Turn to Plaintiff's Exhibit 21 in that binder in front of

25   you.  Do you recognize the document that's Plaintiff's Exhibit

G76MNAJ6                          M. Shamailov – direct

1    21?

2    A.  Yes.

3    Q.  And what is it, to your knowledge?

4    A.  I believe it's a trademark application or certificate.

5            MR. ANDROPHY:  I ask that Plaintiff's Exhibit 21 be

6    admitted.

7            THE COURT:  21 is received.

8            (Plaintiff's Exhibit 21 received in evidence)

9    Q.  Can you turn to Plaintiff's Exhibit 22.  Do you recognize

10   that document?

11   A.  Yes.

12   Q.  And what is it?

13   A.  I believe it's the same thing.

14           MR. ANDROPHY:  And we ask that Plaintiff's Exhibit 22

15   be admitted into evidence.

16           MR. XUE:  Objection.

17           THE COURT:  Can you briefly state the ground, counsel.

18           MR. XUE:  Lack of foundation and authentication of the

19   document.

20           THE COURT:  Overruled.  22 is received.

21           (Plaintiff's Exhibit 22 received in evidence)

22   Q.  You testified previously that you recall and you were aware

23   that in 2010 you were sued by some Gotham Pizza employees,

24   correct?

25   A.  Yes, that's correct.

1    Q.  Were you aware at that time that Lana Shamailov was also

2    sued?

3    A.  Yes, I was.

4    Q.  Did you inform her that she was also being sued?

5    A.  No.

6    Q.  Do you know if she was represented by counsel in that

7    lawsuit?

8    A.  Officially she was, but she was never present.

9            MR. ANDROPHY:  I have no further questions at this

10   time.

11           MR. XUE:  Your Honor, I just want to make sure if

12   plaintiff rests their case because I intend to call Michael

13   Shamailov as my own witness, too.

14           THE COURT:  Your cross-examination may extend beyond

15   the scope of the plaintiff's direct.  You may proceed.

16           MR. XUE:  Thank you, your Honor.

17   CROSS-EXAMINATION

18   BY MR. XUE:

19   Q.  Mr. Shamailov, when you first formed Gotham Pizza

20   restaurants in 2008, which restaurant was that?

21   A.  It was 2007.  It was the location on 1443 York Avenue.

22   Q.  While it's incorporated, can you describe the size of

23   restaurant, how many employee you have --

24   A.  Fairly small restaurant.  Approximately 500 square feet.

25   And in the beginning I was working there myself along with

G76MNAJ6                          M. Shamailov - cross

1     Kenny, Cenan Menedi, and maybe a couple of other interested

2     employees.  This is just a part.

3     Q.  Did later on you hire more people to work at that location?

4     A.  That's correct.

5     Q.  How many people on average do you have --

6     A.  About four or five.

7     Q.  Is the second restaurant almost the same similar size --

8              THE COURT:  Excuse me, counsel.  We are going to treat

9     this as direct, so nonleading questions.  Thank you.

10             MR. XUE:  Ok.

11    Q.  Can you describe the size of the second restaurant and the

12    location of the second restaurant?

13    A.  Approximately the same size, slightly bigger.  Same amount

14    of employees.

15    Q.  When did you open the second one?

16    A.  In November 2009.

17    Q.  For the third one, when?

18    A.  April, May 2010.

19    Q.  And how big is that restaurant?

20    A.  Same size as the second one.

21    Q.  How many employees do you have at that restaurant?

22    A.  Approximately the same four or five.

23    Q.  When did you open a fourth one?

24    A.  In July of 2013.

25    Q.  What's the size on that restaurant?

```
 1    A.  It's bigger size, actually, square footage wise.  And

 2    approximately six to seven employees.

 3    Q.  How many employees were working at Gotham Pizza restaurant

 4    on average?

 5    A.  Which Gotham Pizza restaurant?

 6    Q.  All four of them total.

 7    A.  Approximately 20 to 25.

 8    Q.  And did you personally work for Gotham Pizza?

 9    A.  Yes.

10    Q.  Did Lana Shamailov ever work for any of these restaurants?

11    A.  No.

12    Q.  Did she ever supervise any employee at the restaurant?

13    A.  No.

14    Q.  Did she ever keep record of employees' work for any of

15    these restaurants?

16    A.  No.

17    Q.  Did she ever set pay of any employees in any restaurant?

18    A.  No.

19    Q.  Did she ever set schedule for any employees in these

20    restaurants?

21    A.  No.

22    Q.  Did each restaurant have its own corporate entity?

23    A.  Yes.

24    Q.  Did each restaurant have its own accounting system?

25    A.  Yes, it does.
```

G76MNAJ6                       M. Shamailov - cross

1   Q.  Did each restaurant prepare its own food?

2   A.  Yes.

3   Q.  And you also testified sometimes on emergency basis you

4   used employee from another location, right?

5   A.  That's correct.

6   Q.  How often would that happen?

7   A.  Once every three months, approximately.

8   Q.  Can you describe what kinds of emergencies?

9   A.  For instance, an employee would not show up to work or had

10  to call in sick at one location and we called upon an

11  individual who might have had a day off from another location

12  and asked as a favor if he can assist and take the place of the

13  gentleman who was either sick or didn't show up.

14  Q.  If an employee work for a particular location was called to

15  work at another location, did this employee get paid?

16  A.  Absolutely, yes.

17  Q.  Besides yourself, who else, if anyone, help you manage

18  Gotham Pizza restaurant?

19  A.  Cenan Menedi, Kenny.

20  Q.  From what year to what year did Kenny help you manage this

21  restaurant?

22  A.  From 2007 to about 2014.

23  Q.  Do you have any sisters?

24  A.  Yes.

25  Q.  What's your sister's name?

1    A.   Jennifer.

2    Q.   Shamailov?

3    A.   Yes.

4    Q.   Does she come to Gotham Pizza restaurant?

5    A.   Yes.

6    Q.   What's the color of her hair?

7    A.   Blonde.

8    Q.   Did Lana Shamailov ever go to Gotham Pizza restaurant?

9    A.   No.

10   Q.   Did you ever introduce Lana Shamailov to any of these

11   plaintiffs?

12   A.   No.

13   Q.   Who keep the employees' employment record, like pay record

14   and time record, for Gotham Pizza restaurants?

15   A.   I did.

16   Q.   Anyone else?

17   A.   Sometimes Kenny would.

18   Q.   You heard testimony since yesterday.  Why some record have

19   pay information and some record don't have pay information?

20   A.   When I started to keep pay information I only had two

21   locations and I had the assistance of Kenny when he was

22   managing alongside with me and I had more time when I was doing

23   payroll to be able to put -- have the information there during

24   payroll.  As I grew and just got really, really busy myself,

25   plus we went separate ways as far as me and Kenny goes, I

1    really just didn't have the time anymore.  It was very time

2    consuming to do the payroll in that fashion.  I was all by

3    myself and still am until today.  And I run four businesses,

4    about to be fifth one, take care of my family.  And there is

5    only 24 hours in a day and there is only so much I can do.  It

6    doesn't mean I'm guilty with how I paid or if I paid wrongfully

7    to my employees.

8            THE COURT:  Ok.  The last part of that answer is

9    stricken.  So the answer will stop:  And there is only two 24

10   hours in a day and there is only so much I can do.

11   Q.  When did Kenny's employment with Gotham Pizza terminate?

12   A.  2014, approximately.

13   Q.  What was Kenny's position before he was terminated?

14   A.  He was an all-around manager, as far as hiring, firing,

15   training, doing payroll, assisting sometimes in the pizzeria as

16   far as working.

17   Q.  Was there a dispute between Kenny and you?

18   A.  Yes.

19   Q.  Can you briefly describe the nature of that dispute?

20   A.  Yes.  In the end, approximately a year before he was

21   terminated, he was constantly staying home and not showing up

22   to work and leaving a lot of the work to me to do.  He was also

23   creating a little bit of an aggressive environment towards my

24   employees, and he was treating them a little too aggressively,

25   in my opinion, and I was constantly arguing with him about

1    that.  There is also a reason why this particular lawsuit was

2    brought upon me by what plaintiffs have told me as far as when

3    I met with them.

4              MR. ANDROPHY:  Objection to the last portion of that.

5              THE COURT:  Overruled.  That's it.  Next question.

6    Q.  When you heard testimony of five plaintiff here, how do you

7    keep employees' time record in Gotham Pizza restaurants?

8    A.  All the employees are required every week, at the end of

9    their work week, to fill in all the hours on the hour column as

10   well as they are not necessary -- they are not obligated to

11   fill in the cash column at all.  That was just there from the

12   beginning and they are just keeping that record for themselves,

13   maybe, just for their own record.

14   Q.  Where did you get this form from, the records people

15   testifying to since yesterday?

16   A.  I spoke to my accountant and other -- and another attorney

17   a long time ago who had assisted me in how to create a time

18   sheet that would be able to keep records of their hours and

19   their tips generated and how to have sections of their total

20   hours, total tips paid and amounts received, should have a

21   signature line for them to sign upon receiving their pay.

22   Q.  Let me direct your attention to Exhibit H, book one.  Do

23   you have that in front of you?

24   A.  I'm not sure.

25   Q.  I'm showing you Exhibit H, the first page of Exhibit H.

1    Can you tell me what's this document?

2    A.  This is a pay notice.

3    Q.  And who signed this pay notice?

4    A.  Prisco Najera.

5    Q.  When did you give this to Mr. Najera?

6           THE COURT:  Sustained.  It's without foundation.  Just

7    place a nonleading question.

8    Q.  Did you give this document to Mr. Najera?

9    A.  Yes.

10   Q.  When did you do that?

11   A.  On the day of hiring.

12   Q.  What day was that?

13   A.  It was March 9.

14   Q.  What year?

15   A.  2011.

16   Q.  Before you have Mr. Najera sign this document, was the

17   information besides the signature, was it here or not?

18   A.  Yes.

19          THE COURT:  Mr. Xue, I am going to ask you, please,

20   not to lead.

21          MR. XUE:  Ok.

22   Q.  When was this information filled out?

23   A.  At the time I gave it to him.

24   Q.  At what location did you give this document to him?

25   A.  York Avenue.  I filled it out along together with him, so

1    he sees exactly what I'm filling out.  As I'm filling it out

2    and filling it in, I'm explaining the entire document to him.

3    Q.  Did he ask you any questions before he signed this

4    document?

5    A.  Not exactly.  He might have asked me a couple of questions,

6    not that I recall.  But he didn't really need to because I was

7    explaining everything pretty clearly to him.

8    Q.  What was Mr. Najera's position when he was hired?

9    A.  He was a delivery person.

10   Q.  What was the rate for Mr. Najera at that time?

11   A.  7.25.

12   Q.  And is the rate for all hours the same?

13   A.  No.

14   Q.  What's the difference, if there is any?

15   A.  Any hour after 40 hours he was paid $10.87.

16   Q.  How do you calculate his pay?

17   A.  If he worked, for example, 60 hours, I would do $7.25 times

18   40 hours, it would give me a number.  Then I would take 20

19   hours times that by 10.87, it would give me a number, and I

20   would put the two numbers together.

21   Q.  How often would you receive time sheet from Mr. Najera?

22   A.  At the end of every work week.

23   Q.  I am showing you the second page of Defense Exhibit H.  Can

24   you tell me on this document which part of the writing is

25   Mr. Najera's writing and which part is your writing?

1    A.  All the hours, all the cash tips, all the credit card tips,

2    all the Seamless web tips and his signature is all his

3    handwriting.

4    Q.  How about the other writing?

5    A.  That's mine.

6    Q.  And the total amount received?

7    A.  My handwriting.

8    Q.  And when did you put your handwriting on this document?

9    A.  When I did the payroll.

10   Q.  Did you put your handwriting before or after Mr. Najera

11   signed this document?

12   A.  Before.

13   Q.  How was Mr. Najera paid, cash, check?

14   A.  Cash, yes.

15   Q.  Was Mr. Najera afforded the opportunity to count the cash?

16   A.  Yes.

17   Q.  During Mr. Najera's employment with Gotham Pizza, did he

18   ever complain to you that you failed to pay him all the wage he

19   deserve?

20   A.  No.

21   Q.  This document also show cash tip, credit card tip, and

22   Seamless web tip?

23   A.  Yes, it does.

24   Q.  Why did you have employee keep this information?

25   A.  Because I needed it so I can calculate how much to pay him

1    at the end of the week.

2    Q.  When did employee get paid cash tip?

3    A.  For this particular pay period he was -- he received his

4    paycheck on Tuesday.

5              THE COURT:  Paycheck?

6              THE WITNESS:  I'm sorry.  Not on Tuesday.  The week

7    started on Wednesday and I believe it ended on Monday night for

8    this particular -- we had a payday of Tuesday, but whoever was

9    off on that particular day, I had to actually do payroll

10   sometimes twice in a week when people were off, I had to come

11   the next day and give the remaining that were not working that

12   day.

13   Q.  For employee, for delivery employee who receive tip, cash

14   tip when they were performing a delivery, do they have to turn

15   the cash tip back to Gotham Pizza or they just keep it?

16   A.  They keep it.

17   Q.  For credit card tip, how often did Gotham Pizza process the

18   credit card tip?

19   A.  They received the credit card tips in total at the end of

20   the week on payday.

21   Q.  How about Seamless tip?

22   A.  Same thing.

23   Q.  Was there any deduction made for credit card tip?

24   A.  None at all for credit card tips.

25   Q.  How about Seamless?

1   A.  Yes.

2   Q.  What were the deduction made?

3   A.  Exactly 14 percent.

4   Q.  Why did you make that deduction?

5   A.  Seamless web charges every restaurant in New York City, not

6   just me, 14 percent for all transactions in total, including

7   the tip, to the restaurant, which is deducted at the end of the

8   month and funds are received by the restaurant owners.

9   Q.  Seamless will pay restaurant owners?

10  A.  Once a month.

11  Q.  Do you recall the employment duration of Prisco Najera?

12  A.  I know he was hired in March 2011.  I believe until some

13  time in 2012.

14  Q.  Was Mr. Najera required to submit time sheet every week?

15  A.  Yes.

16  Q.  Do you have any other time sheets for Mr. Najera than

17  what's shown on Defense Exhibit H?

18  A.  It looks like all of it.

19  Q.  Has Mr. Najera's pay rate ever changed during his

20  employment?

21  A.  No.

22  Q.  Did you ever pay him weekly?

23  A.  No.

24          THE COURT:  I have to say I think that last question

25  and answer may be confusing.  I am not sure it's what you

1    intended, counsel.  Can I just read it back to you:

2    "Q.  Did you ever pay him weekly?

3    "A.  No."

4    A.  Yes, I paid him weekly.

5    Q.  Every week you paid him?

6    A.  Correct.

7    Q.  Have you ever paid him a weekly rate instead of hourly

8    rate?

9    A.  No.

10   Q.  How was Mr. Najera's employment terminated?

11   A.  He was fired.

12   Q.  Why was he fired?

13   A.  He didn't show up to work actually one week.  I gave him a

14   chance to change his ways as far as his not showing up.  He

15   then worked for another few days.  The same thing happened

16   again, he didn't show up to work.  And when he finally showed

17   up, I told him he had to leave and he can't work anymore

18   because he's not being responsible.

19   Q.  Do you recall, when was that?

20   A.  Some time in 2012.

21   Q.  After Mr. Najera was terminated, did you ever see him again

22   before other than the past few days?

23   A.  Yes.

24   Q.  When was the first time you seen him after he was

25   terminated?

1   A.  I would say about six months later.

2   Q.  Was there any conversation between you and him?

3   A.  Yes.

4   Q.  And do you remember the sum and substance of that

5   conversation?

6   A.  Yes, I do.

7   Q.  Could you tell me what was said?

8   A.  I asked him why did he initiate a lawsuit against me

9   regarding underpayment of wages and overtime claims and he

10  said, it's not about the money.  It's all because of your

11  partner, Kenny, that I started this lawsuit.  I said, what does

12  that have to do with Kenny?  He said, well, he is one of the

13  owners, isn't he?  I said, no, he's not.  I know and everyone

14  knows him as the owner, so we just wanted to hurt him

15  financially and give him such a hard time and that's why we

16  initiated the lawsuit against him.  I said, but I'm the one

17  getting hurt from here if you don't have any issues.  I don't

18  have any issues with you, he said.  I have issues, and then he

19  used very bad language, regarding Kenny.  And that was about

20  it.  He just left quickly.  He didn't want to continue talking.

21  Q.  Do you know plaintiff Israel Fuentes?

22  A.  Yes.

23  Q.  I direct your attention to Defense Exhibit I.  I am going

24  to show you the first page of I.

25      When did you give this document to Mr. Fuentes?

1            THE COURT:  Sustained.

2    Q.  Did you give this document to Mr. Fuentes?

3            THE COURT:  Sustained.

4    Q.  What's this document?

5    A.  It's a pay notice.

6    Q.  Whose signature is on this pay notice?

7    A.  Israel Fuentes.

8    Q.  When did he sign this document?

9    A.  February 2011.

10   Q.  What information was in this document before he signed this

11   document?

12           THE COURT:  Counsel.  You may want to look at the

13   orientation of the document as displayed.

14           MR. XUE:  Thank you, your Honor.

15   Q.  What information was in this document before Mr. Fuentes

16   signed this form?

17   A.  The location where he would be working, the payday, the

18   regular rate that he will be receiving, and the overtime that

19   he would be receiving.

20   Q.  When did he sign this document, if you recall?

21   A.  On the day of hiring.

22   Q.  What was Mr. Fuentes' position with the restaurant?

23   A.  He was a delivery person.

24   Q.  Was he paid a different rate from Prisco Najera?

25   A.  No.

1   Q.  Let me show you the second page of Defense I.  Was

2   Mr. Fuentes required to keep time record and tip records during

3   his employment?

4   A.  Yes.

5   Q.  Can you tell me what does the second page represent?

6   A.  His time sheet, which has his hours and his tips earned,

7   and the pay rate, pay information, and the total amount

8   received, his signature, along with the pay period workweek.

9   Q.  What information was here before Mr. Fuentes signed this

10  document?

11  A.  All the information that you see there.

12  Q.  During Mr. Fuentes' employment has he ever complained to

13  you that you did not pay him the wage he's entitled to?

14  A.  No.

15  Q.  Do you remember when was Mr. Fuentes' employment

16  terminated?

17  A.  I believe some time in late 2012.

18  Q.  Do you have any other time sheets for Mr. Fuentes?

19  A.  No.

20  Q.  Did Gotham Pizza have a policy about bicycle use?

21  A.  No policy.

22  Q.  Was it a job requirement for a delivery person to have

23  bicycles?

24  A.  Yes.

25  Q.  When you hired delivery workers for Gotham Pizza, was there

1   any discussion about bicycle?

2   A.  No discussion was needed other than I let them know that to

3   do their job a bicycle is necessary.

4   Q.  Did anyone ever tell you they don't have a bicycle?

5   A.  No.

6   Q.  Did any of the plaintiff ever tell you they don't have a

7   bicycle?

8   A.  No.

9   Q.  Who hired Prisco Najera?

10  A.  A long time ago.  It's really hard to remember.  It was

11  either me or Kenny.  No one else.

12  Q.  As a general way of practice in Gotham Pizza, if you hired

13  an employee, you meet with the employee.  Did you discuss pay

14  and schedule with employee?

15  A.  Yes.  Because they always asked that question before they

16  ever started.

17              (Continued on next page)

18

19

20

21

22

23

24

25

1   BY MR. XUE:

2   Q.  So, for delivery employee, what did you usually tell them?

3   A.  I told them that the exact workweek, as far as total hours,

4   is not set in stone yet but it will be something around 60, 65

5   hours on an average but your pay rate will be 7.25 per hour for

6   the first 40 hours and anything above will be 10.87.

7   Q.  Was there any discussion about how small -- the beginning

8   and ending hours more than -- last more than ten hours?

9   A.  Excuse me.  Repeat the question.

10  Q.  Besides the pay rate, was there any other discussions?

11  A.  They asked do they ever get breaks, and I said as many as

12  they need.  There was never a set time -- they were just taken

13  as they please -- but it usually always ended up being two to

14  three times a day.

15  Q.  Were all employees provide with meals?

16  A.  Yes, I never charged them for meals.  They were free to eat

17  as much pizza as they wanted, as much drinks as they wanted,

18  and some would consume more than another.  I never counted,

19  never -- and it didn't matter to me.

20  Q.  Were employee provide with any breaks time to consume

21  meals?

22  A.  Again, whenever they had the chance, which was at least

23  two, three times a day, they would take the chance to have a

24  meal break.

25  Q.  And how long is usually the meal break?

1    A.  At least 30 minutes.

2    Q.  And were they required to work during the break?

3    A.  No, they were not even on premises.

4    Q.  I direct your attention to Exhibit N, like Nancy.  This is

5    a document Bates stamped 70 to 127.  Do you see it?

6            Can you tell me what's this document?

7    A.  Time sheet.

8    Q.  What was Mr. --

9            THE COURT:  I'm sorry, that's not in evidence.

10           MR. XUE:  I believe it was previously admitted, your

11   Honor.

12           THE COURT:  N?

13           MR. XUE:  Yes.

14           THE COURT:  I don't believe so.

15           MR. XUE:  Okay.  Then I will ask for admission of the

16   document, your Honor.  I think it's same document as plaintiff

17   presented.

18           THE COURT:  Okay, if it's the same, you either have to

19   use the admitted document or separately lay a foundation for

20   this other document.

21           MR. XUE:  I will use the already admitted document.

22   It's Exhibit 8 of plaintiffs' exhibit.

23           THE COURT:  Thank you very much.

24           Plaintiffs' Exhibit 8?

25           MR. XUE:  Yes.  I don't have -- witness have a copy.

1    We have to use plaintiff book.

2    A.  Here.

3    Q.  Yes, 8.

4    A.  This is by numbers.  These are by numbers.

5            THE COURT:  Yes.  We're looking at document 8.

6            THE WITNESS:  8?

7            THE COURT:  Tab 8.

8            THE WITNESS:  Got it.

9    BY MR. XUE:

10   Q.  What was Mr. Alonso's position with Gotham Pizza?

11   A.  He was a delivery person.

12   Q.  Was he required to keep track, tip record, every week?

13   A.  Yes.

14   Q.  Was this all the time sheets and the tip record you have

15   for him?

16   A.  Yes.

17   Q.  Do you have any other records for him that you did not

18   produce here?

19   A.  No.

20   Q.  Do you recall for how long did Mr. Alonso work for Gotham

21   Pizza?

22   A.  Approximately a year.

23   Q.  Has his pay rate ever changed?

24   A.  No.

25   Q.  And do you recall what was his rate of pay?

1   A.  Same as all the other delivery persons; $7.25.

2   Q.  Did he get paid the same rate for all hour of work?

3   A.  Up to 40 hours for $7.25; after 40 hours, $10.87.

4   Q.  If his workday is longer than ten hours, did you do

5   anything?

6   A.  Yes.

7   Q.  What did you do?

8   A.  I gave him an extra minimum wage as a so-called bonus.

9   Q.  How about other delivery employees, what happened if their

10  day is longer than ten hours?

11  A.  I did the same exact thing.

12  Q.  Is the information on this page, which is Bates number 70,

13  whose handwriting is here?

14  A.  On Exhibit 8?

15  Q.  First page, yes.

16  A.  That is Mr. Alonso's.

17  Q.  And on his time sheet and tip records, the handwriting on

18  this record, whose handwriting is it?

19  A.  Mr. Alonso's.

20  Q.  When Mr. Alonso was working for you, did he ever complain

21  that you did not pay him correctly?

22  A.  No.

23  Q.  Did he ever complain that you withhold his tip?

24  A.  No.

25  Q.  In term of tip treatment, is his treatment different from

1   any other delivery employee?

2   A.  No.  Upon hiring, every delivery person was informed

3   regarding the 14 percent deduction on their SeamlessWeb orders

4   that they would deliver.  They all agreed upon it -- they

5   didn't have to agree but they did agree -- and they started

6   work.

7   Q.  You heard testimony from plaintiffs saying that they were

8   shortchanged 20, 30, sometimes even 40 dollars a week for tips.

9   Did any of the plaintiff ever complain to you saying that their

10  tip was shortchanged?

11  A.  No.  They didn't complain.  That 20, 30 dollars is exactly

12  that 14 percent deduction.

13  Q.  And did you keep their deduction?  Did you or Gotham Pizza

14  keep their deduction?

15  A.  I didn't keep it nor take it.  It wasn't given; it was

16  taken away from SeamlessWeb.

17  Q.  So is it correct to say it was already taken by Seamless

18  before you --

19  A.  Yes.  To give you an example, if the customer left an

20  amount of $5 on a SeamlessWeb order, they would receive

21  14 percent less of that $5.  I would also receive 14 percent

22  less of that $5.  If I were to give the entire five dollars to

23  the delivery person, then I would be basically paying

24  14 percent of the tip out of my own or the business' funds to

25  pay the tip, as if I was the customer.

G76KNAJ7                        M. Shamailov – cross

1    Q.  I draw your attention to Exhibit T.  It's on second book.

2              Can you tell me whose record is this?

3    A.  Aureliono Tapia.

4              THE COURT:  T is not in evidence.

5              MR. XUE:  Your Honor, actually, I'm going to use

6    Plaintiffs' Exhibit 10.  It's previously already admitted.

7    Q.  Do you see the document, Exhibit 10?

8    A.  Yes.

9    Q.  It's Bates stamp 001 to 0056.

10   A.  Yes.

11   Q.  When did Mr. Tapia start working for Gotham Pizza?

12   A.  July 2012.

13   Q.  For how long did he continue to work for Gotham Pizza?

14   A.  Approximately six months to a year, until he left for about

15   six months.

16   Q.  Did he come back to work for Gotham Pizza?

17   A.  Yes.

18   Q.  Why did he leave Gotham Pizza?

19   A.  I believe the other place of work had called upon him for

20   help.  He used to work there even prior to working for me in

21   the beginning.

22   Q.  What did you hire him for?  What was his position?

23   A.  Delivery person.

24   Q.  So it's your understanding he returned to his prior employ?

25   A.  Correct.  They called upon him.  I'm not sure what they

G76KNAJ7                    M. Shamailov – cross

1   exactly promised him but he decided to go there, and we left on

2   good terms.

3   Q.  Okay.  When Mr. Tapia first began working for Gotham Pizza,

4   do you recall what was his rate of pay?

5   A.  7.25.

6   Q.  Is it for all hour of work?

7   A.  For the first 40 hours.

8   Q.  And what happened to the hours more than 40 hours?

9   A.  He was paid overtime wage of $10.87.

10  Q.  What happened, if anything, if his workday last more than

11  ten hours a day?

12  A.  He would receive one extra hour of minimum wage.

13  Q.  When Mr. Tapia was working for you, did he ever claim that

14  you did not pay him all the wage he deserved?

15  A.  No.

16  Q.  Did he ever claim that you deliberately deduct his tip?

17  A.  No.

18  Q.  If you look through this Plaintiffs' Exhibit 10, there's

19  some weeks has SeamlessWeb tip information, some with there's

20  no information.  Do you know why?

21  A.  Yes.  I stopped dealing with SeamlessWeb for a short period

22  of time, so no employee was generating SeamlessWeb tips.

23          THE INTERPRETER:  I'm sorry, could the end of that

24  answer be repeated for the interpreter?

25          THE WITNESS:  I stopped dealing with SeamlessWeb for a

1    short period of time, so no employee was generating SeamlessWeb

2    tips.

3    Q.  Are you still using Seamless now?

4    A.  Right now, it's merged with GrubHub.

5    Q.  Do they still deduct the payment you receive?

6    A.  Yes, they do.

7    Q.  Has the percentage changed --

8    A.  No.

9    Q.  -- or it's remained the same?

10   A.  It's remained the same.

11   Q.  Why there is no payment information on Plaintiffs' Exhibit

12   10, besides the tip information?

13   A.  I just didn't have the time to fill it in.

14   Q.  How often -- strike that.

15          Did you pay all delivery employee weekly?

16   A.  Yes.

17   Q.  So before they received a payment, did you give them

18   opportunity to count the money?

19   A.  Yes, I did.

20   Q.  Did you ever explain to the employee why you have them keep

21   the time sheet?

22   A.  I needed some type of record in order to do payroll.  They

23   had their own diary where they would keep all their hours, all

24   their credit card tips.  They used do that at the beginning but

25   then they actually started doing it day by day.  So these time

1   sheets were always there and they would just fill it in every

2   single night as far as what time they entered, what time they

3   left, how much tips they generated, and they would leave for

4   that day and do the same thing over and over, until the end of

5   the week.  It was handed over to me.

6   Q.  You heard Mr. Tapia testifying this morning saying that if

7   a few page of this time sheet was signed by someone else.  Did

8   you heard that testimony?

9   A.  Yes, I did.  Very shocking.

10  Q.  Were you ever aware of that?

11  A.  No.

12  Q.  Did you ever allow any other employee to sign for on behalf

13  of the other employee?

14  A.  No.  Nobody would know how to.

15  Q.  Did Mr. Tapia ever complain that some other employee sign

16  his name without his authorization?

17  A.  No.

18  Q.  You also heard his testimony on some days he will be

19  working but then he would put down "off" on the day he was

20  working, right?

21  A.  I heard that, yes.

22  Q.  Did he ever complain to you or any employee in your

23  restaurant ever complain to you that they were forced to put

24  down "off" on the day they were working?

25  A.  I don't understand why you would put down "off" when you

1  actually worked that particular day.  And why would you put

2  your hours on the rest of the days?  I just don't see the point

3  of that.

4  Q.  Did you ever ask employee to put "off" on the day they were

5  working?

6  A.  No.  I only told them to put "off" on the day that they

7  were off.

8  Q.  Did they have to work on the day they were off?

9  A.  Only if I called upon that as an emergency but they would

10  then fill in the hours of that day if they did work.

11  Q.  Did you ever instruct Rodolfo to ask an employee to put

12  "off" on the day --

13  A.  Are you referring to Rodrigo?

14  Q.  Yes.  Rodrigo.

15  A.  Repeat the question.

16  Q.  Did you ever instruct Rodrigo to have employee put "off" on

17  the day they were working?

18  A.  No.

19  Q.  How was Mr. Tapia's employment terminated with the company?

20  A.  He quit.

21  Q.  Do you know why did he quit?

22  A.  Yes.  He was working on an average of about 60 hours a

23  week, and this was in the newly formed pizzeria and business

24  was not so great, it was pretty slow, and was not -- the time

25  to work hourly was not required by all the delivery persons.

G76KNAJ7                    M. Shamailov – cross

1   So all the delivery persons' hours got cut approximately about

2   four to five hours per week.  He wasn't so happy with that for

3   that little cut.  I did mention to him that it was only

4   temporary, until business would bounce back.  I believe it was

5   just a bad season.  And he decided to quit.

6   Q.  Was Mr. Tapia paid differently from other delivery worker?

7   A.  He was paid $8 an hour, actually, in that new pizzeria,

8   from the first day.

9   Q.  Was there any particular reason he get paid a higher rate?

10  A.  It was just that -- it was a -- it was a bigger pizzeria

11  and it was a new pizzeria but it was also a little bit short on

12  staff at that time because it was new, it was a little bit hard

13  to find employees.  So I told him that he would get a 75-cent

14  raise from his previous rate when he used to work for me.

15  Q.  Is $8 an hour equivalent to all hour of work?

16  A.  No.

17  Q.  What would happen if --

18  A.  It would be $12 for the any hours above 40 hours.

19  Q.  Do you recall for how long did Mr. Wilfredo Ramirez work

20  for Gotham Pizza?

21  A.  Approximately six months.

22  Q.  What was his position?

23  A.  A delivery person.

24  Q.  And what was his rate?

25  A.  7.25.

1    Q.   Is it for all hour work?

2    A.   No.

3    Q.   What?

4    A.   For the first 40 hours.

5    Q.   What happened after 40 hours?

6    A.   He would get $10.87.

7              THE COURT:  Can you spell the name that you just asked

8    the witness about?

9              MR. XUE:  W-i-l-f-r-e-d-o, first name; last name

10   R-a-m-i-r-e-z.

11             THE COURT:  Is that what you understood was being

12   asked?

13             THE WITNESS:  Wilfredo Ramirez, yes.

14             THE COURT:  Thank you very much.

15   BY MR. XUE:

16   Q.   Did Mr. Ramirez rate ever change?

17   A.   No.

18   Q.   Do you know how was his employment terminated?

19   A.   He quit.

20   Q.   Do you know why did he quit?

21   A.   Actually, I think he just was -- he was coming also a

22   little late sometimes and the gentleman who was running the

23   location at that time, he kept giving him the warnings.  And

24   eventually they were getting into arguments, and he just

25   himself said, I'm just going to quit, I'm not going to work

1    here anymore.

2    Q.  How come you don't have any employment record for

3    Mr. Ramirez?

4    A.  I'm not sure.  I had records scattered, sometimes Kenny had

5    some but they were scattered in some pizzerias, some at my

6    home.  I had the robbery that happened also at one of my

7    pizzerias where I had a box full of paperwork, and that was

8    stolen along with money from the register, which I have -- I

9    have records of that.

10   Q.  Did Gotham Pizza keep any posters in the restaurant?

11   A.  Yes.

12   Q.  What kinds of posters?

13   A.  FLSA type of posters, where it would be from the New York

14   State labor department, posters that displayed minimum wages

15   that are current at the particular year, updated, the overtime

16   rates, all information in English and in Spanish, all the rules

17   and regulations.

18   Q.  Can you describe the location of the poster?

19   A.  Yes.  It was at eye level, on an open wall, behind the

20   counter, usually, where we would work.

21   Q.  So who can see the posters?

22   A.  Everybody.

23   Q.  Can you describe the location of this wall?  I mean when

24   you enter the Gotham Pizza restaurant, where the poster is

25   located.

1   A.  It was located behind the counter, where all the pizza was

2   being made, or serving the customers, the area -- the work area

3   basically.  There would be an open wall.  A big wall was

4   necessary because the poster was fairly big.

5   Q.  How big is the poster?

6   A.  I would say about three feet tall by two feet wide.

7   Q.  And you said -- what language was the poster in?

8   A.  English and Spanish.

9   Q.  If you recall, what did the posters say, in or about --

10  between the year 2009 until 2014, what did the poster say about

11  the rate, if you recall?

12  A.  Minimum wage, $7.25, in big bold letters.

13  Q.  I'm showing you Defense Exhibit XX.  Can you tell me,

14  what's this document?

15  A.  This is the poster with the labor laws.

16  Q.  So this is a two-page document, right?  Actually,

17  three-page, right?

18  A.  Yes.

19  Q.  And is this the picture of the posters?

20  A.  Yes.

21  Q.  Is this picture for one location or for different location

22  of the Gotham Pizza restaurants?

23  A.  Three locations.

24  Q.  Was the poster located in the same location on each of the

25  Gotham Pizza restaurants?

G76KNAJ7                          M. Shamailov – redirect

1   A.   Approximately.

2             MR. XUE:   Your Honor, I move for admission of Defense

3   XX.

4             THE COURT:   Received.

5             (Defendants' Exhibit XX received in evidence)

6             MR. XUE:   Publish for the jury.

7   Q.   Who took this photos?

8   A.   I did.

9   Q.   Is every posters in Spanish and in English?

10  A.   Yes.

11  Q.   Did any employee ever ask you for the bike repair costs?

12  A.   No.

13            MR. XUE:   Your Honor, I have no more questions for

14  this witness.

15  REDIRECT EXAMINATION

16  BY MR. ANDROPHY:

17  Q.   Is it your testimony that around 2012, at some point in

18  2012, you decided it was too time-consuming to write down on

19  these time sheets that we've looked at the pay information that

20  you had previously been writing?

21  A.   Yes.

22  Q.   How much time does it take to write down the total amounts

23  that an employee receives?

24  A.   I would say about ten minutes each.

25  Q.   For each employee?

1    A.  Yes.

2    Q.  Why would it take ten minutes?

3    A.  Because the calculating itself takes a while.

4    Q.  But you were doing that calculating anyway in order to pay

5    them the correct amount; isn't that right?

6    A.  Yes.

7    Q.  How did you do those calculations that you were doing

8    anyway in order to determine the correct amount of pay?

9    A.  I would do it, actually most of it, in my head.

10   Q.  You wouldn't do it on paper at all?

11   A.  I would, yes.

12   Q.  After 2012, did you keep any records of these calculations

13   that you were doing when you did it on paper?

14   A.  It was just a piece of paper that I would use.

15   Q.  So you would write it down on paper but then you would

16   throw that paper away, correct?

17   A.  Yes, correct.

18   Q.  How much time would it have taken to write down the total

19   amount received, on any employee's paper?

20   A.  It wasn't just the total amount received.

21   Q.  What else was it?

22   A.  There was the pay rate, the overtime rate, spread of hours

23   paid, overtime paid.  And all of that had to be put there.  It

24   was time-consuming.

25   Q.  You were figuring out those calculations anyway, correct?

1   A.  Yes.

2   Q.  And the pay rate and overtime rate for the delivery

3   workers, your testimony is, it remained the same, correct?

4   A.  I'm sorry, repeat the question.

5   Q.  The pay rate and overtime rate for the delivery workers,

6   with the exception of Mr. Tapia, remained the same throughout

7   their employment, correct?

8   A.  Yes, correct.

9   Q.  It was the same for all of them, again, with the exception

10  of Mr. Tapia, correct?

11  A.  Correct.

12  Q.  How time-consuming would it have been to write down "pay

13  rate 7.25" and "overtime rate 10.87" on those pieces of paper?

14  A.  Honestly, I had 30 workers, approximately to do, and even

15  that was by itself, even the way I ended up doing it, took a

16  long time because I was just so busy.  By adding another even

17  minute or two for each person was just, to me, a lot of work,

18  it was almost scary.

19  Q.  And you were calculating their pay by using the pay rate

20  and overtime rate; is that correct?

21  A.  I would calculate their pay by using their regular rate and

22  overtime rate, yes.

23  Q.  Were you also calculating spread-of-hours pay?

24  A.  Yes.

25  Q.  And, again, did you write that down anywhere?

1    A.  I wrote that on a piece of paper, yes.  I had to because

2    usually there was cents involved in there.

3    Q.  And you didn't keep that piece of paper after you wrote it

4    down?

5    A.  No.  They were mostly scrap paper.

6    Q.  Would it have taken you more time to write that down on the

7    time sheet as opposed to a piece of scrap paper?

8    A.  It had to be much more neat on a time sheet, especially for

9    the employees to read it.  And that takes just -- I don't have

10   maybe the best handwriting to make it so neat.

11   Q.  So, rather than write it either neatly or not so neatly,

12   you decided just to not write it down on the time sheet at all?

13   A.  Right.  I would scribble it on a piece of scrap paper.

14   Q.  Did you also add up the amount of tips in order to figure

15   out the pay?

16   A.  Yes.

17   Q.  Again, you decided not do that anymore on the time sheet?

18   A.  You mean to put the total amount of tips?

19   Q.  Correct.

20   A.  Right.

21   Q.  Do you recall approximately when in 2012 you changed your

22   practice, as far as keeping these pay records on these sheets?

23   A.  Right when I was about in construction time of the fourth

24   pizzeria.

25   Q.  Do you recall approximately what month or months that might

1    be?

2    A.   Six months before July?  Maybe March/February,

3    February/March.

4    Q.   Around February or March?

5    A.   Of 2013.

6    Q.   I'm sorry, 2013 or 2012?

7    A.   About 2013, right at the beginning.

8    Q.   So you changed -- is it your testimony that you recorded

9    the pay throughout the entire 2012?

10   A.   No.

11   Q.   Okay.  So when -- I'm trying to understand -- did you

12   change your policy, as far as keeping track of the pay given to

13   employees on these time sheets?

14   A.   It was right around the beginning of 2012.

15   Q.   Do you recall what month?

16   A.   I don't.

17   Q.   Do you recall when you first became aware of this lawsuit?

18   A.   I'm sorry?

19   Q.   Do you recall when you first became aware of this lawsuit

20   brought by Prisco Najera and other plaintiffs?

21   A.   No.  I was aware of the lawsuit when I was served.

22   Q.   Okay.  Do you recall when that was?

23   A.   I'm not exactly sure.  It was about four years ago.

24   Q.   Right.  Around April or May 2012 sound correct?

25   A.   If you say so.

1    Q.  So, after you became aware of this lawsuit, is it your

2    testimony you continued not to keep any records of the pay that

3    you were paying employees at all, basically?

4    A.  Right, it makes no sense, right?  I would have to continue,

5    especially if I have a lawsuit.  It was just that

6    time-consuming.

7    Q.  Okay.  And you retained counsel at that time?

8    A.  Yes.

9    Q.  And you still continued with this practice of not keeping

10   track of time -- keeping track of pay?

11          MR. XUE:  Objection.

12          THE COURT:  Overruled.

13   A.  I have a different method right now.

14   Q.  When did you change your method?

15   A.  Maybe about a year ago.

16   Q.  What's that method that you currently use?

17   A.  I don't wish to answer that.

18          THE COURT:  I'm sorry?

19          THE WITNESS:  I don't wish to answer that.  I don't

20   think it's really relevant.

21          MR. XUE:  I object.

22          THE COURT:  I'm sorry, you don't get to make that

23   choice.  I'm sorry.

24          THE WITNESS:  Okay, okay.

25          MR. XUE:  I'm object to the question, your Honor; not

1    relevant.  Current matter.

2              THE COURT:  Okay.  Well --

3              THE WITNESS:  Okay, I can answer it, if it's

4    necessary.

5              THE COURT:  We'll deal with this at 5:00 o'clock but

6    in the future, if your lawyer doesn't object, I'm afraid you

7    have to answer the question.

8              THE WITNESS:  Yes, your Honor.

9              THE COURT:  Okay, we'll just put this topic aside

10   until 5:00.

11             MR. ANDROPHY:  Should I move on to a different

12   question?

13             THE COURT:  Yes.  Thank you.

14   BY MR. ANDROPHY:

15   Q.  You testified that some of Wilfredo or I guess all of

16   Wilfredo Ramirez's records, you believed they were stolen; is

17   that right?

18   A.  I believe they were stolen or just misplaced.

19   Q.  So you don't have any of those records?

20   A.  I don't.

21   Q.  Now, you were asked about Prisco Najera's records, if these

22   records at Plaintiffs' Exhibit 3 or Defendants' Exhibit I

23   constitute all the weeks of his employment, and you answered

24   that they do.  Is that correct?

25   A.  I'm sorry, I don't understand the question.

1    Q.  You've testified that the Prisco Najera's records are all

2    of the weeks that he worked at Gotham Pizza?

3    A.  That's correct.

4    Q.  Isn't it possible that some of his records were either

5    misplaced or stolen, just like Wilfredo Ramirez's were?

6    A.  No.

7    Q.  Why is that not possible?

8    A.  Because I had -- I've had it on a separate piece of record,

9    privately written down, when he started, when he was

10   terminated.

11   Q.  You have a separate record other than what we've reviewed

12   in court today?

13   A.  Yes.

14   Q.  Has that record ever been provided to anyone in this case?

15   A.  No, because it was in my phone, in a note section of my

16   iPhone.  It wasn't really a hard copy.

17   Q.  Do you continue to have those notes?

18   A.  I went through about five cell phones from that time.

19   Q.  But your recollection today is that, based on those notes,

20   you know the exact dates of his employment?

21   A.  Yes; exactly what the papers show.

22   Q.  How is it that you know those dates of employment when

23   these are notes that, as you just testified, were in your phone

24   about five phones ago?

25   A.  The papers show when he started, the pay notice shows when

1  he started, and the last piece of paper shows when he was

2  terminated.

3  Q.  When was the last time you reviewed those notes to confirm

4  that that's correct?

5  A.  I'm not sure I remember when I reviewed them.

6  Q.  I direct your attention to Plaintiffs' Exhibit 24.  I know

7  you have a number of binders in front of you.

8  A.  It's this one here?

9  Q.  The one at the bottom.

10  A.  Okay.  Plaintiffs'?  This is it, right here.

11  Q.  I was asking 24.  This is 10.

12  A.  Oh.

13  Q.  At Plaintiffs' Exhibit 24, do you see that the

14  approximately first 12 pages have pay records and dates on

15  them?

16  A.  Yes.

17  Q.  And those records also don't have what you may have heard

18  referred to as Bates stamps on them; is that correct?  There's

19  no indication, there's no numbering on them that was added by

20  the attorneys in this case.  Do you see that?

21  A.  Yes.

22  Q.  And then about --

23        THE COURT:  And just for the jury's edification, where

24  would one find a Bates stamp, Counsel?  Can you ask that?

25        MR. ANDROPHY:  Sure.

G76KNAJ7                         M. Shamailov - redirect

 1   Q.  Do you see on the Bates stamps towards the bottom of the

 2   page for the first 12 or so pages?

 3   A.  No.

 4   Q.  And starting with -- do you see that, around maybe the 13th

 5   page?

 6   A.  Yes.

 7   Q.  We start having Bates stamps; is that correct?

 8   A.  Yes.

 9           MR. ANDROPHY:  Just display that.  The Bates stamp

10   refers to this notation at the bottom on this page, Najera v.

11   Gotham Pizza 000455.

12   Q.  Do you know whether --

13           THE COURT:  Is that a question?  Is that what you

14   understand counsel was referring to when he referred to a Bates

15   stamp?

16           THE WITNESS:  Yes.  It's the little --

17           THE COURT:  Thank you.

18   BY MR. ANDROPHY:

19   Q.  Do you know -- withdrawn.

20           The time records starting with that first Bates stamp

21   record, Najera v. Gotham Pizza 00455, those do not contain

22   records as to the total amount received, correct?

23   A.  That's correct.

24   Q.  Do you know if those records are from before or after the

25   records that do have the pay information?

1          MR. XUE:  Objection.

2     A.  I know that they're --

3          THE COURT:  Overruled.

4     A.  I know that they're after.

5     Q.  You know that they're after in time?  I'm not just asking

6     about the placement in the exhibit.  Your testimony is that

7     they're from after -- from a later period than the documents

8     with the pay information?

9     A.  Yes.

10    Q.  Okay.

11         The last document with pay information is dated

12    March 20th through March 26th, 2012; is that correct?

13    A.  March 20th to March 26th.

14    Q.  Do you recall when Israel Fuentes stopped working for

15    Gotham Pizza?

16    A.  It was around the end of 2012.

17    Q.  Did you hear him testify earlier today that he stopped

18    working around March 2012?

19    A.  No.

20    Q.  If he did so testify, do you think he's --

21    A.  No, I believe he testified that he ended at 2014.

22    Q.  The record will show what it is, but if he did so testify,

23    that he finished March 2012, you think he's mistaken about when

24    he finished?

25    A.  March 2012?

1    Q.   Yes.

2    A.   He's absolutely mistaken.

3    Q.   Okay.   You think that he gave an earlier date for his end

4    of employment at Gotham Pizza?

5    A.   Yes, right.

6              THE COURT:   Counsel, is this a good time to break?

7              MR. ANDROPHY:   Yes, your Honor.

8              THE COURT:   Thank you.

9              So it's 5:00 o'clock and I just wanted to give members

10   of the jury a very brief instruction, and that is:   There was a

11   reference earlier today, mid-day, about Mr. Xue being present

12   at a particular meeting in connection with an affidavit.   I'm

13   striking that testimony.   You should ignore it.   He is not a

14   witness in this case, he has no personal information with

15   respect to these events or matters, and you should absolutely

16   disregard any of that testimony or information.

17             Thank you.   And with that, I wish you a good night.

18   Please take your binders, those of you who have them, into the

19   jury room and just leave them there overnight.   Have a safe

20   trip home.

21             (Continued on next page)

22

23

24

25

1      (Jury not present)

2      THE COURT:  So we're going to deal with the

3  questionnaire, but before we get to that, there was an open

4  issue, and that was questions about the defendants' current

5  method of keeping track of payments to employees.  So I'll take

6  your objection, Mr. Xue.

7      MR. XUE:  Your Honor, I think it's not relevant to

8  this proceeding.  Your Honor, plaintiffs claim that their

9  employment terminate back in 2012 or '13, I think the latest.

10  Let me just double-check.

11      Actually, everyone claim was terminated -- every

12  plaintiff claim employment was terminated by 2013.  So we are

13  talking about three years later how they keep track of time.

14  It's not relevant to the proceeding.

15      THE COURT:  Okay.  It's a relevance argument.  I'll

16  hear from plaintiff.

17      MR. ANDROPHY:  Yes.  I think, first, Mr. Shamailov

18  brought it up.  Without prodding he said, I have a different

19  method now.  And I think it's fair for the jury to hear, since

20  he raised that issue, what his current method is.  I think it

21  has relevance even though it deals with a time that the

22  plaintiffs were not working at Gotham Pizza.  I think it does

23  go to his credibility as well as willfulness of violations that

24  occurred previously.

25      THE COURT:  In what way is it relevant to his

G76KNAJ7                          M. Shamailov - redirect

1   credibility?

2          MR. ANDROPHY:  Well, he raised this, that he has a

3   different method of recording the pay.  Whether that's true or

4   not is, I think, a matter that bears on his credibility since

5   it is something that he raised himself.

6          THE COURT:  I'm not sure I'm capturing the credibility

7   argument.  Are you saying he doesn't have a different method

8   now and, therefore, when we explore that or you explore it, we

9   will learn that he was lying to the jury when he said he has a

10  different method now?  What is the credibility argument?  I'm

11  not sure.

12         MR. ANDROPHY:  Yes, that may be the case.

13         THE COURT:  But you don't know?

14         MR. ANDROPHY:  I don't know.

15         THE COURT:  Okay.  So, unless I understand a different

16  credibility argument, I don't find that that's a ground for

17  admitting this evidence.  It's true he volunteered that he has

18  a different method now, and I do think it would be relevant to

19  the willfulness issue.  I'm going to reflect on this and I'll

20  let you know first thing in the morning.

21         Let's turn to the voir dire questions.  I'll take

22  first the plaintiffs' requests or objections with respect to

23  the sample voir dire for Plaintiff Alonso, understanding that

24  it will be replicated for each of the five plaintiffs, where

25  appropriate, of course, where the claims fit.

1              MR. ANDROPHY:  Of course.  The only issues that we

2     have is, we noticed that there were no questions about

3     providing the wage statements or wage notices.  I recall we

4     discussed that at a conference, a telephone conference, last

5     week.  My memory is not a hundred percent exactly on what

6     defendants said, if they were conceding that point or not, but

7     if they are not conceding that point, then we would request

8     that the jury be instructed to make a finding on that.

9              THE COURT:  I think there is only one plaintiff who is

10    making the claims that they did not receive the notification at

11    the beginning of employment and the paystub notification that's

12    required on a weekly basis when receiving pay.  And I think

13    Mr. Alonso is not that plaintiff.  I do have a draft verdict

14    form with those questions for the one plaintiff who is making

15    that claim.  I'd have to check your spreadsheet, but I think in

16    the spreadsheet of claims, it's only for one plaintiff that's

17    making those.

18             MR. ANDROPHY:  Your Honor, you are correct, and

19    Mr. Alonso did not have those claims.

20             THE COURT:  So the notice claim in this case is being

21    brought on behalf of Mr. Tapia only.  If you give me a minute,

22    I think I can read those questions to you, the notice

23    questions, but meanwhile, let me take any objections or

24    requests from you, Mr. Xue.

25             MR. XUE:  Your Honor, I reviewed it, and the proposed

1   verdict sheet is fine with me.  I have no objections.

2             THE COURT:  Thank you.

3             Then, as I mentioned, it takes quite a bit of work for

4   us to replicate this.  I appreciate counsel reviewing it.

5   We'll now convert this into a questionnaire for the jury for

6   all five plaintiffs.

7             Let's talk about a charging conference.  We'll have

8   the charging conference tomorrow morning at 9:00 o'clock.  I

9   can have the charge ready for you to review at 8:00 o'clock in

10  the morning or at 8:30, whichever you prefer.  We'll certainly

11  be here at 8:30.  Do you want it here at 8:00?

12            MR. XUE:  No; 8:30 is fine.

13            MR. ANDROPHY:  8:30 is fine with us.

14            THE COURT:  Okay, both plaintiff and defendant request

15  8:30.

16            I think it's likely we'll end all the testimony

17  tomorrow and have time for the defendants' summation.  How long

18  does the defendant intend his summation to take?

19            MR. XUE:  Probably about 20 minutes.

20            THE COURT:  20 minutes?

21            MR. XUE:  Yes.

22            THE COURT:  How long does the plaintiff anticipate the

23  plaintiffs' summation taking?

24            MR. ANDROPHY:  I think about the same, 20 minutes.

25            THE COURT:  Well, we may be able to get both -- I

G76KNAJ7                    M. Shamailov - redirect

1   don't know, we'll see how the time plays out -- summations in

2   tomorrow.  I'm going to see if I can confirm the time.  I'm

3   keeping track of time but I'm having my staff independently

4   keep track of time and then we compare our notes, so if I

5   haven't done that comparison yet, we'll just have Ms. Rojas

6   call you.  Wait one minute.

7            (Pause)

8            THE COURT:  I'm going to give you the time but we're

9   going to double-check this, and if it's different, I'm going to

10   have somebody leave a voicemail message for you within the next

11   hour.  We're all moving fast here, so I just want to double,

12   double, double-check this.

13            I have for the plaintiff that they've used four hours

14   and 45 minutes of their six hours and that the defendants have

15   used three hours and 26 minutes.

16            (Continued on next page)

17

18

19

20

21

22

23

24

25

G76MNAJ8

1          THE COURT:  The questions with respect to notice for

2     plaintiff Tapia are as follows:

3          Have the defendants shown that they provided Tapia

4     with written notice of his wages as required by law?  Yes, no.

5     If you answered no to question F14, indicate the number of

6     weeks for which Tapia worked for Gotham Pizza and had not been

7     provided with written notice of his wages.

8          Has Tapia shown that the defendants failed to provide

9     Tapia with pay stubs as required by law?  Yes, no.  If you

10    answered yes, indicate the number of weeks for which Tapia

11    worked for Gotham Pizza and was not provided with pay stubs.

12         Those are the series of questions on notice.  Did they

13    seem ok to the plaintiff?

14         MR. ANDROPHY:  Yes.  They seem acceptable to

15    plaintiff.

16         THE COURT:  Mr. Xue, do they seem ok to you?

17         MR. XUE:  Yes, your Honor.  I believe the claimed

18    duration of employment, there was some months that the New York

19    Labor Law did not require the pay notice.  I will doublecheck

20    when I go back tonight.  I don't think that the entire

21    duration, the notice requirement is applicable to the entire

22    duration.

23         THE COURT:  There are really two notice issues here.

24    One is a notice at the beginning of employment.  A second

25    notice is essentially giving a statement to the employee to

G76MNAJ8

1    keep each time they are paid that describes the calculation and

2    the amount that they are being paid, among other things.  And

3    Mr. Xue as I understand it, wants to check whether New York

4    Labor Law requirements in these two respects apply during the

5    entire period of employment for Mr. Tapia.

6              Do I understand you correctly, Mr. Xue?

7              MR. XUE:  That's correct, your Honor.

8              THE COURT:  Are you making that point with respect to

9    both notice requirements or only one?

10             MR. XUE:  I believe only the first one involving the

11   initial notice of pay rate.

12             THE COURT:  Good.  We will doublecheck that, when that

13   law went this to effect and whether it coincides with

14   Mr. Tapia's testimony about the dates of his employment, and I

15   know you will check that, too.  Thank you very much.

16             Is there anything else we need to do before we part

17   today?

18             MR. ANDROPHY:  Does your Honor plan to have trial on

19   Friday?

20             THE COURT:  Yes.

21             MR. ANDROPHY:  I just wanted to confirm that that's

22   the case.

23             THE COURT:  That's the notice I gave counsel last

24   week, that we would be sitting Friday.  Either we will have

25   some summations fold over into Friday or not, depending on how

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

G76MNAJ8

1    smoothly tomorrow goes, but certainly it looks like the jury

2    charge will be given Friday morning and then the jury will be

3    permitted to deliberate during the day.

4            I have a busy calendar for the afternoon, but I'll

5    give priority, of course, to any jury notes if the jury is

6    deliberating.

7            Mr. Xue, did you have any issues you wish to raise

8    today?

9            MR. XUE:  No, your Honor.

10           THE COURT:  Thank you so much.  Enjoy your evening.

11           (Adjourned to Thursday, July 7, 2016, at 9:00 a.m.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

<pre>
 1                        INDEX OF EXAMINATION

 2     Examination of:                           Page

 3     ELEUTERIO ALONSO CHABLE

 4     Direct By Mr. Androphy . . . . . . . . . . . 142

 5     Cross By Mr. Labuda  . . . . . . . . . . . . 143

 6     WILFREDO RAMIREZ

 7     Direct By Mr. Clark  . . . . . . . . . . . . 156

 8     Cross By Mr. Xue . . . . . . . . . . . . . . 162

 9     AURELIONO TAPIA

10     Direct By Mr. Androphy . . . . . . . . . . . 167

11     Cross By Mr. Xue . . . . . . . . . . . . . . 190

12     Redirect By Mr. Androphy . . . . . . . . . . 204

13     ISRAEL FUENTES

14     Direct By Mr. Androphy . . . . . . . . . . . 205

15     Cross By Mr. Xue . . . . . . . . . . . . . . 221

16     LANA SHAMAILOV

17     Direct By Mr. Androphy . . . . . . . . . . . 232

18     Cross By Mr. Xue . . . . . . . . . . . . . . 241

19     MICHAEL SHAMAILOV

20     Direct By Mr. Androphy . . . . . . . . . . . 243

21     Cross By Mr. Xue . . . . . . . . . . . . . . 264

22     Redirect By Mr. Androphy . . . . . . . . . . 295

23                      PLAINTIFF EXHIBITS

24     Exhibit No.                            Received

25      10    . . . . . . . . . . . . . . . . . . 171
</pre>

24 . . . . . . . . . . . . . . . . 210
4 . . . . . . . . . . . . . . . . . 255
5 . . . . . . . . . . . . . . . . . 258
6 . . . . . . . . . . . . . . . . . 259
7 . . . . . . . . . . . . . . . . . 260
9 . . . . . . . . . . . . . . . . . 261
11 . . . . . . . . . . . . . . . . 261
12 . . . . . . . . . . . . . . . . 261
21 . . . . . . . . . . . . . . . . 263
22 . . . . . . . . . . . . . . . . 263

                    DEFENDANT EXHIBITS

Exhibit No.                          Received

PP . . . . . . . . . . . . . . . . . 165
YY . . . . . . . . . . . . . . . . . 185
I . . . . . . . . . . . . . . . . . 223
XX . . . . . . . . . . . . . . . . . 295